## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HEALTHY TEEN NETWORK
1501 St. Paul St., # 124
Baltimore, MD  21202


     Plaintiff,


v.

                                      Civil Action No. 1:18-cv-468

ALEX M. AZAR II, in his official capacity as
SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC  20201,

     and

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Ave. SW
Washington, DC  20201


     Defendants.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

This is an action pursuant to the Administrative Procedure Act ("APA")

challenging the U.S. Department of Health and Human Service's ("HHS") unlawful

termination of a five-year teen pregnancy prevention program grant award to Plaintiff

Healthy Teen Network three years into the program.

In 2010, Congress created the Teen Pregnancy Prevention ("TPP") Program to

bring a rigorous, evidence-based focus to developing, studying, and replicating effective

teen pregnancy prevention and adolescent health programs.  Lauded by medical groups and HHS itself as contributing to sharp declines in teen pregnancy since its creation, and hailed as a "poster-child" for evidence-based policy, the TPP Program has been an unqualified success.  In July 2017, however, following appointment of opponents of evidence-based programs, HHS informed all 81 TPP Program grantees that it was terminating the Program two years early.  While no reason for the decision has been provided to the grantees, HHS officials have publicly offered shifting *post hoc* explanations, ranging from the unsupported claim that the grantee programs are ineffective to baldly asserting that the Congressionally-mandated TPP Program is not in line with the President's proposed budget.  Even if they could be credited, none of these explanations provides a basis for termination under HHS's own regulations.  And, none of them permits HHS to thwart the mandates of Congress.

The grantees affected include Healthy Teen Network, a Baltimore-based, national non-profit that builds capacity among adolescent health professionals and organizations to promote better health outcomes for teens.  In July 2015, Healthy Teen Network was awarded a five-year grant under the TPP Program to conduct a randomized control trial to test Pulse, a new, web-based, bilingual English/Spanish mobile app that provides medically accurate, age-appropriate sexual and reproductive health information.  During the first two years of the grant, including just a few weeks before the grant was terminated, HHS praised Healthy Teen Network for the quality of its study and innovation, highlighting Healthy Teen Network's work in its publications and conferences.  HHS's about-face has transformed the nature of Healthy Teen Network's

study, causing Healthy Teen Network to drastically shorten the evaluation period and abandon the Spanish-language portion of the project.

HHS's actions were arbitrary, capricious, and contrary to law, and they have harmed and continue to harm Healthy Teen Network and those served through the grant. Accordingly, HHS's premature termination of Healthy Teen Network's grant and its related denial of carry-over funds (*i.e.*, funds not used in the prior year of the grant) should be set aside and HHS should be required to solicit and process Healthy Teen Network's application for continued year four funding.

## Jurisdiction and Venue

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

2.      Venue is proper under 28 U.S.C. § 1391(e).  Defendants are an agency of the United States and an official of the agency sued in his official capacity and Plaintiff resides in this district.

## Parties

3.      Plaintiff Healthy Teen Network is a non-partisan, non-profit organization that for more than thirty years has worked on a national level to promote better outcomes for adolescents and young adults by advancing social change, cultivating innovation, and strengthening youth-supporting professionals and organizations.  Located in Baltimore, Maryland, Healthy Teen Network promotes and supports unique and holistic programming to improve the health and well-being of young people.

4.      Defendant Alex M. Azar II is the Secretary of HHS.  He is sued in his official capacity.

5.     Defendant HHS is a federal agency headquartered in Washington,

D.C.  HHS administers the Teen Pregnancy Prevention Program, including Healthy Teen

Network's grant, which is the subject of this action.

## Background

### *The Health Risks of Teen Pregnancy to Mother and Child*

6.     Approximately one in four teenaged women in the United States will

become pregnant before the age of 20.[1]  While the rate of teen pregnancy in the United

States has declined over in recent decades, it remains higher than that of other

industrialized countries.[2]

7.     The vast majority of teen pregnancies are unintended—that is, pregnancies

in which the mother has said that she did not intend or want to become pregnant.[3]

8.     Teen pregnancy is linked to a variety of major social concerns such as

poverty and poor outcomes for child well-being, health, and education.[4]

9.     For example, only 38% of women who bear children during their teenage

years receive a high school diploma;[5] teen mothers are more likely to live in poverty and

rely on government assistance than mothers who delay childbearing until past their teen

---

[1] Power to Decide [formerly The National Campaign to Prevent Teen and Unplanned Pregnancy], *Fast Facts: Teen Pregnancy in the United States* (Apr. 2016), https://powertodecide.org/what-we-do/information/resource-library/fast-facts-teen-pregnancy-united-states (citing data from the Centers for Disease Control).
[2] Guttmacher Institute, New Release: Teen Pregnancy Rates Declined in Many Countries Between the Mid-1990s and 2011; United States Lags Behind Many Other Developed Nations (Jan. 23, 2015), https://www.guttmacher.org/news-release/2015/teen-pregnancy-rates-declined-many-countries-between-mid-1990s-and-2011.
[3] Perper, K., Peterson, K., & Manlove, J., *Diploma attainment among teen mothers* (Fact Sheet #2010-01) (2010); Power to Decide, *Why It Matters*, https://powertodecide.org/what-we-do/information/why-it-matters.
[4] *Id.*; Hotz, V. J., McElroy, S. W., & Sanders, S. G., *Teenage Childbearing and Its Life Cycle Consequences*. The Journal of Human Resources, XL (3), 683-715 (2005).
[5] *Id.*

4

years;[6] and children born into poverty are at greater risk for health issues and delays in educational advancement.[7]

10.     Teen mothers are also nearly twice as likely to forgo critical prenatal care in the first trimester of their pregnancies, which creates medical risks to child well-being.[8]  Teens have a higher risk of developing certain health problems during pregnancy (such as high blood pressure or anemia) than do older women.[9]  Pregnant teens are also more likely to experience preterm birth.  The risks are even higher for teenage women who are younger than 15 years old and for those who do not receive any prenatal care.[10]

11.     These issues are especially pronounced in rural areas, where the teenage birth rate is almost 33% higher than in the rest of the country due to lack of access to health clinics, contraception, and counseling resources.[11]

### *Federal Support for Evidence-Based Teen Pregnancy Prevention Initiatives and the Creation of the Teen Pregnancy Prevention Program*

12.     Until 2010, most federal funding for teen pregnancy prevention was disbursed without regard to whether the funded initiatives were proven to be effective.

---

[6] *Id.*; Osofsky, J. D., Hann, D. M., & Peebles, C., *Adolescent Parenthood: Risks and Opportunities for Mothers and Infants*, in C. H. Zeanah (Ed.), Handbook of Infant Mental Health (1st ed. 1993, pp. 106-119).

[7] National Campaign to Prevent Teen and Unplanned Pregnancy, *Why It Matters*: *Teen Childbearing, Education, and Economic Wellbeing* (July 2012), https://thenational campaign.org/sites/default/files/resource-primary-download/childbearing-education-economicwellbeing.pdf.

[8] National Campaign to Prevent Teen and Unplanned Pregnancy, *Why It Matters: Teen Childbearing and Infant Health* (Oct. 2012), https://thenationalcampaign.org/sites/default/files/resource-primary-download/childbearing-infant-health.pdf.

[9] The American College of Obstetricians & Gynecologists, *Having a Baby (Especially for Teens) Frequently Asked Questions for Teens* (Apr. 2015), https://www.acog.org/Patients/FAQs/Having-a-Baby-Especially-for-Teens.

[10] *Id.*

[11] Laura Santhanam, *Why Is the Teen Birth Rate So Much Higher in Rural Areas?*, PBS News Hour (Nov. 16, 2016, 10:28 AM), https://www.pbs.org/newshour/health/teen-birth-rate-higher-rural-areas.

Little funding supported research on the efficacy of teen pregnancy prevention programs. And the evidence that did exist failed to show that programs receiving funding were delivering on their promises to reduce teen pregnancy, delay sexual intercourse, or prevent other sexually risky behaviors.[12]

13.     The lack of funding for evidence-based teen pregnancy prevention programs led the medical, public health, and scientific communities to call for federal funding for evidence-based interventions and new and innovative approaches to address teen pregnancy.

14.     To address that gap in funding, Congress in 2010 created the TPP Program "to fund medically accurate and age appropriate programs that reduce teen pregnancy."[13]

15.     The TPP Program is administered by HHS through the Office of Adolescent Health ("OAH") and overseen by the Office of the Assistant Secretary of Health.[14]

16.     Heralded as a "poster child" for evidence-based policy,[15] the TPP Program is designed to fund teen pregnancy prevention interventions that have been proven by the results of a rigorous evaluation to be effective.  TPP is funded to expand proven effective programs at the community level, to test such programs with new populations and adapt

---

[12] Sexuality Information and Education Council of the United States, *A Brief History of Federal Funding for Sex Education and Related Programs*, http://www.siecus.org/index.cfm?fuseaction=page.viewPage&pageID=1341&nodeID=1.
[13] Consolidated Appropriations Act, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2010), https://www.gpo.gov/fdsys/pkg/PLAW-111publ117/html/PLAW-111publ117.htm.
[14] *Id.*
[15] Valerie Strauss, *Trump Administration Cuts Funding for Teen Pregnancy Prevention Programs*, Wash. Post (Sept. 7, 2017), https://www.washingtonpost.com/news/answer-sheet/wp/2017/09/07/trump-administration-cuts-funding-for-teen-pregnancy-prevention-programs-here-are-the-serious-consequences/?utm_term=.cf94ab0a8063.

them as required, and to develop and test new and innovative approaches using modern day technologies.

17.     The TPP Program focuses on proven results rather than ideological preferences.  It promotes curricula and other interventions that are scientifically proven to be effective and provides funds to study and evaluate new interventions in order to build a body of resources for evidence-based policy.  While some progressive advocates preferred the federal government to simply fund comprehensive sex education and contraception and some conservative advocates preferred an "abstinence-only-until marriage" approach, the TPP Program's approach was unique: instead of advancing a particular political ideology, it posited that reliance on science and data would ultimately better address social needs and be a more effective use of government resources.[16]

18.     Many of the programs embraced by OAH and funded through the TPP Program include abstinence as part of a more comprehensive approach to sexual health and education.  And a few of the TPP Program grants specifically emphasize abstinence because the particular characteristics of those projects met the rigorous standards for funding.  Through funding evidence-based approaches and studies based in scientific principle, the TPP Program has been described as providing "a library of proven choices from which communities can decide which best meets their needs."[17]  Put simply, the TPP Program funds interventions that are shown to effectively address teen pregnancy and/or that study new science-based methods, as opposed to funding programs based on political ideology.

---

[16] Charles Homer, *Teenage Pregnancy Prevention Is The Latest Front In The War On Science*, HealthAffairs: Health Affairs Blog (Aug. 18, 2017, 10:13 AM), https://www.healthaffairs.org/do/10.1377/hblog20170818.061589/full/.
[17] Strauss, *supra* note 15.

19.     Since the TPP program's creation in 2010, teen pregnancy rates have

declined at an increasing rate and many—including OAH itself—have cited the TPP

Program as contributing to this trend.

20.     In creating the TPP Program, Congress appropriated over $100 million

and directed HHS to fund programs and studies as follows:

> $110,000,000 shall be for making competitive contracts and grants to
> public and private entities to fund medically accurate and age appropriate
> programs that reduce teen pregnancy and for the Federal costs associated
> with administering and evaluating such contracts and grants, of which not
> less than $75,000,000 shall be for replicating programs that have been
> proven effective through rigorous evaluation to reduce teenage pregnancy,
> behavioral risk factors underlying teenage pregnancy, or other associated
> risk factors, of which not less than $25,000,000 shall be available for
> research and demonstration grants to develop, replicate, refine, and test
> additional models and innovative strategies for preventing teenage
> pregnancy, and of which any remaining amounts shall be available for
> training and technical assistance, evaluation, outreach, and additional
> program support activities: Provided further, That of the amounts provided
> under this heading from amounts available under section 241 of the PHS
> Act, $4,455,000 shall be available to carry out evaluations (including
> longitudinal evaluations) of teenage pregnancy prevention approaches.[18]

21.     In April 2010, OAH issued two Funding Opportunity Announcements

("FOAs") related to the TPP Program.  One FOA sought applications for Tier 1 grant

projects that were designed to replicate program models that had demonstrated positive

impact on key sexual behavioral outcomes, including reduction of teen pregnancy and

delay of sexual activity.  The other FOA sought applications for Tier 2 grant projects that

were designed to develop and rigorously test new and innovative approaches to prevent

teen pregnancy.[19]

---

[18] Consolidated Appropriations Act, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2010).
[19] Teenage Pregnancy Prevention (TPP): Research and Demonstration Programs and
Personal Responsibility Education Program (PREP); Funding Opportunity
Announcement and Application Instructions, http://wayback.archive-

22.     The FOAs for both Tier 1 and Tier 2 grant projects specified that the projects would be funded for a five-year grant period.[20]  The FOAs instructed applicants to, among other things, "provide a detailed five-year work plan and a timetable for the first year of the project" and to "create a logic model that provides an overview of the entire program for the five years of the cooperative agreement."[21]  The FOAs for both Tier 1 and Tier 2 grant projects specified that the projects would be funded for a five-year grant period.[22]

23.     Between FY 2010 and FY 2014, OAH funded 102 grantees through competitively awarded grants as part of the TPP Program.  The grantees' projects reached more than half a million young people in 39 states and the District of Columbia.  The grantees also trained a combined 6,100 facilitators, created 3,800 community partnerships, and funded over 40 rigorous evaluation studies to identify the factors that contribute to the effectiveness of specific programs.[23]

---

it.org/3909/20140324182152/http://www.hhs.gov/ash/oah/ grants/assets/funding_announcement_04012010.pdf [hereinafter "April 2010 Tier 1 FOA"]; Evelyn M. Kappeler and Amy Feldman Farb, *Historical Context for the Creation of the Office of Adolescent Health and the Teen Pregnancy Prevention Program*, J. ADOLESCENT HEALTH, 54, S3-S9 (2014).

[20] Teenage Pregnancy Prevention (TPP): Research and Demonstration Programs and Personal Responsibility Education Program (PREP); Funding Opportunity Announcement and Application Instructions, http://wayback.archive-it.org/3909/20140324182152/http://www.hhs.gov/ash/oah/grants/assets/funding_announcement_04012010.pdf [hereinafter "April 2010 Tier 1 FOA"]; April 2010 Tier 2 FOA.

[21] *Id.*

[22] *Id.*

[23] Office of Adolescent Health, HHS, *Results from the OAH Teen Pregnancy Prevention Program*, https://www.hhs.gov/ash/oah/sites/default/files/tpp-cohort-1/tpp-results-factsheet.pdf.

*OAH Awards Additional Five-Year Teen Pregnancy Prevention Program Grants*

24.    Since the first group of TPP Program grants was competitively awarded, Congress has continued to appropriate funds for the TPP Program through formal appropriations bills and continuing budget resolutions.

25.    To both extend the reach of existing evidence-based teen pregnancy prevention approaches to at-risk populations and to develop new interventions, OAH issued new FOAs in January 2015 requesting applications for a second cohort of competitive, five-year grants (collectively, the "2015 FOAs").  The 2015 FOAs announced various types of available awards, including for programs that provide capacity-building assistance to replicate evidence-based TPP programs in defined service areas with demonstrated needs (known as Tier 1A grants) and for programs to replicate evidence-based TPP programs to scale in communities with the greatest need (known as Tier 1B grants).

26.    The 2015 FOAs also announced awards for programs intended to "increase the number of evidence-based TPP interventions available by rigorously evaluating new or innovative approaches for preventing teen pregnancy and related risk behaviors."[24]  Per the Tier 2B FOA, these Tier 2B grants were designed to address gaps in the existing evidence and reduce adolescent sexual and reproductive health disparities,"[25] particularly in populations, including older teens and Latino/Hispanic

---

[24] Office of Adolescent Health, Rigorous Evaluation of New or Innovative Approaches to Prevent Teen Pregnancy (Tier 2B) https://www.hhs.gov/ash/oah/sites/default/files/tier2b-foafile.pdf [hereinafter "Tier 2B FOA"].
[25] *Id.*

youth, that are "at disproportionate risk for teen pregnancy" and "where limited evidence-based TPP programs [are] currently available."[26]

27.     The Tier 2B FOA also made clear that "many of the evidence-based TPP programs identified by the HHS TPP evidence review were created more than a decade ago" such that "many do not address the role of technology or use technology for program delivery"; accordingly, grants awarded under this FOA were to be directed towards "[i]nterventions which incorporate technologies, such as internet and social media, [that] have strong potential to reach teens of diverse racial, ethnic and socio-economic backgrounds."[27]

28.     The Tier 2B FOA announced that OAH would fund approximately $18 million for Tier 2B grants.

29.     Due to the "substantial programmatic involvement . . . anticipated between OAH and the grantee during performance of the project," the Tier 2B FOA specified that the grants would be funded "in the form of a five-year cooperative agreement with the grantee" under which OAH, among other things, would review all implementation and evaluation plans as well as "all program materials prior to use in the project to ensure the materials are medically accurate and complete."[28]

30.     The Tier 2B FOA established "five-year project period[s]" and one-year "budget periods" for the grants, meaning that for each of the five grant years, the recipient would be required to submit a "[n]on-competing [c]ontinuation [a]pplication," consisting of a "progress report for the current budget year, and work plan, budget and

---

[26] *Id.*
[27] *Id.*
[28] Tier 2B FOA.

budget justification for the upcoming year."  The Tier 2B FOA further stated that funding

for these subsequent years "is generally level with the initial award amount and is

contingent upon the availability of funds, satisfactory progress of the project, and

adequate stewardship of Federal funds."

31.     Grounds for termination of grants awarded under the program were

limited to a grantee's failure to (1) "meet major milestones as required/defined by OAH";

(2) "receive OAH approval for their evaluation plan by the end of year one"; (3)

"complete planning year milestones and receive OAH approval to begin implementation

and evaluation of the intervention no later than 12 months after receipt of funding"; or (4)

"collect and report on the full set of performance measures at any time during the grant

cycle."[29]

32.     The Tier 2B FOA set forth detailed evaluation and review criteria for grant

applicants.  The proposals were to be scored by an independent panel consisting of

experts in teen pregnancy prevention drawn from academic institutions, non-profit

organizations, state and local government, and other federal agencies.

33.     In response to the 2015 FOA for the Tier 2B grant, Healthy Teen Network

proposed a five-year randomized control trial to test Pulse, a web-based, bilingual

English/Spanish mobile app that provides medically accurate, age-appropriate sexual and

reproductive health information through text and graphics, self-assessments, and racially

diverse videos and films that promote birth control use, clinic utilization, and

communication with a partner.

---

[29] Tier 2B FOA.

34.     Healthy Teen Network proposed to use social media to recruit 1,500
primarily Black and Latina young women aged 18-19, located in geographically diverse
locations nationwide, to complete a baseline survey to assess their knowledge and
behaviors concerning use of contraception, clinic access, and protection from sexually
transmitted infections.  Participants would then be given access for up to six months to
either the English-language version of the Pulse app or a control app containing general
health and fitness information.  To discern the impact of Pulse, surveys would be
administered 6 weeks and 6 months following the baseline survey.  In the later years of
the grant, Healthy Teen Network proposed to similarly study the efficacy of the Spanish-
language version of Pulse.

35.     On July 1, 2015, OAH awarded Healthy Teen Network a five-year, $3.6
million grant, with $723,000 to be awarded annually, as outlined in the Cooperative
Agreement between OAH and Healthy Teen Network.

36.     Reviewers found that Healthy Teen Network's proposal did "an
exemplary job in addressing medical accuracy (review by clinicians and a CDC Lead
Medical Officer), age, cultural and linguistic appropriateness (Black and Latina girls
were involved in content review and decisions)"; that "the team has conducted impressive
formative work in developing the intervention"; and that the "web-based intervention is
quite innovative, and with its targeting of older African-American and Latina teen girls, it
fills an important gap in the list of" evidence-based programs.

37.     On July 6, 2015, Healthy Teen Network received a letter of
congratulations from OAH Director Evelyn Kappeler stating that the office was looking
"forward to working with [Healthy Teen Network] over the next five years to support

13

[its] project and ensure [its] continued success."  Ms. Kappeler also stated that the five-year grants awarded by OAH for all TPP programs would serve 290,000 youth annually and 1.2 million youth over the entire grant period in 38 states and the Marshall Islands.[30]

38.     The Notice of Award and Cooperative Agreement received by Healthy Teen Network along with Ms. Kappeler's letter established a five-year project period for the $3.6 million award spanning from July 1, 2015 to June 30, 2020.  Healthy Teen Network's Award fully funded the grant for the first year and indicated the exact amount of funding for each subsequent grant year, noting only that this "recommended future support" was "[s]ubject to the availability of funds and satisfactory progress of the project."[31]

39.     Healthy Teen Network also received two subawards:  The first was an award that averaged $100,000 annually to increase capacity and provide training in support of a 5-year, $8.75 million Tier 1B grant to the Baltimore City Health Department to implement an OAH-approved, evidence-based sexual health curriculum for more than 10,000 middle and high school students throughout Baltimore in an effort to decrease the city's overall teen birth rate by 30% and to reduce birthrate disparities among Black and Latino teens.  The second was an award that averaged $13,000 annually to increase capacity and provide training and technical assistance in support of a 5-year, $3.5 million Tier 1A grant awarded to the South Carolina Campaign to Prevent Teen Pregnancy to assist 16 youth organizations in providing OAH-approved, evidence-based programming to teens in juvenile justice or foster care.

---

[30] Letter from OAH Director Evelyn Kappeler to Healthy Teen Network (July 6, 2015).
[31] Notice of Award, dated July 1, 2017.

14

40.     In 2015, HHS convened a conference in Washington, D.C. for all the Tier 2B grantees at which it announced that Mathematica Policy Research would be providing technical assistance to the grantees on study design to ensure that grantees' ultimate evaluations would meet rigorous evidence review standards.

### *The Early Work and Success of Healthy Teen Network's TPP Program Evaluation Project*

41.     Following receipt of its award from OAH, Healthy Teen Network proceeded with content development and medical accuracy screening for Pulse and developed and launched a social media campaign to recruit participants for the study.

42.      Healthy Teen Network has received numerous commendations in its reviews by OAH.  For example, OAH praised Healthy Teen Network for a "job well done" and "continued excellence" in year one and, subsequently, for "activities focused on the rigorous evaluation plan including continued recruitment of youth participants, evaluation implementation monitoring, data collection protocols, and performance measures monitoring and input."

43.     To the extent these reviews included recommendations for improvements moving forward, Healthy Teen Network took steps to address them.

44.     Healthy Teen Network complied with all program requirements throughout the grant.

### *HHS's Abrupt Termination of Healthy Teen Network's TPP Program Grant*

45.     In April 2016, Healthy Teen Network submitted a non-competing continuation application for the second year of the grant.

46.     OAH made a second award of $723,000 to Healthy Teen Network in July 2016 for the Pulse study.  Healthy Teen Network also continued to receive payments on the subawards during year two of the grant.

47.     On October 17, 2016, Healthy Teen Network was awarded an additional $62,629 in carry over funding to use in year two of the Pulse grant.

48.     OAH continued to support the TPP Program grants during 2016 and the first half of 2017.  On April 26, 2017, for example, in honor of Teen Pregnancy Prevention Month, HHS touted "TPP grantees work to reach young people in greatest need using evidence-based/innovative strategies."  OAH also held numerous conferences and workshops during this period aimed at supporting the grants, and advising grantees about their projects.

49.     OAH also praised Healthy Teen Network's work on the Pulse study during this period.  In July 2016, at OAH's invitation, Healthy Teen Network presented at HHS's Teen Pregnancy Prevention Conference on the topic of "Taking Sexual Health Research to the Mobile World."  OAH continued to commend Healthy Teen Network's Pulse project during 2017.  In a May 19, 2017 review, OAH recognized that Healthy Teen Network's "activities focusing on program evaluation appear to appropriately align with the current approved evaluation plan" and "balance nicely between ensuring quality program development and ensuring the evaluation will maintain its rigor."  Indeed, in May 2017, OAH widely circulated a report lauding Healthy Teen Network for its "success with targeted recruiting using social media for its evaluation of Pulse."

50.     During this time, preparations were well underway by OAH to fund the grants for year three in support of the full five-year projects.  In April 2017, Healthy Teen

Network submitted a non-competing continuation application for the third year of the grant; it also conferred with career staff at OAH regarding the trajectory of its study, carrying funding over from the second year to the third year, and plans for the fourth and fifth years of the grant.

51.     Yet, OAH's recently appointed political leadership had other plans, shifting the agency's course dramatically.

52.     On June 5, 2017, Valerie Huber was appointed to serve as Chief of Staff in the office of the Assistant Secretary of Health at HHS, the office that oversees OAH.  Ms. Huber is a longtime opponent of the TPP Program, which she now oversees, and her appointment followed the appointment of other opponents of evidence-based programs to key positions at HHS.

53.     Prior to serving at HHS, Ms. Huber was the president of Ascend, formerly known as the National Abstinence Education Association, an association that promotes abstinence-only-until-marriage (often referred to as "sexual risk avoidance") education. Researchers at Case Western Reserve University found that the sexual education programs Ms. Huber ran when she served in state government in Ohio provided "false and misleading information," perpetuated "destructive, inaccurate gender stereotypes," and presented "religious convictions as scientific fact."  One curriculum said that teenagers who have sex before marriage should "be prepared to die."[32]

54.     When interviewed regarding a study published in the widely-respected Journal of Adolescent Health that attributed the recent decline in teen pregnancy rates to

---

[32] Laura Lindberg, John Santelli, & Sheila Desai, *Understanding the Decline in Adolescent Fertility in the United States, 2007-2012,* http://www.jahonline.org/article/S1054-139X(16)30172-0/pdf.

increased access and use of contraception, Ms. Huber discounted the study as "biased" toward birth control.[33]

55.     Following Ms. Huber's appointment, Healthy Teen Network criticized the Trump Administration for the appointment of someone who has a history of disregarding evidence-based findings in favor of her own personal biases.  For example, in a public statement on June 9, 2017 following Ms. Huber's appointment, Healthy Teen Network noted that Ms. Huber "has promoted programs and policies that are ineffective, lack any scientific groundings, and instill fear through medically inaccurate information."  Healthy Teen Network's statement also expressed concern that Ms. Huber's commitment to abstinence-until-marriage education reflects "limited religious values and views that cannot be considered even remotely universal values and fail to support our young people and prepare them to be healthy adults who can participate and contribute to our society."

56.     On July 6, 2017, within a few weeks of Ms. Huber's appointment at HHS and Healthy Teen Network's public and open criticism thereof, Healthy Teen Network received a Notice of Award for year three stating that "[t]his award also shortens the project period to end on June 30, 2018 at the end of this budget year."  The Award also advised of "closeout requirements" due to the fact that the grant was suddenly in its "final project period."

57.     The Baltimore and South Carolina grants of which Healthy Teen Network was a subgrantee were also terminated prematurely.

---

[33] Julie Royner Kaiser, *Drop in Pregnancies Is Due to More Contraceptives, Not Less Sex*, PBS Newshour (Sept. 2, 2016)*, https://www.pbs.org/newshour/health/teen-pregnancies-contraceptives-less-sex.

58.     At no time was Healthy Teen Network provided any explanation by the agency for the termination of its grant.  Ms. Kappeler held an informal webinar for grantees shortly after the termination, but did not provide any particular explanation as to why HHS terminated the grants.  During the webinar, Ms. Kappeler did note that despite the terminations, OAH was at work on guidance concerning requests to carry over funds unused from year two of the grant and instructed grantees to submit such requests as soon as possible.

59.     Career employees at OAH previously working to support the grants expressed surprise that the grants were terminated.

60.     According to news accounts, several grantees were told that the decision came from Ms. Huber's office.

61.     Following the grant terminations, Healthy Teen Network's President and CEO Patricia Paluzzi was particularly outspoken, repeatedly criticizing the agency's action in interviews for multiple television, online, and print media outlets.  For example, Dr. Paluzzi was quoted in a July 14, 2017 *Reveal Magazine* article stating that the Administration does not "like to deal with the sexual reproductive health of teens" and that "[p]ublic health issues shouldn't be political issues."  And in a column by Dr. Paluzzi that appeared in *Cosmopolitan* four days later, she said that the terminations were also "out of character for an administration that claims to want to reduce government waste" because "[e]nding a project two years early means research findings are incomplete and sustainability is lost, rendering the dollars spent to date a loss."  Dr. Paluzzi also stated that the grant terminations were rooted in "ideology"—namely, the fact that those in HHS's political leadership have been "strong opponents of

comprehensive sexual education and contraceptive services, and vehement proponents of abstinence-only education"—and implored *Cosmopolitan*'s readership to call upon their legislators to "demand that the Trump administration not play politics with the lives of teens."[34]

62.    In August 2017, Healthy Teen Network was advised by an agency employee that there would be no use in appealing its grant termination.

63.    Even after the grant termination, employees for Healthy Teen Network continued ongoing discussions with career employees at OAH about applying for carry over funding for year three and the role such funding would play in the completion of the Pulse project.

64.    On August 1, 2017, Healthy Teen Network submitted a request to carry over $51,213 in unused funds from year two into year three.

65.    On August 7, 2017, consistent with Ms. Kappeler's instruction during the webinar, OAH again notified grantees that they could request to carry over unused funds.

66.    On September 26, 2017, Healthy Teen Network received a letter from the HHS's Office of Grants Management denying the organization's request for carry over funds as "not necessary for successful project completion."  The denial of carry over funds followed statements by Healthy Teen Network and other grantees criticizing, among other things, HHS officials for terminating the TPP grants prematurely.

67.    Also in late September 2017, OAH notified grantees that they would no longer be receiving technical and evaluation support from Mathematica.

---

[34] Patricia Paluzzi, *Trump Administration Is Playing Politics with Teenagers' Lives*, Cosmopolitan (Jul. 19, 2017), http://www.cosmopolitan.com/author/208319/patricia-paluzzi/.

68.     HHS's abrupt decision to eliminate funding for Healthy Teen Network and other grantees was made outside the traditional federal budget process and is directly contrary to the TPP Program's appropriations statute.  Congress has continued to fund the TPP Program through annual appropriations that specifically mandate funds to be used for, among other things, "competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy."

69.     Congress has not yet passed an appropriation for FY 2018, but has continued to fund the TPP Program through a series of continuing budget resolutions.

### *HHS's Shifting Public Explanations for Terminating TPP Program Grants*

70.     HHS has not provided an explanation to Healthy Teen Network for the termination of its grant.  When HHS has publicly addressed the grant terminations at large, it has given shifting explanations, stating, for example, that there was "strong evidence of negative impact or no impact" by the funded projects—a purported rationale that is contradicted by the agency's own evidence and is particularly irrational as applied to Tier 2B grants, as the whole purpose of these grants was to test the impact of new innovative approaches.

71.     Other agency officials, such as HHS spokeswoman Diane Gianelli, have claimed that the cuts to the TPP Program are related to the President's FY 2018 Budget. In an email to the *LA Times*, Ms. Gianelli stated "the President's FY 2018 Budget eliminated funding for the Teen Pregnancy Prevention Program, so our grants office informed the grantees of their June 30, 2018 end date, to give them an opportunity to adjust their programs and plan for an orderly closeout."  Not only does this explanation differ from the other public explanations provided by the agency, but it also ignores that

21

the President's budget proposal is merely a *proposal* and has not been enacted by Congress.  Congress continues to fund the TPP Program, notwithstanding the President's request that it not do so.

72.   At the same time, OAH has continued to herald Healthy Teen Network, and the results of the TPP Program more generally.  In a November 9, 2017 review, OAH commended Healthy Teen Network for an "excellent job at maintaining a high level of quality in the [Pulse] app programming." In OAH's Annual Report released in November 2017, the agency touted the TPP Program for having "more than tripled the number of youth served in 2017 compared to 2016, reaching 213,000 young people with evidence-based and evidence-informed teen pregnancy prevention programs" and as "a model of a Federal program developing increasingly rigorous portfolios of evidence."

73.   Also in November 2017, HHS announced that it was directing approximately $10 million in funds for "new research and evaluation collaboration to support and improve teen pregnancy prevention and sexual risk avoidance programs" within HHS.[35]

### HHS's Abrupt and Unexplained Termination of the Grant Has Injured and Continues To Injure Healthy Teen Network and the Populations It Serves

74.   OAH's decision to abruptly cut funding for the 81 TPP Program grantees jeopardizes the well-being of individuals throughout the United States.  It has been criticized by members of Congress, the medical community, and numerous community advocates.  For example, in a letter to then-Secretary of HHS, Tom Price, 37 Senators

---

[35] Press Release, HHS, HHS Announces New Efforts to Improve Teen Pregnancy Prevention & Sexual Risk Avoidance Programs (Nov. 6, 2017), https://www.hhs.gov/ash/oah/news/news-releases/new-sexual-risk-avoidance-programs/index.html.

stated that the action is "short-sighted and puts at risk the health and well-being of women and our most vulnerable youth who depend on the evidence-based work that TPP Program grantees are doing across the nation."[36]  The letter further noted that "[t]he TPP Program is making a vital contribution to building a body of knowledge of what works to prevent teen pregnancy."[37]  Additionally, the American College of Obstetricians and Gynecologists has called HHS's actions "a step backward for ensuring healthy moms and healthy babies."[38]  It has credited the TPP Program for contributing to the sharp declines in teen pregnancy rates over the past six years.[39]

75.     Healthy Teen Network and the populations served by its grant and sub-grant projects are experiencing immediate and irreparable harm from the abrupt termination of the grants.  The loss of years four and five of grant funding for the Pulse project has compelled Healthy Teen Network to reduce its sample size from 1,500 to 1,300 and to shorten the evaluation period of its survey from six months to six weeks—a far less meaningful scientific measure when assessing sexual reproductive health behavior.  Healthy Teen Network has additionally been forced to cancel outright the Spanish-language portion of its study, although a major aim of the Pulse study and the

---

[36] Letter from Patty Murray et al., U.S. Senators, to Thomas E. Price, Sec'y of HHS (July 21, 2017), https://
www.help.senate.gov/imo/media/doc/071817%20Teen%20Pregnancy%20Program%20letter%20FINAL.pdf
[37] *Id.*
[38] Statement of Haywood L. Brown, President, American College of Obstetrics and Gynecologists, *Unintended Pregnancy Prevention is Essential to Women's Health* (July 17, 2017), https://www.acog.org/About-ACOG/News-Room/Statements/2017/Unintended-Pregnancy-Prevention-is-Essential-to-Womens-Health.
[39] *Id.*

Tier 2B grants was to address the critical gap in evidence-based sexual health education for Latino and Hispanic youth.

76.     Healthy Teen Network itself has also been deeply harmed by the loss of grant funds from the Pulse project and the subawards, which together made up approximately one-third of its overall budget.  Healthy Teen Network has been forced to sign a new lease for smaller office space and plans to vacate its current premises in April 2018.  Because of HHS's actions, the organization has also had to leave the positions of three departed employees unfilled, and anticipates needing to lay off at least three more staff members (amounting to one-third of the organization's remaining staff) if it does not secure alternative funding.

77.     Finally, as a consequence of its budget contracting so dramatically owing to HHS's actions, Healthy Teen Network has had to divert staff time and critical resources from core programmatic activities, such as developing and adapting teen-pregnancy related content for e-learning and offering training for a new teen pregnancy prevention intervention, to fundraising efforts in a so far unsuccessful attempt to secure alternative funding in order to continue this project and the organization's other important work.

## CLAIMS FOR RELIEF

### Count One

**(Administrative Procedure Act, 5 U.S.C. § 706(2))**

**Defendants' Termination of Healthy Teen Network's Grant Violates the
Administrative Procedure Act**

78.     Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

79.     The Administrative Procedure Act (APA) provides, among other requirements, that a court "shall . . . hold unlawful and set aside agency action . . . [that is] arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

80.     Defendants' termination of Plaintiff's grant constitutes final agency action, reviewable under the APA.

81.     Defendants' denial of carry-over funds requested by Plaintiff constitutes final agency action, reviewable under the APA.

82.     Defendants' termination of Plaintiff's grant is contrary to law.

83.     Specifically, the 2017 Consolidated Appropriations Act mandated:

> That of the funds made available under this heading, $101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities, and of the remaining amount 75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy: *Provided further*, That of the amounts provided under this heading from amounts available under section 241 of the PHS Act, $6,800,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches.[40]

84.     This Appropriations Act, which remains in place through continuing budget resolutions, requires that HHS fund the TPP Program. In particular, in the Continuing Appropriations Act, 2018, as well as subsequent acts extending it, Congress

---

[40] FY 2017 Consolidated Appropriations Act, Pub. L. No. 115-131, 131 Stat. 135, 536 (2017).

appropriated to HHS "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities … that were conducted in fiscal year 2017."[41]  Congress mandated that such appropriations "shall be available to the extent and in the manner that would be provided by the [fiscal year 2017 appropriations acts]."[42]  In terminating Healthy Teen Network's grant midway through the program, HHS has ignored this statutory mandate and has improperly impounded Congressionally appropriated funds.  HHS is acting contrary to law in violation of the APA and Congressional mandates.

85.    HHS's actions are also contrary to the Congressional Budget and Impoundment Control Act of 1974 (the "Impoundment Control Act"), which requires that the President make appropriated funds "available for obligation," unless the President sends a special message to Congress detailing a request to rescind or reserve funds and Congress then passes a rescission bill rescinding the funding.  2 U.S.C. § 683(a).  There has been no transmission of a special message to Congress by the President seeking to have TPP Program funding rescinded and Congress has not otherwise acted to rescind the funding.  The President is thus required by the Impoundment Control Act to expend the appropriated TPPP funding.  Accordingly, Defendants' termination of the TPP Program grants despite continued funding for the TPP Program constitutes final agency action contrary to the Impoundment Control Act, in violation of the APA.

---

[41] Continuing Appropriations Act, 2018 and Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-56, § 101, 131 Stat. 1129, 1139-40; *see* Bipartisan Budget Act of 2018, Pub. L. No. 115-123 (amending Continuing Appropriations Act, 2018, to extend appropriations through March 23, 2018).
[42] Continuing Appropriations Act, 2018 and Supplemental Appropriations for Disaster Relief Requirements Act, 2017, Pub. L. No. 115-56, § 103.

86.     HHS's actions are also contrary to the agency's own regulations.  HHS's regulations provide that a Federal award may be terminated in whole or in part only where the grantee has failed to comply with the terms and conditions of an award, for cause, with consent of the grantee, or by the grantee upon providing written notification of the reasons for such termination.  *See* 45 C.F.R. § 75.372(a)(1)-(4).  HHS has terminated Healthy Teen Network's grant without identifying any regulatory basis for the termination or following any of the specific procedures required by governing regulations.

87.     To date, HHS has failed to provide a reasoned or legally sufficient justification for terminating Plaintiff's grant.  Indeed, HHS has failed to provide any justification to Healthy Teen Network.

88.     Thus, in terminating the grant award, Defendants have acted arbitrarily, capriciously, and contrary to law in the following ways, among others:

a.  terminating Plaintiff's grant award and other TPP Program grant awards in the face of a Congressional mandate;

b.  terminating Plaintiff's grant award without grounds and otherwise failing to follow HHS grant termination procedures;

c.  failing to explain the basis of its decisions;

d.  providing shifting and unreasoned *post hoc* explanations for its decisions;

e.  making decisions based on undue political interference by agency officials rather than merit; and

   f.  making decisions in retaliation for the criticism that Plaintiff and other

grantees have levied against Ms. Huber, HHS, and/or the Trump

Administration.

### Count Two
### (Administrative Procedure Act, 5 U.S.C. § 706(1))

### Defendants Are Unlawfully Withholding and/or Delaying Action

89.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set

forth herein.

90.    The APA provides, among other things, that a court "shall compel agency

action unlawfully withheld or unreasonably delayed."  5 U.S.C. § 706(1).

91.    Defendants' refusal to solicit, accept, and process Plaintiff's non-

competing continuation grant funding application for each of the annual terms laid out in

Plaintiff's five-year grant award is agency action that has been withheld and/or

unreasonably delayed in violation of, among other things, HHS's own regulations, the

Consolidated Appropriations Act, and the APA.

92.    Defendants' refusal to continue process Plaintiff's grant funding for each

year of the five-year term is agency action that has been withheld and/or unreasonably

delayed and violation of this provision of the APA.

### Count Three
### (Equitable Relief to Preserve Remedy)

93.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set

forth herein.

94.    Defendants are poised to transfer or otherwise obligate the funds at issue

in this action.

95.     Plaintiff is entitled to a full, fair, and meaningful process to adjudicate the unlawful termination of its grant.

96.     Plaintiff will suffer irreparable injury if Defendants transfer, disburse, or otherwise obligate the funds that are the subject of this action before final resolution of this matter. *See City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1427 (D.C. Cir. 1994).

97.     Accordingly, to ensure that Plaintiff has meaningful relief should it prevail in this action, the Court should enjoin Defendants from transferring or otherwise obligating the funds at issue.

WHEREFORE, Plaintiff prays that this Court:

1.      Declare Defendants' termination of the Plaintiff's grant unlawful;

2.      Order Defendants to reinstate the terms of the Notice of Award, including, but not limited to, the five-year funding term;

3.      Order Defendants to reinstate FY18 funding;

4.      Order Defendants to solicit, accept, and process Healthy Teen Network's non-competing continuation application for FY19 funding;

5.      Enjoin Defendants from disbursing, transferring, or otherwise obligating Plaintiff's grant funds for years four and five of its grant until this matter is adjudicated;

6.      Award Plaintiff costs, attorneys' fees, and other disbursements for this action; and,

7.      Grant any other relief this Court deems appropriate.

Dated: February 15, 2018                      Respectfully submitted,

                                        By: /s/ Barry J. Reingold
                                             Barry J. Reingold, Bar No. 06490
                                             700 Thirteenth Street, N.W., Suite 600
                                             Washington, D.C.  20005-3960
                                             Telephone:  202.654.6200
                                             Facsimile:  202.654.6211

                                             DEMOCRACY FORWARD

                                             Javier M. Guzman, D.C. Bar #462679
                                             (Pro Hac Vice to be filed)
                                             Josephine T. Morse, N.Y. Bar #4505673
                                             (Pro Hac Vice to be filed)
                                             Skye L. Perryman, D.C. Bar #984573
                                             (Pro Hav Vice to Be filed)
                                             1333 H St. NW
                                             Washington, DC  20005
                                             (202) 448-9090
                                             jguzman@democracyforward.org
                                             jmorse@democracyforward.org
                                             sperryman@democracyforward.org

                                             Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that on February 15, 2018 I filed the foregoing with the Clerk of the

Court using the ECF System which will send notification of such filing to the registered

participants as identified on the Notice of Electronic Filing.

<div style="margin-left:50%">

 /s/ Barry J. Reingold

Barry J. Reingold, Bar No. 06490
700 Thirteenth Street, N.W., Suite 600
Washington, D.C.  20005-3960
Telephone:  202.654.6200
Facsimile:  202.654.6211

***Attorney for Plaintiff***

</div>