# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

HEALTHY TEEN NETWORK
1501 St. Paul St., # 124
Baltimore, MD 21202

    and

MAYOR AND CITY COUNCIL OF
BALTIMORE
100 N. Holliday Street, Suite 101
Baltimore, MD 21202

    Plaintiffs,

v.

ALEX M. AZAR II, in his official capacity as
SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue, SW
Washington, DC 20201,

    and

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Ave. SW
Washington, DC 20201

    Defendants.

Civil Action No. 1:18-cv-00468-CCB

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION**

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………………………………...1

FACTUAL BACKGROUND…………………………………………………………………….3

ARGUMENT…………………………...……………………………………………………… 19

    A.    HHS Failed To Provide Any Explanation for Unlawfully Terminating the TPP Program, And Its Post Hoc Explanations Fail As A Matter Of Law............ 20

    B.    HHS Failed to Comply with Its Own Regulations................................................ 24

    C.    HHS Acted Contrary to the Continuing Appropriations Act of 2018, the Consolidated Appropriation Act of 2017, and the Impoundment Control Act ...................................................................................................................... 26

II.    Absent Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm .............................. 29

III.    The Balance of Equities and the Public Interest Merit a Preliminary Injunction........... 322

CONCLUSION…………………………………………………………………………………..33

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Allen Corp. of Am., Inc. v. Zayas*,
  Civil Action No. TDC-14-3719, 2014 WL 6893868 (D. Md. Dec. 4, 2014) .................. 31

*Centro Tepeyac v. Montg. Cty.*,
  722 F.3d 184 (4th Cir. 2013) (en banc) ........................................................................ 18

*Charlotte Mem'l Hosp. v. Bowen*,
  665 F. Supp. 455 (W.D.N.C. 1987) .............................................................................. 24

*City of Kansas City v. HUD*,
  923 F.2d 188 (D.C. Cir. 1991) ...................................................................................... 21

*Cordova v. Holder*,
  759 F.3d 332 (4th Cir. 2014) ........................................................................................ 21

*Drakes Bay Oyster Co. v. Jewell*,
  747 F.3d 1073 (9th Cir. 2013) ...................................................................................... 32

*Hughes Net. Sys., Inc. v. Inter- Digital Commc'ns Corp.*,
  17 F.3d 691 (4th Cir. 1994) .......................................................................................... 31

*In re Aiken Cty.*,
  725 F.3d 255 (D.C. Cir. 2013) ...................................................................................... 28

*Inova Alexandria Hosp. v. Shalala*,
  244 F.3d 342 (4th Cir. 2001) ........................................................................................ 21

*Int'l Refugee Assistance Proj. v. Trump*,
  857 F.3d 554 (4th Cir. 2017) ........................................................................................ 32

*Int'l Refugee Assistance Proj. v. Trump*,
  883 F.3d 233 (4th Cir. 2018) ........................................................................................ 29

*Local 2677 Am. Fed. of Gov. Emp. v. Phillips*,
  358 F. Supp. 60 (D.D.C. 1973) ..................................................................................... 27

*Montana v. Brinegar*,
  380 F. Supp. 861 (D. Mont. 1974) ................................................................................ 27

*Motor Veh. Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) .............................................................................................. 20, 22, 23

*Nat'l Envtl. Dev. Assocs. Clean Air Proj. v. EPA,*
    752 F.3d 999 (D.C. Cir. 2014) ................................................................ 24

*Nat'l Council of Comm. Mental Health Ctrs., Inc. v. Weinberger,*
    361 F. Supp. 897 (D.D.C. 1973) ....................................................... 27, 30

*North Carolina Wildlife Fed. v. North Carolina Dept. of Transp.,*
    677 F.3d 596 (4th Cir. 2012) ................................................................ 20

*Planned Parenthood Ariz., Inc. v. Betlach,*
    899 F. Supp. 2d 868 (D. Ariz. 2012) .................................................... 30

*Planned Parenthood of Cent. N.C. v. Cansler,*
    804 F. Supp. 2d 482 (M.D.N.C. 2011) ................................................. 31

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health,*
    699 F.3d. 962 (7th Cir. 2012) ............................................................... 30

*Reaching Hearts Intern., Inc. v. Prince George's County,*
    584 F. Supp. 2d 766 (D. Md. 2008) ..................................................... 31

*Satellite Broad. & Commc'ns Ass'n v. FCC,*
    275 F.3d 337 (4th Cir. 2001) ................................................................ 20

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ............................................................................. 21

*Train v. City of New York,*
    420 U.S. 35 (1975) ............................................................................... 29

*Trump v. Int'l Refugee Assistance Proj.,*
    137 S. Ct. 2080 (2017) ......................................................................... 18

*U.S. ex rel. Taxpayers Against Fraud v. Singer Co.,*
    889 F.2d 1327 (4th Cir. 1989) .............................................................. 31

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................. 18

## STATUTES, RULES, AND REGULATIONS

45 C.F.R. § 75.2 ............................................................................................ 25

45 C.F.R. § 75.372 ..................................................................................... 1, 25

78 Fed. Reg. 78590 (Dec. 26, 2013) ............................................................ 25

Administrative Procedure Act,
    5 U.S.C. § 706.................................................................................*passim*

Bipartisan Budget Act of 2018,
    Pub. L. No. 115-123 ................................................................... 5, 27

Consolidated Appropriations Act of 2010,
    Pub. L. No. 111-117, 123 Stat. 3034 ............................................. 3

Consolidated Appropriations Act of 2017,
    Pub. L. No. 115-131, 131 Stat. 135...................................*passim*

Consolidated Appropriations Act of 2018,
    H.R. 1625, 115th Cong. (forthcoming Pub. L. No. 114-141)................*passim*

Continuing Appropriations Act, 2018, and Supplemental Appropriations for
    Disaster Relief Requirements Act, 2017,
    Pub L. No. 115-56, 131 Stat. 1129 ...................................*passim*

Fed. R. Civ. P. 65(a) ...............................................................*passim*

Impoundment Control Act of 1974,
    2 U.S.C. § 681.......................................................................... 28

Public Health Service Act,
    42 U.S.C. § 300 *et seq* ............................................................. 7

# INTRODUCTION

In 2010, Congress created the Teen Pregnancy Prevention Program ("TPP Program"), a grant program administered by the U.S. Department of Health and Human Services ("HHS") to develop, study, and replicate evidence-based teen pregnancy prevention programs. This program has been widely hailed as a policy success for contributing to sharp declines in teen pregnancy. As the first set of five-year grants was coming to an end in July 2015, HHS awarded a second set of TPP Program grants. Plaintiff Healthy Teen Network and the Mayor and City Council of Baltimore[1] ("Baltimore" or "the City") (collectively, "Plaintiffs") were among the 81 grantees in this second cohort that received five-year grants.[2] During the first two years of the grant, HHS repeatedly praised the quality of Plaintiffs' projects. But in July 2017, HHS made an abrupt about-face: without any explanation, and despite Plaintiffs' successful performance to date, HHS informed Plaintiffs that it was terminating their grants two years early—after the third year of the five-year grant. HHS officials did not provide any contemporaneous reason to the grantees for the unlawful action; instead, they have offered to the public a range of shifting after-the-fact explanations. Even if these post hoc justifications could be credited—and they cannot—none provides a lawful basis for termination under the terms of the grant or HHS's own regulations. *See* 45 C.F.R. § 75.372(a)(1)-(4).

Moreover, HHS's premature termination of Plaintiffs' funding also ignores Congress's explicit directive that HHS continue to distribute funds pursuant to the TPP Program. Indeed, just days ago, on March 23, 2018, Congress passed an appropriations bill that once again mandated

---

[1] The Mayor and City Council of Baltimore, a recipient of a federal grant under the TPP program, is seeking to join this action as a Plaintiff. *See* Consent Motion and Amended Complaint, ECF. No. 16 (filed March 22, 2018).

[2] In addition to receiving its own grant under the TPP Program, Plaintiff Healthy Teen Network is a subgrantee of the City of Baltimore. Am. Compl. For Decl. & Inj. Relief ("Am. Compl.") ¶ 42, ECF No. 16-1.

full funding for the TPP Program.  Notwithstanding Congress's unequivocal intent to continue the TPP Program, HHS is refusing to take the steps necessary to enable Plaintiffs to obtain year-four funding of their grants.  Under the terms of their five-year TPP Program grants, Plaintiffs receive their funds annually and to obtain each year's funds they are required to submit a non-competing continuation application for the upcoming budget year.  HHS, however, does not intend to process Plaintiffs' continuation applications for year four of the grant without a Court order directing that it do so; and processing will take two months when it does begin that effort.  Jt. Mot. for Order Preserving Remedies and Agreed Proposed Briefing Schedule, ¶ 5, ECF No. 17.[3]  Plaintiffs cannot wait.  HHS's refusal to process these applications during the pendency of this suit threatens to leave Plaintiffs without a remedy.  Plaintiffs have already had to make difficult decisions regarding staffing their organizations and projects.  And they are now making additional decisions regarding the staffing and continuation of their TPP-funded programs and, as such, must know whether they will have money to support these programs beyond the end of year-three funding on June 30, 2018.

HHS's decision to terminate all grants funded by the TPP Program is arbitrary, capricious, and contrary to law—in clear violation of the Administrative Procedure Act ("APA").  But absent an expeditious decision on the merits, any relief from this Court may come too late to matter. Accordingly, Plaintiffs seek a preliminary injunction directing HHS to accept and process Plaintiffs' non-competing continuation applications for their fourth budget year—a condition precedent for the release of TPP Program year-four funding—in time for release of those funds on July 1, 2018.

---

[3]     Today, the Parties also file a Joint Request for Expedited Briefing Schedule on the Motion for Preliminary and Permanent Injunction, in order to preserve the Plaintiffs' remedies that would be lost absent a decision directing HHS to immediately process Plaintiffs' non-competing applications for year four of the TPP Program grant.

Plaintiffs also request that this Court, pursuant to Federal Rule of Civil Procedure 65(a)(2), consolidate its consideration of the likelihood of success findings for a preliminary injunction with consideration of a permanent injunction that resolves this case in its entirety. It is undisputed that HHS terminated Plaintiffs' five-year grants prematurely and without any explanation. Nor has HHS produced any record of reasoned decision-making. The Parties' dispute therefore is purely legal—whether those terminations violated the APA because they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A)—and may appropriately be resolved at this stage.

## FACTUAL BACKGROUND

**I.     Congress Established the TPP Program in 2010 and Has Continued to Direct HHS to Administer the Program in Each of the Following Years**

Approximately one in four teenaged women in the United States will become pregnant before the age of 20, and teen pregnancy is linked to a variety of major social concerns. Am. Compl. For Decl. & Inj. Relief ("Am. Compl.") ¶¶ 7-12, ECF No. 16-1. Those concerns are particularly pronounced in Baltimore, which has a teen birth rate twice as high as the state of Maryland, and one-and-a-half times as high as the national average. Declaration of Dr. Leana S. Wen, M.D., MSc., FAAEM ("Wen Decl.") ¶ 5. Yet, prior to 2010, most federal funding for teen pregnancy prevention initiatives was distributed without regard to whether the funded initiatives had been proven effective. Am. Compl. ¶ 13. In 2010, however, Congress shifted its approach by establishing the TPP Program and appropriating over $100 million "for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy." Consolidated Appropriations Act, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2010). Congress specified that the TPP Program was to be administered by

HHS through the Office of Adolescent Health ("OAH") and overseen by the Office of the Assistant Secretary of Health. H.R. Rep. No. 111-366, at 1043 (2009) (Conf. Rep.) (adopting Senate position explained in S. Rep. No. 111-55, at 160 (2009) (Conf. Rep.)). And Congress directed OAH to spend the appropriated funds across two tiers of grants: Tier 1 grants, designed to replicate programs that had demonstrated positive impacts on key sexual behavioral outcomes, and Tier 2 grants, designed to develop and rigorously test new and innovative approaches to teen pregnancy prevention.

The TPP Program was heralded as a "poster child" for evidence-based policy. Am. Compl. ¶ 17. Rather than base funding decisions on political ideology, Congress instead designed the Program to focus on proven results, funding initiatives that were shown to effectively address teen pregnancy or that studied new science-based methods for tackling the problem. Am. Compl. ¶¶ 18-19. And, indeed, since the TPP Program's creation in 2010, teen pregnancy rates in the United States declined sharply—with many, including OAH itself, citing the TPP Program as contributing to the trend. Am. Compl. ¶ 21. Congress has appropriated funds for HHS to continue administering the TPP Program every year since the program's inception. In the 2017 Consolidated Appropriations Act, for example, Congress mandated as follows:

> That of the funds made available under this heading, $101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not more than 10 percent of the available funds shall be for training and technical assistance, evaluation, outreach, and additional program support activities, and of the remaining amount 75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy: Provided further, That of the amounts provided under this heading from amounts available under section 241

4

of the PHS Act, $6,800,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches.

Pub. L. No. 115-131, 131 Stat. 135, 536 (2017).

Since then, in the Continuing Appropriations Act, 2018, and Supplemental Appropriations for Disaster Relief Requirements Act, 2017 ("Continuing Appropriations Act of 2018"), as well as subsequent acts extending it, Congress continued to mandate funding for the TPP Program at 2017 levels, appropriating "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions provided in such Acts, for continuing projects or activities … that were conducted in fiscal year 2017." Pub L. No. 115-56, §101, 131 Stat. 1129, 1139-40. In other words, through continuing resolutions, Congress continued to fund government programs, including the TPP Program, "to the extent and in the manner that would be provided by" the 2017 Consolidated Appropriations Act. *Id.* § 103. *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123. Then, on March 23, 2018, Congress passed the 2018 Consolidated Appropriations Act, H.R. 1625, 115th Cong. (forthcoming Pub. L. No. 114-141), funding TPP through substantially the same language as above.[4]

---

[4]    The 2018 Consolidated Appropriations Act provides that "$101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy…." Consolidated Appropriations Act, 2018, H.R. 1625, Div. H, Title II, 115th Cong. (forthcoming Pub. L. No. 114-141). Of this, Congress specified that "75 percent shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teen pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, and 25 percent shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy…." In addition, the Act appropriated $25 million to "implement education in sexual risk avoidance (defined as voluntarily refraining from nonmarital sexual activity…."). *Id.*

## II.    Until Recently, OAH Funded and Administered the TPP Program as Required by Congress

In April 2010, in accordance with Congress's mandate in establishing and appropriating funds for the TPP Program, OAH issued two Funding Opportunity Announcements ("FOAs"), one that requested applications for Tier 1 grants (for replicating evidence-based programs) and another that requested applications for Tier 2 grants (best for testing new and innovative approaches). Am. Compl. ¶ 23. Both FOAs specified that the projects would be funded for a five-year period, and both instructed applicants to "provide a detailed five-year work plan" and to "create a logic model that provides an overview of the entire program for the five years" of the grant. Am. Compl. ¶ 24. Between FY 2010 and FY 2014, OAH funded 102 entities as part of this first cohort of five-year TPP Program grantees. Am. Compl. ¶ 25. These projects collectively reached more than half a million young people, trained 6,100 facilitators, and created 3,800 community partnerships across the United States. *Id.*

In January 2015, toward the end of the first grant period, OAH issued new FOAs requesting applications for a second cohort of competitive, five-year grants. Am. Compl. ¶ 27. These FOAs were further specialized, announcing four types of available awards. As relevant to Baltimore, Tier 1B awards were intended to "[r]eplicate [e]vidence-[b]ased TPP [p]rograms to [s]cale in [c]ommunities with the [g]reatest [n]eed" by targeting "resources to serving communities with the greatest need for preventing teen pregnancy and reducing existing disparities."[5] As relevant to Healthy Teen Network, Tier 2B awards were intended "to increase the number of evidence-based

---

[5]    Office of Adolescent Health, Replicating Evidence-Based Teen Pregnancy Prevention Programs to Scale in Communities with the Greatest Need (Tier 1B), Announcement No. AH-TP1-15-002 ("Tier 1B FOA"), https://www.hhs.gov/ash/oah/sites/default/files/tier1b-foafile.pdf.

TPP interventions available by rigorously evaluating new or innovative approaches for preventing teen pregnancy and related risk behaviors,"[6] particularly within populations, including Latino youth, that are at a disproportionately high risk of teen pregnancy, and for which there are limited numbers of OAH-approved TPP interventions. Just as with the first cohort of grants, these awards were "in the form of a five-year cooperative agreement … [which] is an award instrument of financial assistance where substantial programmatic involvement is anticipated between OAH and the grantee." Tier 1B FOA, at 28; Tier 2B FOA, at 33. The five-year project periods included one-year "budget periods," meaning that for each year of the five-year project period, "grantees are required to submit a non-competing application." Tier 1B FOA, at 83; Tier 2B FOA, at 85. This non-competing continuation application consisted of "a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." Tier 1B FOA, at 83; Tier 2B FOA, at 85.

## III. In 2015 Baltimore Received A Five-Year Cooperative Agreement and Subsequently Earned Accolades from HHS for Successful Implementation

On July 1, 2015, OAH awarded Baltimore a five-year, $8.745 million Tier 1B grant, with $1.749 million to be awarded annually. Am. Compl. ¶ 39; Wen Decl. ¶ 9. The purpose of the grant was to allow the Baltimore City Department of Health to partner with the Baltimore City Public Schools System, Title X clinics,[7] and numerous community partners to implement evidence-based sexual reproductive health programming in middle schools, high schools, and Title X clinics. Wen

---

[6]     Office of Adolescent Health, Rigorous Evaluation of New or Innovative Approaches to Prevent Teen Pregnancy (Tier 2B), Announcement No. AH-TP2-15-002 ("Tier 2B FOA"), at 3, https://www.hhs.gov/ash/oah/sites/default/files/tier2b-foafile.pdf.

[7]     Title X clinics are community-based clinics providing family planning related health services primarily to low-income families. They were first authorized under the Title X Family Planning Program, which is part of the Public Health Service Act enacted in 1970. *See* 42 U.S.C. § 300 *et seq.*

Decl. ¶ 7.  The grant was designed to reach 10,000 adolescents per year during the five-year grant period and aimed to decrease the overall teen birth rate of 43.4 per 1,000 teen girls by 30% by the end of the project, and to ensure sustainable delivery of evidence-based teen pregnancy prevention programs in Baltimore into the future.  Am. Compl. ¶¶ 37-38; Wen Decl. ¶ 7.  In a congratulatory letter, OAH Director Evelyn Kappeler stated that her office was looking "forward to working with [Baltimore] over the next five years to support [its] project and ensure [its] continued success." Am. Compl. ¶ 40; Wen Decl. ¶ 10, Ex. B.  The Notice of Award and Cooperative Agreement that accompanied Director Kappeler's congratulatory letter established a project period for the $8.745 million grant award spanning from July 1, 2015 to June 30, 2020.  Am. Compl. ¶ 41; Wen Decl. ¶ 9, Ex. A.

After receiving its award, Baltimore established the project's organizational structure, executed agreements with numerous community partners, implemented successful pilots within each of the three settings (middle schools, high schools, and Title X clinics), and completed all OAH year-one milestones.  Am. Compl. ¶ 43; Wen Decl. ¶ 12.  After a thorough selection process, the Baltimore City Department of Health chose to implement a different evidence-based program in each of the three settings and worked with each individual school to devise the best method for implementing the selected program curricula.  Am. Compl. ¶¶ 43-46; Wen Decl. ¶¶ 13-14.

After submitting a non-competing continuation application, Baltimore received a second award of $1.749 million for year two, as well as $329,782.67 in carry over funding.  Am. Compl. ¶¶ 50-52; Wen Decl. ¶¶ 19-20.  By the end of year two, the City's health department had reached 10,317 youth with evidence-based programming, which exceeded the program's goal of 10,000; fully implemented evidence-based programs in the high schools and Title X clinics; and implemented the programs in a quarter of middle schools, training nearly 50% of middle school

faculty. Am. Compl. ¶ 53; Wen Decl. ¶ 21. Baltimore complied with all program requirements throughout the grant and, to the extent OAH provided any recommendations for improvement, took steps to address those recommendations. Wen Decl. ¶ 22.

OAH offered numerous accolades and commendations for Baltimore's work throughout the first three years of the grant. OAH praised Baltimore for its "tremendous accomplishment' in scaling up its evidence-based programs to surpass the goal of reaching 10,000 young people per year. Wen Decl. ¶ 26. It commended Baltimore for training 158 new facilitators and delivering follow-up training to 143 facilitators in year two. Wen Decl. ¶ 26. It praised the program for its "high" mean attendance for the "It's Your Game" program (91%) and Seventeen Days program (100%), noting that "90% of participants for [It's Your Game] and 100% for Seventeen Days attended 75% or More of sessions." Wen Decl. ¶ 26, Ex. H. OAH scored the overall quality for the three program models as "high (above 90% scored 4 or more on overall quality)." Wen Decl. ¶ 26, Ex. H. On the administrative side, OAH commended Baltimore for submitting a "detailed, reasonable, adequate, cost efficient" budget," for its "strong parent engagement program," and for its incorporation of "OAH assessment tools to ensure safety and inclusivity." Wen Decl. ¶ 22, Ex. D. OAH even sought Baltimore's counsel for improving the national TPP Program, asking Baltimore to serve on the Sustainability Committee for the TPP Program. Am. Compl. ¶¶ 47, 54, Wen Decl. ¶ 16. Overall, OAH noted that Baltimore had "done a tremendous job of working together on a shared vision and achieving results," which OAH attributed to "clear and consistent communication, harnessing individual partners' strengths and expertise, diligently working together to overcome systemic challenges through innovative solutions, and practicing continuous quality improvement in an authentic manner." Wen Decl. ¶ 26, Ex. H. OAH's praise is borne out by the City's 20% decrease in the teen birth rate from 2014-16, a positive trend attributable in part

9

to the work of the City and Healthy Teen Network under Baltimore's TPP Program grant. Wen Decl. ¶ 38.

## IV.   In 2015, Healthy Teen Network Received a Five-Year Cooperative Agreement and Subsequently Earned Accolades for its Study from HHS

On July 1, 2015, OAH awarded Healthy Teen Network, a Baltimore-based non-profit dedicated to improving adolescent health outcomes, a five-year, $3.6 million Tier 2B grant, with $723,000 to be awarded annually. Am. Compl. ¶ 71; Declaration of Patricia Paluzzi ("Paluzzi Decl.") ¶¶ 2-3. The purpose of the grant was to conduct a five-year randomized control trial of Pulse, a web-based, bilingual English/Spanish mobile application that provides medically accurate, age-appropriate sexual and reproductive health information through text and graphics, self-assessments, and racially diverse videos and films. Am. Compl. ¶ 69; Paluzzi Decl. ¶ 3. Healthy Teen Network proposed to use social media to recruit 1,500 primarily Black and Latina young women aged 18-19, located in geographically diverse locations nationwide, to complete a baseline survey to assess their sexual health knowledge and behaviors. Paluzzi Decl. ¶ 5. Study participants would then be given access for up to six months to either the English-language version of the Pulse application or a control application containing general health and fitness information. Surveys would then be administered to discern the impact of Pulse, and to similarly study the efficacy of the Spanish-language version of Pulse. *See* Am. Compl. ¶ 70; Paluzzi Decl. ¶ 5. Like Baltimore, Healthy Teen Network received a letter from Director Kappeler stating that OAH was looking "forward to working with [it] over the next five years to support [its] project and ensure [its] continued success." Am. Compl. ¶ 40. The Notice of Award and Cooperative Agreement that accompanied Director Kappeler's congratulatory letter established a project period for the $3.6 million grant award spanning from July 1, 2015 to June 30, 2020. Am. Compl. ¶ 71; Paluzzi

Decl. ¶ 3. And OAH reviewers praised Healthy Teen Network, including by recognizing Healthy Teen Network's "solid history of work in the sexual and reproductive health area, including developing TPP interventions and disseminating them" and noting Healthy Teen Network's "directly relevant experience in mounting and successfully completing" similar projects. Paluzzi Decl., ¶ 7, Ex. E.

In July 2015, Healthy Teen Network also received two subawards: An award averaging $100,000 annually to increase capacity and provide training in support of Baltimore's Tier 1B grant and an award averaging $13,000 annually to increase capacity and provide training and technical assistance in support of a 5-year, $3.5 million Tier 1A grant awarded to the South Carolina Campaign to Prevent Teen Pregnancy. Am. Compl. ¶ 75; Paluzzi Decl. ¶ 16.

After receiving its award for the Pulse study, Healthy Teen Network proceeded with content development and medical accuracy screening for Pulse and a media campaign to recruit and enroll participants in the study. Am. Compl. ¶¶ 77-78; Paluzzi Decl. ¶ 5. After submitting a non-competing continuation application, Healthy Teen Network received a second award of $723,000 for year two, as well as $62,629 in carry over funding. Am. Compl. ¶¶ 81-83. Healthy Teen Network also continued to receive payments on the subawards during year two of the grant. Am. Compl. ¶ 82. And in year two, Healthy Teen Network set about conducting the study, completing all its milestones for that grant year. Paluzzi Decl. ¶ 8. Healthy Teen Network complied with all program requirements throughout the grant. Paluzzi Decl. ¶ 9. To the extent that OAH's reviews included recommendations for improvements, Healthy Teen Network took steps to address them. Paluzzi Decl. ¶ 8.

As with Baltimore, OAH offered praise and numerous commendations for Healthy Teen Network's work throughout the first two years of the grant. Paluzzi Decl. ¶ 7. For example, OAH

invited Healthy Teen Network to present at a July 2016 conference; recognized Healthy Teen Network in May 2017 for "activities focusing on program evaluation [that] appear to appropriately align with the current approved evaluation plan" and "balance nicely between ensuring quality program development and ensuring the evaluation will maintain its rigor"; and that same month widely circulated a report lauding Healthy Teen Network's "success with targeted recruiting using social media for its evaluation of Pulse." Am. Compl. ¶¶ 78, 84.

## V.      In 2017 OAH Prematurely Terminated Plaintiffs' Grants As Well As All Other Grants Issued Under the TPP Program

During the spring of 2017, preparations were well underway by OAH career staff to fund the grants for year three in support of the full five-year projects. Am. Compl. ¶ 85; Declaration of Benjamin Link ("Link Decl.") ¶ 3, Ex. C.  In April 2017, Plaintiffs each submitted their second non-competing continuation applications, just as they had done the year before, this time to obtain funding for year three of the grants.  Wen Decl. ¶ 23; Paluzzi Decl. ¶ 10.  In so doing, Plaintiffs conferred with career staff at OAH regarding the trajectory of their projects and plans for future grant years.  *Id.*  On June 5, 2017, Valerie Huber, a longtime opponent of the TPP Program and evidence-based programs more generally, was appointed to serve as Chief of Staff in the Office of the Assistant Secretary of Health at HHS, the office that oversees OAH.  Am. Comp. ¶ 87. Ms. Huber joined other opponents of evidence-based programming, such as Teresa Manning and Steven Valentine, who had been appointed to key positions within the Agency earlier in 2017. Am. Compl. ¶¶ 62, 87.  Very shortly after Ms. Huber's appointment, in the first week of July 2017, to Plaintiffs' surprise, they received a Notice of Award for year three that—with a single sentence and no explanation—prematurely terminated their five-year grants awards: "This award also shortens the project period to end on June 30, 2018 at the end of this budget year."  Am. Compl.

¶¶ 60, 91; Wen Decl. ¶ 24; Paluzzi Decl. ¶ 13. No explanation for the termination was provided to Plaintiffs. Am. Compl. ¶¶ 61, 94; Wen Decl. ¶ 24; Paluzzi Decl. ¶ 15. The award letter advised Plaintiffs of "closeout" requirements due to the fact that the grants were suddenly ending. Am. Compl. ¶¶ 60, 91; Wen Decl. ¶ 24.

Baltimore appealed the termination of its grant on August 3, 2017 and to date has received no response. Am. Compl. ¶ 64; Wen Decl. ¶ 25, Ex. G. Healthy Teen Network was advised by an Agency employee that there was no use in appealing. Am. Compl. ¶ 98; Paluzzi Decl. ¶ 18. Following discussions with OAH career staff, Plaintiffs each applied to carry additional funds over from year two into year three. Am. Compl. ¶¶ 65, 100. These carry-over requests were denied by HHS as "not necessary" to the completion of Plaintiffs' projects. *Id.* ¶¶ 66, 102; Wen Decl. ¶ 28; Paluzzi Decl. ¶ 20. In addition, while Plaintiffs have previously been required to submit non-competing continuation applications in April in advance of receiving each year of funding, Wen Decl. ¶ 31; Paluzzi Decl. ¶ 22, HHS will not process Plaintiffs' applications absent a court order. Jt. Mot. ¶ 5, ECF No. 17.

HHS has never told Plaintiffs why their grants were terminated. But after receiving widespread criticism for terminating the grants, it has publicly offered a range of shifting post hoc rationalizations for its decision. For example, HHS has stated that there was "strong evidence of negative impact or no impact" by the funded projects. Am. Compl. ¶ 108. OAH Director Kappeler took issue with HHS's criticism, noting that it contained "several errors." Link Decl. ¶ 11, Ex. K. Plaintiffs, moreover, have consistently met all performance standards and received numerous commendations from HHS itself—even following the terminations. Wen Decl. ¶ 22, Exs. C-E; Paluzzi Decl. ¶ 7, Exs. E-I. HHS has also praised the program as a whole. In November of 2017— months after notifying Plaintiffs about the decision to prematurely terminate the grants—HHS

13

released its OAH Fiscal Year 2017 Report, lauding the "TPP Program as a model of a federal program developing increasingly rigorous portfolios of evidence." Am. Compl. ¶¶ 63, 107, 110; Annual Report at 3.[8]

Additionally, other Agency officials, such as HHS spokeswoman Diane Gianelli, have claimed that the cuts are related to the President's FY 2018 Budget, which proposed eliminating funding for the TPP Program altogether. Am. Compl. ¶ 108. But at the time of that statement the President's budget was merely a *proposal* and had not been enacted by Congress. Indeed, Congress has expressly declined to adopt the President's proposal to discontinue the TPP Program and has continued to fund the TPP Program through the fourth year of the grants. Consolidated Appropriations Act of 2018, H.R. 1625, 115th Cong. Div. H, Title II, (Pub. L. No. forthcoming)

## VI. Recently Produced Documents from HHS Show the Agency's Arbitrary Actions

HHS's lack of transparency with the public and grantees, including Baltimore and Healthy Teen Network, led Democracy Forward Foundation, a counsel in this case, to file a Freedom of Information Act ("FOIA") request with the Agency in late August 2017 to seek information concerning the Agency's abrupt decision to terminate all grants under the TPP Program. Link Decl., ¶ 1, Ex. A. After months of refusing to produce documents, on March 9, 2018 HHS made its first production in the FOIA litigation. Link Decl., ¶ 2, Ex. B. Those documents reveal that the decision to terminate the TPP Program grants was made hastily and over the course of a few weeks, without any record of reasoned decision-making, and under the influence of political appointees who have long opposed evidence-based policy.

---

[8] U.S. DEPT. OF HEALTH AND HUMAN SERVICES, OFFICE OF ADOLESCENT HEALTH, FISCAL YEAR 2017 ANNUAL REPORT (2017) ("Annual Report"), *available at* https://www.hhs.gov/ash/oah/sites/default/files/2017-annual-report-508-compliant.pdf.

The documents show that on May 18, 2017—consistent with the discussions Plaintiffs had with OAH staff in the spring of 2017—OAH Director Kappeler, a career civil servant who has worked for HHS in administrations of both parties, approved funding of the existing TPP Program grantees for "the third year of the five-year project period." *See* Link Decl. ¶ 3, Ex. C at Page 85_17-0284-FOIA (also stating that in fiscal year 2015 "OAH awarded funding through the TPP Program to a total of 84 grantees for five-year project period."). Yet, just days later, Dr. Don Wright, an HHS employee who was elevated to Acting Assistant Secretary of Health in the current Administration, requested information regarding the TPP Program grants and noted that the information had to be shared with the "Policy Team prior to awarding" the grants. *See* Link Decl., ¶ 4, Ex. D.

The documents further show that throughout the next month Director Kappeler and her staff were excluded from discussions about terminating the grants. Link Decl., ¶ 12, Ex. L at 452_17-0284-FOIA (memo to file from Kappeler noting that career staff "were not part of the discussions" concerning termination of the grants and were not made aware of actions "until the last minute"); *id*. at Ex. E at 414_17-0284-FOIA (exchange between Kappeler, having not been privy to communications concerning the status of the TPP Program grants, and Wright asking what direction will be taken). Indeed, as of June 27, 2017—just days before Plaintiffs' grants were terminated—OAH staff were still unaware of what action was being taken on the grants, despite having informed HHS political appointees that the grantees were having to lay off staff because of the uncertainty. *Id.* at ¶ 6, Ex. F (showing that as of June 27, 2017, career staff was awaiting direction from the Policy Team, despite informing political officials that OAH grantees were having to lay off staff because of uncertainty); *see also id.* at ¶ 5, Ex. E (as of June 21, 2017, HHS

had made no final determination regarding the TPP Program grants and OAH staff was waiting for the policy team to determine "what…[it] actually wants to do").

During the first week of July 2017, OAH informed grantees, including Plaintiffs, that their grants would be terminated as of June 30, 2018, cutting the five-year grant by two years. The FOIA-produced documents reveal that Ms. Huber, Ms. Manning, and Mr. Valentine were directly involved in terminating the TPP Program grants. *Id*. at ¶ 10, Ex. J at 70-74_17-0284-FOIA. OAH staff were given no explanation for the Agency's decision to terminate the grants until after the letters were issued. *See* Link Decl. ¶ 12, Ex. M (Kappeler noting that OAH staff was not made aware of the grant action until the last minute and was not provided with guidance on communications to the grantees until days after the grants were terminated); *Id*. ¶ 9, Ex. I (career employee at OAH noting OAH staff was not issued information or talking points regarding the decision to cut the grants as of the date of the grant termination).

In addition to bypassing input from employees who are experts in this area, including those in OAH, which is the unit Congress has tasked with administering the TPP Program grants, HHS acted without regard to Congress's appropriation of funds specifically for TPP Program grants. This is a departure from how HHS has terminated grants under other Congressionally-created programs, in those cases not doing so "until after Congressional action made it clear there was a lack of appropriation." Link Decl., ¶ 12, Ex. L at 453_17-0284-FOIA.

**VII.  Plaintiffs are Facing Imminent and Irreparable Harm as a Result of HHS's Action**

Plaintiffs and the communities they serve are now facing imminent and irreparable harm. The loss of years four and five of TPP Program funding for Baltimore has and will impede its efforts to deliver evidence-based programming to high-risk youth across the City, and threatens continued teen pregnancy prevention efforts in Baltimore. The City had a teen birth rate twice as

high as the state of Maryland overall and one-and-a-half times as high as the national average. Wen Decl. ¶ 5. With the help of the TPP Program, Baltimore achieved a 20% decrease in the teen birth rate from 2014-2016. Wen Decl. ¶ 38. And yet more than 10,000 preteens and teens who would have been educated through Baltimore's TPP Program grant will now be denied participation in evidence-based sexual reproductive health education, and 125 teachers will likewise now either not receive important refresher materials, or not be trained at all. Wen Decl. ¶¶ 26, 33. Already, due to the impending funding shortfall, Baltimore has had to adjust the project in order to meet in year three of the TPP Program grant as many of the sustainability goals as possible that it had planned for years four and five; consequently, many goals, such as training all teachers and adapting curricula for certain special school populations (including Spanish-speakers and youth with developmental disabilities), have gone unmet. Wen Decl. ¶ 33. The termination jeopardizes the plans of Baltimore's schools and clinics to sustain the delivery of the health curriculum past the expiration of the five-year grant. *Id.* The Baltimore City Department of Health and the chronically underfunded Baltimore City Public School System will have to divert funds beginning in July 2018 that would have been used for other programs, such as Youth Leadership Development, Community Health Education and Outreach, and Youth-Friendly Clinical Standards that benefit the public's health. Wen Decl. ¶ 34. This diversion is required to pay for some or all of fourteen crucial staff positions that have been funded by the TPP grant. Wen Decl. ¶ 34. The City, moreover, has had to further divert staff time and resources from other programmatic activities, such as clinical management and collective impact development, to fundraising efforts in an attempt to secure alternative funding. Wen Decl. ¶ 28.

Healthy Teen Network's predicament is also dire. Due to the loss in funding, it will be forced to reduce the sample size of its study from 1,500 to 1,300 and to abandon the Spanish-

language portion of the study altogether, although a major aim of the Pulse study and the FOA was to address the critical gap in evidence-based sexual health education for Latina youth. Paluzzi Decl. ¶ 24. Further, Healthy Teen Network itself has already been deeply harmed by the loss of grant funds for the Pulse project and for the subawards, which together made up approximately one-quarter of its overall budget. Paluzzi Decl. ¶ 25. It has had to sign a new lease for smaller office space, will imminently be vacating its current offices, and has been forced to leave the positions of three departed employees unfilled. *Id.* If Healthy Teen Network does not secure alternative funding by September 2018, it anticipates needing to lay off at least three more staff members, together amounting to a reduction of one-third of the organization's staff. *Id.* Finally, as is the case for Baltimore, Healthy Teen Network has had to divert staff time and critical resources to fundraising at the expense of other programmatic activities, such as developing and adapting teen-pregnancy related content for e-learning and offering training for a new teen pregnancy prevention intervention. Paluzzi Decl. ¶ 26. In fact, time spent by Healthy Teen Network's staff on fund development activities has doubled since the grant termination was announced. *Id.*

## LEGAL STANDARD

To obtain the preliminary injunctive relief they seek, Plaintiffs must establish (1) a likelihood of success on the merits; (2) that irreparable harm is likely in the absence of preliminary relief; (3) that the balance of equities tips in Plaintiffs' favor; and (4) that preliminary relief is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Centro Tepeyac v. Montg. Cty.*, 722 F.3d 184, 188-89 (4th Cir. 2013) (en banc) (outlining *Winter* standard). A court's crafting of an injunction is an "exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v.*

*Int'l Refugee Assistance Proj.,* 137 S. Ct. 2080, 2087 (2017) (citing *Winter*, 555 U.S. at 20, 24). Under Rule 65(a)(2), "court may advance the trial on the merits and consolidate it with the hearing." Fed. R. Civ. P. 65(a)(2).

## ARGUMENT

HHS's premature termination of Plaintiffs' TPP Program grants—with no contemporaneous explanation whatsoever and in violation of its own regulations and Congress's clear intentions—was arbitrary, capricious, and contrary to law. Accordingly, there is a strong likelihood that Plaintiffs will succeed on the merits. Moreover, there is little doubt that the balance of hardships tips sharply in Plaintiffs' favor, and that the public interest supports an injunction. Indeed, without injunctive relief, Plaintiffs may be left with no remedy at all and forced to abandon much of their teen pregnancy prevention work. Yet requiring HHS, as a preliminary matter, to process non-competing continuation funding applications and to prepare to make appropriated funds available to Plaintiffs on July 1, 2018, would merely return the parties to their pre-termination status and effectuate Congress's directive in the appropriations bill that the TPP Program continue to fund evidence-based programs.

In addition, and in accordance with Rule 65(a), Plaintiffs request the Court to consolidate the preliminary injunction hearing with a hearing on the merits, or in the alternative to hold a hearing and issue a decision providing the requested preliminary relief by the end of April, and to hold a separate merits hearing soon thereafter. Whether the grant terminations were unlawful turns on the purely legal determination that they violated the APA because they were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Because this is a legal and not a factual issue, the reasons why Plaintiffs are *likely* to succeed on

the merits, are the same reasons Plaintiffs *do in fact* succeed on the merits. Judicial economy therefore will be served by consolidation.

I.    **Plaintiffs Prevail On The Merits**

    A.    **HHS Failed To Provide Any Explanation for Unlawfully Terminating the TPP Program, And Its Post Hoc Explanations Fail As A Matter Of Law**

The APA authorizes this Court to hold unlawful and set aside final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is instead valid if the agency "articulate[s] a satisfactory *explanation* for its action [that demonstrates] a rational connection between the facts found and the choice made." *Satellite Broad. & Commc'ns Ass'n v. FCC*, 275 F.3d 337, 370 (4th Cir. 2001) (internal citation omitted) (emphasis added).

Here, HHS's termination of Plaintiffs' grants is the extreme example of arbitrary decision-making: HHS not only failed to articulate a rational reason for unlawfully cutting short the grants, it failed to offer grantees *any reason at all*. Rather than provide a timely explanation, HHS instead has publicly provided shifting, after-the-fact explanations. But in judging the propriety of agency action, courts may not consider "post hoc rationalizations." *North Carolina Wildlife Fed. v. North Carolina Dept. of Transp.*, 677 F.3d 596, 604 (4th Cir. 2012) (internal citations omitted). Instead, the action must be judged "solely by the grounds invoked by the agency." *Id.* Even if the Court

could credit HHS's shifting, post hoc statements, the statements themselves are inconsistent and non-sensical. Moreover, HHS's own documents show that the process that led to the termination decision excluded career experts and was not based on a record of reasoned decision-making.

First, Plaintiffs never received an *explanation* from HHS for the termination of their grants—only one threadbare sentence in their Notices of Award received on July 6, 2017 effectuating the termination itself: "This award also shortens the project period to end on June 30, 2018 at the end of this budget year." Wen Decl. ¶ 40; Paluzzi Decl. ¶ 13. That is insufficient as a matter of law. The required explanation for an agency decision "must be articulated by the agency at the time of its action; neither we nor the agency may supply the explanation on appeal." *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001). Thus, when an agency terminates a grant but provides no contemporaneous "reasoned explanation," that termination is arbitrary and capricious. *See City of Kansas City v. HUD*, 923 F.2d 188, 189, 194 (D.C. Cir. 1991). The propriety of HHS's action must be judged by the grounds it invoked at the relevant time, and here because of HHS's abject failure to offer an explanation a court would "be compelled to guess at the theory underlying the agency's action." *SEC v. Chenery Corp.*, 332 U.S. 194, 196-97 (1947); *see*, *e.g.*, *Cordova v. Holder*, 759 F.3d 332, 338 (4th Cir. 2014). HHS's failure to offer any contemporaneous explanation for its decision, much less a reasoned one, itself renders its decision arbitrary and capricious.

HHS has offered a variety of unconvincing post hoc justifications for its termination decisions. Even if the Court could credit these statements, they only further demonstrate the Agency's inability to articulate a reasoned basis for the termination of Plaintiffs' grants.

One post hoc rationalization offered by HHS was its assertion that there was "strong evidence of negative impact or no impact" by the TPP Program projects. Am. Compl. ¶ 107.

There is no basis for this assertion, either in the case of Plaintiffs or the TPP Program as a whole. First, HHS has not and cannot identify any such evidence in the case of Plaintiffs. Plaintiffs have consistently met all performance standards and received numerous commendations from HHS itself—even following the terminations. Wen Decl. ¶ 22, Ex. C, D, E; Paluzzi Decl. ¶ 7, Ex. E, F, G, H, I.

HHS's post hoc public comments about the entire TPP Program's ineffectiveness also cannot be credited. Indeed, in November of 2017—months after notifying Plaintiffs about the decision to prematurely terminate the grants—HHS released its OAH Fiscal Year 2017 Report, lauding the "TPP Program as a model of a Federal program developing increasingly rigorous portfolios of evidence." Am. Compl. ¶¶ 63, 107, 110; Annual Report at 3. That same month, HHS lauded Healthy Teen Network's work, stating that it has done an "excellent job at maintaining a high level of quality" and that the program was "moving smoothly." Paluzzi Decl. ¶21, Ex. I. HHS's belated reference to negative results "runs counter to the evidence before the agency," and is therefore insufficient as a matter of law. *State Farm*, 463 U.S. at 44.

Moreover, documents obtained in the FOIA action show that leaders within OAH itself questioned representations made by HHS in the press regarding the effectiveness of the TPP Program. OAH Director Kappeler wrote an email to the Office of the Assistant Secretary on July 26, 2017 about an article published by the Associated Press and New York Times, which included statements made by an HHS spokesperson about the effectiveness of the program, that contained "several errors" about TPP Program evaluations. Link Decl. ¶ 11, Ex. K. Director Kappeler noted in the email that she and others at OAH were "not clear where some of the statements" in the quote from HHS were coming from and offered to provide the Office of the Assistant Secretary with "accurate data" concerning the TPP Program. *Id.* Consequently, even if it could be properly

considered, HHS's after-the-fact claim that the TPP Program was ineffective—an assertion contradicted within the agency itself and belied by laudatory agency statements made shortly before and after the termination decision—if not outright implausible, certainly runs counter to the evidence before HHS. *State Farm*, 463 U.S. at 43.

Other post hoc rationalizations from HHS are equally illogical. For instance, an HHS spokeswoman told the press that the grants had been terminated because of the President's FY 2018 budget request to eliminate the TPP Program. Am. Compl. ¶ 108. But this is nonsensical, because the President's budget request does not unilaterally establish the budget; and Congress has funded the TPP Program since 2010 and continues to do so. Indeed, this statement only reiterates that HHS disagrees with Congress's policy decision to create and continue to fund the TPP Program. Any desire on the part of HHS to cut that funding does not make for a reasoned basis for its decision to terminate Plaintiffs' grants.

The process that led to the grant termination also reveals the arbitrary nature of the Agency's decision. HHS had previously planned to continue full grant funding, but briskly reversed course. Link Decl. ¶¶ 4-11; Exs. D-K. Career staff in the very office that administers the TPP Program grants were excluded from the hastily-made decision to terminate the TPP Program grants and they themselves were not provided with an explanation for the agency's decision until *after* the decision was made. *See* Link Decl. ¶ 12, Ex. L (career head of OAH noting that OAH was not "aware of the grant action until the last minute" and was not provided with "official talking points" until July 13, 2017, well after the grants had already been cut); *Id*. ¶9, Ex. I (career employee at OAH noting that she or OAH staff had "not been issued any guidance or talking points" as of the date of the grant termination).

Indeed, one career employee at OAH sent an email to OAH staff informing them that decisions had been made regarding the termination of the grants but that she "ha[s] not been issued any guidance or talking points" that the staff could use when fielding calls from grantees. Link Decl. ¶ 9, Ex. I. Rather than provide OAH staff with a reason for the terminations, the employee instead was forced to ask that OAH staff write down questions so that she could forward them on to senior leadership at the Office of the Assistant Secretary of Health for answers. *Id.*

More fundamentally, the documents reveal that, in contrast to the practice of the agency in prior Presidential transitions, here, the agency took action to cut all TPP Program grants notwithstanding Congress' continued funding of the program. Indeed, Director Kappeler, when admonished by leadership for questioning the termination of the TPP Program grants stated that in prior Presidential transitions "grants were not ended until after congressional action made it clear there was a lack of appropriation." *Id.* at Ex. L. Here, in contrast, there has been no lapse in appropriations for the TPP Program.

In sum, HHS's decision—made abruptly and in isolation of those agency officials expert in and most familiar with the TPP Program, without any reason given to the grantees, and justified by post hoc rationalizations lacking any factual support—bears all the hallmarks of arbitrary and capricious agency action. It therefore cannot stand under the APA.

### B.  HHS Failed to Comply with Its Own Regulations

HHS's premature termination of Plaintiffs' grants was also contrary to HHS's own regulations, in clear violation of the APA. *See Nat'l Envtl. Dev. Assocs. Clean Air Proj. v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) ("It is axiomatic … that an agency is bound by its own regulations … [and] an agency action may be set aside as arbitrary and capricious if the agency fails to comply with its own regulations."); *see also Charlotte Mem'l Hosp. v. Bowen*, 665 F. Supp.

455, 458 (W.D.N.C. 1987), *aff'd sub nom. Charlotte Mem'l Hosp. & Med. Ctr., Inc. v. Bowen*, 860 F.2d 595 (4th Cir. 1988) ("It is hornbook law that an administrative agency is bound by its own regulations and cannot maintain a position contrary to those regulations"). HHS regulations define "termination" as "the ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance." *See* 45 C.F.R. § 75.2. These regulations provide that HHS may terminate a federal award in whole or in part only where: (1) the grantee has failed "to comply with the terms and conditions of an award;" (2) "for cause;" (3) "with consent" of the grantee; or (4) "by the [grantee]" upon providing written notification of the reasons for such termination. *See* 45 C.F.R. § 75.372(a)(1)-(4). In terminating the grants prior to the planned end of the five-year project period, HHS has not even purported to rely on any of the four grounds outlined in its regulations. Nor could it, because none apply.

First, Plaintiffs complied with all the program requirements throughout the grant periods. Paluzzi Decl. ¶ 9; Wen Decl. ¶ 29. They were in good standing with OAH prior to the termination and were consistently praised for their work. Wen Decl. ¶¶ 22, 26; Paluzzi Decl. ¶ 7.

Second, HHS has never claimed to terminate Plaintiffs' grants for "cause" and there would be no basis for doing so. Paluzzi Decl. ¶ 14; Wen Decl. ¶ 29. In the OMB guidance on which HHS modeled its regulation, OMB explained that the "for cause" provision addresses circumstances "beyond the Federal agency's … control" that may require awards to be terminated, for example, "situations like those encountered during implementation of the Recovery Act or Sequestration, where congressional mandates encouraged expedited performance, or changes to appropriated amounts require modifications to programs." *See* OMB, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590,

78599 (Dec. 26, 2013). Here, neither in July 2017 nor now has a comparable situation beyond the Agency's control required early termination of Plaintiffs' grants.

And, finally, Plaintiffs have certainly never consented to nor requested the termination of their grants. Paluzzi Decl. ¶ 14; Wen Decl. ¶ 30. Accordingly, HHS's actions are contrary to its own regulations and thus violate the APA.

## C. HHS Acted Contrary to the Continuing Appropriations Act of 2018, the Consolidated Appropriation Act of 2017, and the Impoundment Control Act

HHS's termination is also contrary to law because it violates a clear mandate from Congress. The APA authorizes a reviewing court to hold unlawful and set aside agency action found to be "not in accordance with law" and to "compel agency action unlawfully withheld." 5 U.S.C. §§ 706(1), (2)(A). In the Consolidated Appropriations Act of 2017, Congress continued the TPP Program and appropriated funds to HHS for the grantees' third budget period, which began on July 1, 2017. Pub. L. No. 115-31, 131 Stat. 135, 536. In the Continuing Appropriations Act, 2018, and subsequent continuing resolutions amending it, Congress appropriated to HHS "[s]uch amounts as may be necessary, at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017 and under the authority and conditions in such Acts, for continuing projects or activities . . . that were conducted in fiscal year 2017." Pub. L. No. 115-56 § 101, 131 Stat. 1129, 1139-40. By maintaining appropriations for the TPP Program, Congress had already funded a significant portion of year four of the TPP grants, a funding year that begins

on July 1, 2018.[9]  Congress further reaffirmed its commitment to the program last week, funding the TPP Program in FY2018 at the same levels as FY2017.  On March 23, 2018, the President signed the Consolidated Appropriations Act, 2018, which mandates $101 million for the TPP Program.  Consolidated Appropriations Act, 2018, H.R. 1625, Div. H, Title II, 115th Cong. (forthcoming Pub. L. No. 114-141).  In other words, as of last Friday, the full funds for year four of the TPP Program had been appropriated.

Notwithstanding that there has been no interruption in Congressional appropriations for the TPP Program, HHS has nonetheless refused to disburse these funds.  In so doing, HHS acted in contravention of Congress's directive, and therefore not in accordance with law in violation of the APA.  *See Montana v. Brinegar*, 380 F. Supp. 861 (D. Mont. 1974) (finding unlawful the Office of Management and Budget's refusal to spend federal highway funds based on the Office's own inflation concerns—a reason not authorized by the Federal-Aid Highway Act); *see also Nat'l Council of Comm. Mental Health Centers, Inc. v. Weinberger*, 361 F. Supp. 897, 901-03 (D.D.C. 1973) (finding that the Department of Health, Education and Welfare was required to expend appropriated funds on grants that met criteria outlined in the Community Mental Health Centers Act despite the Department's initial refusal to expend funds and process grant applications because of the President's budget and spending priorities); *Local 2677 American Fed. of Gov. Emp. v.*

---

[9]    Prior to Congress' passage of the Consolidated Appropriations Act, 2018, several acts amended the Continuing Appropriations Act, 2018, to extend appropriations at existing levels until Congress passed the full spending bill.  *See* Bipartisan Budget Act of 2018, Pub. L. No. 115-123. In particular, the Continuing Appropriations Act, 2018, and subsequent acts amending it, provided HHS with 173 days of funding for the TPP Program grants. Because the notices of award provide for HHS to fund the TPP Program grants through five "budget periods" that begin on July 1 of each year of the five-year grant, the Act had appropriated funding for the TPP Program through December 21, 2018. Now, with the Consolidated Appropriations Act, 2018, Congress has fully funded the TPP Program through June 31, 2019.

*Phillips*, 358 F. Supp. 60 (D.D.C. 1973) (despite the President's budget request to Congress for no funding for the Office of Economic Opportunity, "the Executive must continue to operate an authorized program until the funds expire or Congress declares otherwise"). Instead of implementing the program as mandated by Congress, HHS emails reflect that decisions by career staff were reversed in the summer of 2017 and instead staff were forced to provide "the politicals…what they need" to hastily terminate all grants under the TPP Program. Link Decl. ¶ 7, Ex. G.

HHS's unlawful withholding of appropriated funds violates not just the Consolidated Appropriations Act, 2018 and prior Congressional budgetary actions, such as the Continuing Appropriations Act of 2018—but also the Impoundment Control Act of 1974, 2 U.S.C. § 681, which limits the Executive Branch's ability to withhold funds appropriated by Congress. Under the Impoundment Control Act, the President can propose rescission of specific funds through a "special message," but both the House and Senate must approve that rescission within 45 days. 2 U.S.C. § 683(a)-(b). As both the Office of Management and Budget and the Government Accountability Office have recognized, agency withholdings of appropriated funds based on budget proposals to eliminate programs "constitute impoundments that agencies may make only after the President transmits a special message to Congress."[10] In other words, "the President does

---

[10]     *See* Gov't Accountability Off., B-329092, *Impoundment of the Advanced Research Projects Agency-Energy Appropriation Resulting from Legislative Proposals in the President's Budget Request for Fiscal Year 2018* 5 (2017), https://www.gao.gov/assets/690/688941.pdf, (citing OMB Circular No. A-11, pt. 3, § 112.2 (updated July 2017), *available at* https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/assets/a11_current_year/a11_2017. pdf).

not have unilateral authority to refuse to spend [appropriated] funds." *In re Aiken Cty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013).

The Supreme Court weighed in soon after the Impoundment Control Act was passed to affirm an order directing the Executive Branch to spend money allocated by Congress for certain projects. *See Train v. City of New York*, 420 U.S. 35 (1975). The Court interpreted statutory language that allocated funds "shall be allotted" as requiring the Executive to disburse those funds. *Id.* The language appropriating funds for the TPP Program is similarly mandatory. The Consolidated Appropriations Act of 2017 (and therefore the Continuing Appropriations Act of 2018), as well as the Consolidated Appropriations Act, 2018, state that "$101,000,000 *shall be for* making competitive contracts and grants . . . " Pub. L. No. 115-131, 131 Stat. 135, 536 (emphasis added); H.R. 1625, Div. H, Title II, 115th Cong. (forthcoming Pub. L. No. 114-141). Without a rescission bill from Congress, HHS's refusal to make the TPP Program funds available violates the Impoundment Control Act, and therefore is not in accordance with the law in violation of the APA.

## II.  Absent Preliminary Relief, Plaintiffs Will Suffer Irreparable Harm

Irreparable harm "occurs when the threatened injury impairs the court's ability to grant an effective remedy." *Int'l Refugee Assistance Proj. v. Trump*, 883 F.3d 233 (4th Cir. 2018). Here, Plaintiffs and the populations they serve have already suffered irreparable injury and are at imminent risk of further harm. Under the terms of Plaintiffs' TPP Program grants, they must submit applications for non-competing continuation funding each year to obtain funds for the following grant period. The submission of the applications is the only method for Plaintiffs to officially obtain its funding for the following budget year. Paluzzi Decl. ¶ 22; Wen ¶ 31. HHS, however, does not intend to process the applications for the 2018 budget year in the absence of a

Court issues an order in Plaintiffs' favor. Jt. Mot. ¶ 5. HHS has also represented that it will need a minimum of two months to process the applications. *Id.* Based on these representations, HHS maintains would only be able to process the application by June 30, 2018 if this Court issues a ruling before April 30, 2018.

Thus, Plaintiffs cannot receive year-four grant funding absent HHS's processing of their applications, and they cannot complete their programs absent such funding, leading them to suffer irreparable harm. *See Weinberger,* 361 F. Supp. at 901 ("[T]he Court entered a preliminary injunction ordering defendants to review and fully process by normal criteria all pending applications, and to take measures necessary under 31 U.S.C. § 200 to prevent all unobligated and unspent funds for the first-year grant programs from lapsing"). Indeed, Healthy Teen Network has already taken dramatic steps to alter its program in the face of potential loss in funding, including by reducing its sample size and abandoning its Spanish-language study. Paluzzi Decl. ¶ 24. Moreover, because of HHS's actions, the organization has had to leave the positions of three departed employees unfilled, and anticipates needing to lay off at least three more staff members (together, amounting to one third of the organization's total staff) by September 2018 if it does not secure alternative funding. Paluzzi Decl. ¶ 25. Baltimore has similarly had to adjust its projects; it will not be able to adapt its projects for Spanish-speaking youth and youth with developmental disabilities. Wen Decl. ¶ 33. These programmatic cuts harm both Plaintiffs and the communities they serve. *See, e.g., Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d. 962, 980 (7th Cir. 2012) (irreparable harm shown where loss of Medicaid funding would require Planned Parenthood to "lay off dozens of workers, close multiple clinics, and stop serving a significant number of its patients," and where patients would "lose their provider of choice for the duration of the litigation"); *Planned Parenthood Ariz., Inc. v. Betlach*, 899 F. Supp. 2d 868,

30

886 (D. Ariz. 2012) (irreparable harm shown where patients are "denied their choice of qualified health care provider" and Planned Parenthood would "immediately lose revenue from Medicaid funding"); *Planned Parenthood of Cent. N.C. v. Cansler*, 804 F. Supp. 2d 482, 498-99 (M.D.N.C. 2011) (finding irreparable harm to Planned Parenthood from loss of funds because "if the staff members are laid off and the clinic is closed, the Court would be unable to provide an effective or meaningful remedy at the conclusion of this litigation"). Moreover, despite expending significant resources in attempts to do so, Plaintiffs have not been able to secure alternate funding. Paluzzi Decl. ¶ 24; Wen Decl. ¶ 35. This as-yet-unsuccessful effort is diverting resources from other core programmatic activities and thus impeding Plaintiffs' ability to carry out their missions—which itself also constitutes irreparable harm. *See Reaching Hearts Intern., Inc. v. Prince George's County*, 584 F. Supp. 2d 766, 795 (D. Md. 2008) (finding that harm to plaintiff's ability to fulfill its mission constituted irreparable harm and granting interim relief).

Without judicial intervention, HHS has made clear its intention to obligate the funds through a new grant process to new grantees. Jt. Mot. ¶ 5. But the Fourth Circuit has held— repeatedly—that injunctive relief is appropriate to prevent a defendant from disbursing disputed funds in a manner that would render an injury irremediable. *See, e.g.*, *Hughes Network Sys., Inc. v. Inter- Digital Commc'ns Corp.*, 17 F.3d 691, 694 (4th Cir. 1994) (irreparable harm may exist where "[d]amages may be unobtainable from the defendant because he may become insolvent before a final judgment can be entered and collected." (internal citation omitted)); *U.S. ex rel. Taxpayers Against Fraud v. Singer Co.*, 889 F.2d 1327, 1330 (4th Cir. 1989) (affirming preliminary injunction where the principal defendant's assets were "in danger of dissipation and depletion"); *Allen Corp. of America, Inc. v. Zayas*, Civil Action No. TDC-14-3719, 2014 WL 6893868, at *4 (D. Md. Dec. 4, 2014) (finding adequate evidence of irreparable harm where

defendant "may move or dissipate" the funds at issue and would thus be unable "to generate income sufficient to pay a judgment"). Plaintiffs accordingly seek judicial relief to ensure that the conditions for fourth-year funding are in place and the promised funds are available to Plaintiffs should they prevail in this litigation. On the other side of the scale, restoring the pre-termination status quo does not impose any cost on the government, for an injunction would only require it do what it is already obligated to do—process Plaintiff's year-four applications in order to expend funds that have been appropriated by Congress.

## III.     The Balance of Equities and the Public Interest Merit a Preliminary Injunction

The balance of equities and public interest factors are closely related and often considered together when the government is a party. *See Int'l Refugee Assistance Proj. v. Trump*, 857 F.3d 554, 602 (4th Cir. 2017), *vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance Proj.*, 138 S. Ct. 353 (2017); *see also, Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2013). Here, both factors merit an order requiring HHS to process Plaintiffs' applications for year-four funding. Plaintiffs, the Baltimore schools and community partners participating in the programs, and the public at large would all be harmed if this Court does not issue a preliminary injunction that maintains the Agency's ability to fund Plaintiffs' grants at the conclusion of this matter. Moreover, the public has an interest in the orderly management and completion of grant-funded projects, not to mention a substantial interest in the positive public health outcomes that would result from Baltimore's work and in the particular findings that would come from Healthy Teen Network's study. It is no surprise then that 37 Senators and the American College of Obstetricians and Gynecologists, as well as multiple other groups and public health experts, have made clear the harm to the public caused by HHS's premature termination of these important grants. Link Decl. ¶¶ 16-18, Exs. P, Q, R.

## CONCLUSION

Plaintiffs are likely to prevail on the merits in this litigation and will suffer irreparable harm absent temporary relief. Further, the balance of equities and public interest weigh strongly in favor of such relief. Accordingly, Plaintiffs request that this Court enter a preliminary injunction requiring HHS to process Plaintiffs' application for non-competing continuation funding. The Parties respectfully request that the Court consider this motion on an expedited. Jt. Mot. ¶ 8.

Moreover, pursuant to Federal Rule of Civil Procedure 65(a)(2), Plaintiffs request that this Court consolidate its consideration of a motion for a preliminary injunction with consideration of a permanent injunction on the merits of this case. As demonstrated above, Defendants' termination of Plaintiffs' TPP grants was arbitrary and capricious and not in accordance with law, creating immediate and irreparable harm to Plaintiffs. Plaintiffs therefore ask this Court to consider Plaintiffs' request for injunctive relief requiring the Agency to process to set aside its unlawful termination of Plaintiffs' TPP grants.

Dated: March 27, 2018

Respectfully submitted,

DEMOCRACY FORWARD FOUNDATION

*Skye L. Perryman*

Javier M. Guzman, D.C. Bar #462679
*(Pro Hac Vice)*
Josephine T. Morse, N.Y. Bar #4505673
*(Pro Hac Vice)*
Skye L. Perryman, D.C. Bar #984573
(*Pro Hac Vice*)
1333 H St. NW
Washington, DC  20005
(202) 448-9090
jguzman@democracyforward.org
jmorse@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*


PERKINS COIE, LLP
Barry J. Reingold, Bar No. 06490
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

*Attorney for Healthy Teen Network*


Andre M. Davis #00362
City Solicitor

Suzanne Sangree #26130
Senior Counsel for Public Safety & Director of
    Affirmative Litigation

Gabriel Auteri*
General Counsel to Baltimore City Department of
    Health

Elizabeth R. Martinez #29394
Assistant Solicitor, Litigation

City of Baltimore Department of Law
City Hall, Room 109
100 N. Holliday Street
Baltimore, MD 21202
443-388-2190
Andre.Davis@baltimorecity.gov
suzanne.sangree2@baltimorecity.gov
Gabriel.Auteri@baltimorecity.gov
liz.martinez@baltimorecity.gov

*Attorneys for Mayor and City Council of Baltimore*

*\*Application for Admission to United States District Court, District Court of Maryland pending*

**CERTIFICATE OF SERVICE**

I certify that on March 27, 2018, I filed the foregoing with the Clerk of the Court using

the ECF System which will send notification of such filing to the registered participants as

identified on the Notice of Electronic Filing.

/s/ *Skye L. Perryman*

DEMOCRACY FORWARD FOUNDATION

Javier M. Guzman, D.C. Bar #462679
*(Pro Hac Vice)*
Josephine T. Morse, N.Y. Bar #4505673
*(Pro Hac Vice)*
Skye L. Perryman, D.C. Bar #984573 (*Pro Hac Vice*)
1333 H St. NW
Washington, DC  20005
(202) 448-9090
jguzman@democracyforward.org
jmorse@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*