# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

HEALTHY TEEN NETWORK, *ET AL.*,

    Plaintiffs,

        v.

ALEX M. AZAR II, IN HIS OFFICIAL CAPACITY AS
SECRETARY, U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES, *ET AL.*,

    Defendants.

Civil Action No. 1:18-cv-00468-CCB

# MEMORANDUM IN SUPPORT OF DEFENDANTS' CROSS-MOTION
# TO DISMISS OR FOR SUMMARY JUDGMENT
# AND IN OPPOSITION TO
# <u>PLAINTIFFS' MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ................................................................................................................... 1

BACKGROUND ..................................................................................................................... 3

    I.  Under the TPP Program, HHS Provided One-Year Grants and Retained Discretion to Issue Continuation or Competing Awards in Future Years ................................................. 3

    II.  HHS's Grant "Termination" Procedures Are Inapplicable to Continuation Awards......... 6

    III.  Continuing Resolutions Banned HHS from Obligating Future TPP Funds ...................... 8

PROCEDURAL HISTORY...................................................................................................... 9

ARGUMENT ........................................................................................................................ 11

    I. Plaintiffs Are Not Entitled to a Preliminary Injunction...................................................... 11

        A. Plaintiffs' Administrative Procedure Act Claims (Counts I & II) Are Unlikely to Succeed on the Merits ................................................................................................. 12

            1.  Plaintiffs' Interpretation Would Violate the Anti-Deficiency Act ................... 12

            2.  Plaintiffs' Award Documents Reserve HHS's Discretion Not to Make Continuation Awards in Future Years ............................................................ 16

            3.  HHS Regulations Governing "Termination" Do Not Negate the Plain Terms of Plaintiffs' Awards ..................................................................................... 18

            4.  Neither the Impoundment Control Act Nor the Appropriations Laws Provide Support for Plaintiffs' Administrative Procedure Act Claims ........................... 20

            5.  HHS's Decision Not to Issue Future Continuing Awards Is "Committed to Agency Discretion" and Unreviewable ........................................................... 24

            6.  HHS's Decision Was Not Arbitrary or Capricious under the APA .................. 27

        B. The Remaining Preliminary Injunction Factors Do Not Support Relief..................... 29

            1.  Plaintiffs' Delay in Seeking Relief Undermines Their Assertion of Irreparable Harm ...................................................................................................... 29

            2.  The Balance of Equities Favors HHS ............................................................ 31

            3.  Plaintiffs' Requested Relief Will Deprive the Public of the Opportunity to Compete for TPP Program Funds .................................................................. 32

    II.  The Court Should Dismiss, or Enter Summary Judgment on, All of Plaintiffs' Claims .. 33

        A.  As Demonstrated Above, Plaintiffs' APA claims (Count I & II) Lack Merit ........... 33

        B.  Plaintiffs' Equitable Relief Claim (Count III) Fails to State a Claim and Is Barred By Sovereign Immunity................................................................................................ 34

CONCLUSION...................................................................................................................... 34

# TABLE OF AUTHORITIES

## CASES

*Alan Guttmacher Institute v. McPherson*,
  597 F. Supp. 1530 (S.D.N.Y. 1984)................................................................... 26

*Alan Guttmacher Institute v. McPherson*,
  805 F.2d 1088 (2nd Cir. 1986)....................................................................... 26

*American Trucking Association, Inc. v. Delaware River Joint Toll Bridge Commission*,
  458 F.3d 291 (3d Cir. 2006)........................................................................... 29

*American Whitewater v. Tidwell*,
  770 F.3d 1108 (4th Cir. 2014) ...................................................................... 27

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection, Department of Homeland Security*,
  801 F. Supp. 2d 383 (D. Md. 2011) .............................................................. 21

*Ancient Coin Collectors Guild v. U.S. Customs & Border Protection, Department of Homeland Security*,
  698 F.3d 171 (4th Cir. 2012) ........................................................................ 21

*Apter v. Richardson*,
  510 F.2d 351 (7th Cir. 1975) ........................................................................ 25

*Association of National Advertisers, Inc. v. Federal Trade Commission*,
  627 F.2d 1151 (D.C. Cir. 1979)..................................................................... 29

*Autonomy, Inc. v. TASC, Inc.*,
  No. 15-cv-505, 2015 WL 7313380 n.7 (E.D. Va. Nov. 19, 2015) ............... 14

*Bennett v. Spear*,
  520 U.S. 154 (1997)....................................................................................... 20

*Block v. Community Nutrition Institute*,
  467 U.S. 340 (1984)....................................................................................... 24

*California Human Development Corporation v. Brock*,
  762 F.2d 1044 (D.C. Cir. 1985)..................................................................... 25

*Cessna Aircraft Company v. Dalton*,
  126 F.3d 1442 (Fed. Cir. 1997)..................................................................... 15

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971) ........................................................................ 25

*City of Houston v. Department of Housing & Urban Development*,
24 F.3d 1421 (D.C. Cir. 1994) ..................................................... 34

*City of New Haven v. United States*,
634 F. Supp. 1449 (D.D.C. 1986) ................................................ 22

*Communirt Action of Laramie Cnty. v. Bowen*,
866 F.2d 347 (10th Cir. 1989) ...................................................... 25

*Cray Research, Inc. v. United States*,
44 Fed. Cl. 327 (1999) ............................................................ 14, 15

*Davis & Assocs., Inc. v. District of Columbia*,
501 F. Supp. 2d 77 (D.D.C. 2007) ........................................ 13, 14

*Department of Army v. Blue Fox, Inc.*,
525 U.S. 255 (1999) ...................................................................... 34

*Di Biase v. SPX Corp.*,
872 F.3d 224 (4th Cir. 2017) ........................................................ 11

*Federal Deposit Insurance Corporation v. Meyer*,
510 U.S. 471 (1994) ...................................................................... 34

*Federal Crop Ins. Corporation v. Merrill*,
332 U.S. 380 (1947) ...................................................................... 15

*Fort Sumter Tours, Inc. v. Babbitt*,
66 F.3d 1324 (4th Cir. 1995) ........................................................ 27

*General Parts Distribution LLC v. Perry*,
907 F. Supp. 2d 690 (E.D.N.C. 2012) .......................................... 31

*Grassetti v. Weinberger*,
408 F. Supp. 142 (N.D. Cal. 1976) ............................................... 25

*Heckler v. Chaney*,
470 U.S. 821 (1985) ................................................................ 24, 25

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996) ................................................................ 12, 15

iii

*Inova Alexandria Hosp. v. Shalala*,
  244 F.3d 342 (4th Cir. 2001) ......................................................................... 27

*Invention Submission Corporation v. Rogan*,
  357 F.3d 452 (4th Cir. 2004) ......................................................................... 21

*John Lemmon Films, Inc. v. Atlantic Releasing Corp.*,
  617 F. Supp. 992 (W.D.N.C. 1985) ................................................................ 31

*Kletschka v. Driver*,
  411 F.2d 436 (2nd Cir. 1969) ......................................................................... 25

*Leiter v. United States*,
  271 U.S. 204 (1926) ................................................................................. 13, 14

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ................................................................................. 24, 25

*Local 2677, American Federation of Government Employees v. Phillips*,
  358 F. Supp. 60 (D.D.C. 1973) ...................................................................... 22

*Lujan v. National Wildlife Federation*,
  497 U.S. 871 (1990) ....................................................................................... 20

*Maryland Department of Human Resources v. Department of Health and Human Services*,
  854 F.2d 40 (4th Cir. 1988) ........................................................................... 12

*Montana v. Brinegar*,
  380 F. Supp. 861 (D. Mont. 1974) ................................................................. 22

*Motor Vehicle Manufacturers Association v. State Farm Mutual Insurance Company*,
  463 U.S. 29 (1983) ......................................................................................... 27

*National Council of Community Mental Health Centers, Inc. v. Weinberger*,
  361 F. Supp. 897 (D.D.C. 1973) .................................................................... 22

*National Credit Reporting Association, Inc. v. Equifax, Inc.*,
  No. 08-cv-2322-WDQ, 2008 WL 4457781 (D. Md. Sept. 30, 2008) .............. 31

*National Ctr. For Manufacturing Sciences. v. United States*,
  114 F.3d 196 (Fed. Cir. 1997) ....................................................................... 23

*Navajo Nation v. Azar*,
  2018 WL 1092155 (D.D.C. Feb. 28, 2018) ................................................... 17

*Office of Personnel Management v. Richmond*,
  496 U.S. 414 (1990) ............................................................................................... 15

*Philadelphia Housing Authority v. U.S. Department of Housing & Urban Development*,
  553 F. Supp. 2d 433 (E.D. Pa. 2008) ................................................................... 26

*Public Citizen v. Stockman*,
  528 F. Supp. 824 (D.D.C. 1981) ........................................................................... 20

*Quince Orchard Valley Citizens Association, Inc. v. Hodel*,
  872 F.2d 75 (4th Cir. 1989) ........................................................................... 30, 31

*RCS Enterprises v. United States*,
  57 Fed. Cl. 590 (2003) .......................................................................................... 14

*Sam Gray Enterprises v. United States*,
  250 F.3d 755 (table) (Fed. Cir. May 31, 2000) ................................................... 14

*Siebert v. Gene Security Network, Inc.*,
  75 F. Supp. 3d 1108 (N.D. Cal. 2014) ................................................................. 17

*Train v. City of New York*,
  420 U.S. 35 (1975) ................................................................................................ 22

*United States ex rel. Bauchwitz v. Holloman*,
  671 F. Supp. 2d 674 (E.D. Pa. 2009) ................................................................... 19

*Vance-Warren Comprehensive Health Plan, Inc.*,
  DAB No. 2180, 2008 WL 2649498 (H.H.S. Dep't App. Bd. June 18, 2008) ................. 6, 7, 19

*Village of Bald Head Island v. U.S. Army Corps of Engineers*,
  714 F.3d 186 (4th Cir. 2013) ................................................................................ 21

*Webster v. U.S. Department of Agriculture*,
  685 F.3d 411 (4th Cir. 2012) ................................................................................ 27

*Welch v. United States*,
  409 F.3d 646 (4th Cir. 2005) ................................................................................ 34

*Williams v. District of Columbia*,
  902 A.2d 91 (D.C. 2006) ....................................................................................... 13

*Wilson-Cook Medical, Inc. v. Wiltek Medical, Inc.*,
  927 F.2d 598 (4th Cir. 1991) ................................................................................ 30

*Winter v. Natural Resources Defense Council, Inc.*,
 555 U.S. 7 (2008).............................................................................. 11

## STATUTES

5 U.S.C. § 701(a)(2).............................................................................. 24, 25

5 U.S.C. § 702..................................................................................... 34

5 U.S.C. § 704..................................................................................... 20

22 U.S.C. § 2151b(d).............................................................................. 26

31 U.S.C. § 1341............................................................................. passim

Consolidated Appropriations Act, 2010
Pub. L. No. 111-117............................................................................... 3

Consolidated and Further Continuing Appropriations Act, 2016
Pub. L. No. 114-113............................................................................... 8

Consolidated Appropriations Act, 2017
Pub. L. No. 115-31............................................................................ 3, 15

Consolidated Appropriations Act, 2018
Pub. L. No. 115-141.............................................................................. 10

Continuing Appropriations Act, 2018
Pub. L No. 115-56.......................................................................... 8, 9, 23

## UNITED STATED CONSTITUTION

U.S. Const. art I, § 8, cl. 1...................................................................... 12

## RULES

Fed. R. Civ. P. 12(b)(1).......................................................................... 33

Fed. R. Civ. P. 12(b)(6).......................................................................... 33

Fed. R. Civ. P. 56................................................................................ 33

## REGULATIONS

45 C.F.R. § 75.2............................................................................... 7, 18

45 C.F.R. § 75.309(a)............................................................................. 7

**OTHER AUTHORITIES**

H.R. 3358, 115th Cong. (2017)............................................................................................. 9

**INTRODUCTION**

Plaintiffs, who have been grantees under the Teen Pregnancy Prevention Program ("TPP Program"), are suing for emergency relief now after learning last July that current projects would not receive an additional award of funds. Although they are understandably disappointed about this programmatic change, Plaintiffs knew from the beginning that their TPP Program grants were an annual commitment only, and that the government could change its funding priorities in any future year. Contrary to Plaintiffs' assertions, this case is not about grant termination. No grant has been terminated. Rather, the issue is whether an awardee of a one-year grant may convert that time-limited, discretionary benefit into a multi-year government obligation, before Congress has appropriated funds for future years and without affording the agency an opportunity to decide whether to renew the grant or open the award to new competition. Plaintiffs have asked this Court to compel the U.S. Department of Health and Human Services ("HHS") to renew their grants, even though the agency has inherent discretion not to award a grant in future years and is affirmatively precluded from obligating public funds until Congress makes an appropriation for that purpose.

Although Plaintiffs' current projects will not receive further federal funding, they voluntarily accepted that prospect when they agreed to participate in the program. Plaintiffs' theory of grant awards is inconsistent both with federal law and Plaintiffs' agreements. Each Plaintiff, in accepting funds under its grant, also accepted all grant terms, including provisions that Plaintiffs had no guarantee of a continuation of funds beyond each one-year "budget period." Indeed, HHS could not give Plaintiffs any such guarantee, as it is prohibited by law from obligating funds beyond the period of time for which it has an appropriation. An agency's decision whether to recompete grant funds under a new appropriation or to issue those funds on a

non-competitive basis is committed to its discretion and not subject to judicial review. A decision to the contrary could upend the statutorily-mandated system of discretionary grants under which HHS funds more than $30 billion of biomedical research, prevention and treatment projects annually.

The thrust of Plaintiffs' contention is that HHS's lawful exercise of discretion not to make continuation awards violates the Administrative Procedure Act ("APA"), but the claim has no merit. They attempt to bolster their APA claim by contending that HHS's conduct violates the Impoundment Control Act, but that is an equally meritless claim. Plaintiffs do not fall within the zone of interests protected under the Impoundment Control Act, and their attempt to bootstrap it to the APA cannot manufacture standing. The Impoundment Control Act exists to protect Congress's control over Executive spending, not to guarantee the flow of appropriated funds to would-be beneficiaries. Even if Plaintiffs could sue under the Impoundment Control Act, they have not identified a "final agency action" that the statute would prohibit. At the time this suit was filed, HHS had only taken preliminary steps to recompete TPP Program funds—it had not "impounded" those funds by doing so.

Plaintiffs' pleadings devote substantial space to extolling the value of the TPP Program and to laud their projects, but those facts do not and cannot establish a legal basis that obligates HHS to continue issuing grant awards to them. Accordingly, the Court should dismiss the amended complaint with prejudice or, alternatively, enter judgment in HHS's favor on Plaintiffs' claims.

# BACKGROUND

## I.  Under the TPP Program, HHS Provided One-Year Grants and Retained Discretion to Issue Continuation or Competing Awards in Future Years

In 2010, Congress appropriated $110 million to HHS to administer the TPP Program.[1]

At the time this suit was filed, this funding, with minor variations in amount, had been

appropriated annually through the fiscal year ("FY") 2017 appropriations bill, passed in May

2017.  Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135, 536 (May 5,

2017).  Congress funded the TPP Program for making "*competitive* contracts and grants."  *Id.*

(emphasis added).

After five years of administering the program, HHS issued new Funding Opportunity

Announcements ("Funding Announcements") for the TPP Program in 2015.  The Funding

Announcements stated HHS would fund awards using a one year "budget period"—that is,

awarding one year of funds at a time—and a five-year "project period," subject to Congress's

future appropriations and to HHS's discretion whether to make continuation awards or open a

new competition for funding.  The Funding Announcements, therefore, did not guarantee

---

[1] The original appropriation makes funds available for

>  competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, of which not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy, and of which any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities: *Provided further*, That of the amounts provided under this heading from amounts available under section 241 of the PHS Act, $4,455,000 shall be available to carry out evaluations (including longitudinal evaluations) of teenage pregnancy prevention approaches.

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034, 3253 (2009).

funding for any year beyond the first year of award. Rather, the Funding Announcements stated that for "[e]ach year of the approved project period, grantees are required to submit a noncompeting application which includes a progress report for the current budget year, and work plan, budget and budget justification for the upcoming year." *See, e.g.*, Tier 1A Funding Opportunity Announcement, Office of Adolescent Health, Dep't of Health & Human Servs., at 72 (2015), Hunt Decl., Ex. A. The Funding Announcements also explained that "recipients must comply with all terms and conditions outlined in their grant awards, the Department of Health and Human Services (HHS) Grants Policy Statement, requirements imposed by program statutes and regulations and HHS grant administration regulations, as applicable, as well as any requirements or limitations in any applicable appropriations acts." *Id.* at 68.

Plaintiffs, all participants in various aspects of the TPP Program, received their first notices of award in the summer of 2015, which included a budgeted award of financial assistance for one year only (July 1, 2015 to June 30, 2016), along with "recommended future support" for subsequent budget years. *See, e.g.*, City of Baltimore 2015-16 Notice of Award, at 1, Wen Decl., Ex. A.[2] Consistent with the Funding Announcements, the awards indicated that funding for future years were contingent on HHS approval. The awards did this by stating that grantees must "comply with all terms and conditions outlined in the grant award, including grant policy terms and conditions contained in applicable [HHS] Grant Policy Statements," and hyperlinking to those policies on HHS's website. *Id.* at 4-5. The FY 2017 awards twice declare that when grantees draw down their award money, they were accepting those terms and conditions. *See, e.g.*, City of Baltimore 2017-18 Notice of Award, Wen Decl., Ex F, at 1 (Box No. 16) & 3 ¶ 1.

---

[2] Awards for subsequent budget periods were explicitly denominated "Non-Competing Continuation" awards. City of Baltimore FY 2016 Award, Hunt Decl., Ex. I.; *see also* Healthy Teen Network FY 2016 Award, at 1, Paluzzi Decl., Ex. C.

The Grants Policy Statement incorporated into those awards repeatedly declares that continuation awards beyond the budget year are contingent on HHS's discretionary decision to issue them, a decision based in part on its determination whether government interests have changed so that future funds should be recompeted. When describing the "project period" system, the Grants Policy Statement cautions that although "project period[]" may "indicat[e] the [operating division's] intention to provide continued financial support" beyond the budget period, such projections

> are contingent on satisfactory progress, the availability of funds, and *the continued best interests of the Federal government*. They are not guarantees that the project or program will be funded or will be funded at those levels, and they create *no legal obligation to provide funding beyond the ending date of the current budget period* as shown in the [notice of award].

Grants Policy Statement, U.S. Dep't of Health & Human Servs., at I-34 (emphasis added), Hunt Decl., Ex. B. The "Terms and Conditions" of the Grants Policy Statement further reserves HHS's broad discretion to not make a continuation award:

> An [operating division] may decide not to make a non-competing continuation award within the current competitive segment for one or more of the following reasons:
>
> • Adequate Federal funds are not available to support the project.
> • A recipient failed to show satisfactory progress in achieving the objectives of the project.
> • A recipient failed to meet the terms and conditions of a previous award.
> • *For whatever reason, continued funding would not be in the best interests of the Federal government.*

*Id.* at II-89 (emphasis added).

Under the "project period" system, grants are accordingly "programmatically approved" for a period of up to five years, "but are funded in annual increments called budget periods." *Id.* at I-34. Because continuation awards are not guaranteed, each year grantees must submit an "official request to [HHS's Office of Adolescent Health] for continued funding" known as a

"non-competing continuation application." Guidance for Preparing a Non-Competing Continuation Grant Application, Off. of Adolescent Health, U.S. Dep't of Health & Human Servs., at 3 (Nov. 2016), Hunt Decl., Ex. C.[3] If HHS approves a grantee's request for funding—whether an initial award or a continuation award—the grantee receives a "Notice of Award" that includes the "approved project period and budget period start and end dates," and, distinctly, the "amount of Federal funds authorized for obligation by the recipient" within the next "budget period" in response to the grantee's application for funding. Hunt Decl., Ex. B, at I-33.

The discretionary character of whether HHS will issue continuation awards is reinforced by HHS's position that such decisions cannot be appealed unless the denial was because the grantee failed "to meet the terms and conditions of a previous award." *Id.* at II-89. Where HHS makes a policy decision not to issue continuation awards, the departmental appeals board "has no power to review" the decision because such decisions "generally are matters committed to the federal agency's discretion." *In re Vance-Warren Comprehensive Health Plan, Inc.*, DAB No. 2180, 2008 WL 2649498, at *1 (H.H.S. Dep't App. Bd. June 18, 2008).

## II.  HHS's Grant "Termination" Procedures Are Inapplicable to Continuation Awards

HHS's announcement that it had reevaluated government interests and would not issue future continuation awards did not "terminate" any of Plaintiffs' award funding because their past awards did not obligate any future funding. "Termination" is a term of art in HHS

---

[3] *See also* Hunt Decl., Ex. B, at I-16 (defining non-competing continuation application as "a request . . . for funding the second or subsequent budget period within an approved competitive segment"); *id.* at B-3 (defining "competitive segment" as "[t]he initial project period recommended for support (up to 5 years) or each extension of a project period resulting from a competing continuation award").

regulations concerning grants; not every decision to discontinue funding constitutes a "termination," and a decision not to issue future continuation awards is not a termination at all.

HHS regulations provide several definitions that illuminate the distinction between terminating a grant and declining to issue a future continuation award. A "termination" is "the ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance." 45 C.F.R. § 75.2. The "period of performance" is the "time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award," such as "orders placed for property and services" and "contract and subawards." 45 C.F.R. § 75.2; *see also id.* § 75.309(a) ("A non-Federal entity may charge to the Federal award only allowable costs incurred during the period of performance," subject to limited exceptions for pre-award costs necessary to carry out the work approved under the award). "Project period" is defined by cross-reference to the substantive definition of a "period of performance." *Id.*

In the context of continuation awards such as Plaintiffs', the time during which the grantee can incur new obligations—i.e., the "period of performance" during which an award cannot be terminated except consistent with HHS regulations—is the "budget period." Grantees obtain funding one "budget period" at a time after submitting and obtaining HHS approval for their detailed budgets and work plans. As the Grants Policy Statement explains, the Notice of Award received by the grantee "show[s] the amount of Federal funds *authorized for obligation*" by the grantee, which is limited to a particular "budget period," "and any future-year commitments," which are the funds the agency currently projects (but does not guarantee) will be awarded to the grantee in remaining years of the "project period." Hunt Decl., Ex. B, at I-33 (emphasis added). The reference to the "project period" in the grant documents confers no authority on Plaintiffs to incur new obligations beyond the "budget period" and accordingly

cannot be equated with the "period of performance" used in the regulations.  This reading of the grant documents is also consistent with the limitations imposed on HHS (and other federal agencies) by the Anti-Deficiency Act, discussed further below, that prohibit the obligation of funds in advance of annual appropriations.  Here, the term "project period," as used in the grant documents, includes future fiscal years not yet appropriated by Congress.  To comply with the Anti-Deficiency Act, the term cannot create an enforceable obligation beyond any one-year "budget period."

### III. Continuing Resolutions Banned HHS from Obligating Future TPP Funds

In the past, HHS has renewed funding for TPP Program grantees during the summer using funds appropriated for the fiscal year ending that September.  For example, funds for the budget period starting July 1, 2016 and ending June 30, 2017 came out of the FY 2016 appropriations, which expired September 30, 2016.  *See* Consolidated and Further Continuing Appropriations Act, 2016, Pub. L. No. 114-113, 129 Stat. 2242, 2617 (enacted Dec. 18, 2015).

At the time Plaintiffs filed their original complaint, Congress had approved a series of continuing resolutions to fund the government through March 23, 2018, while negotiating a FY 2018 budget.  Most important among the continuing resolutions was the Continuing Appropriations Act, 2018, Pub. L. No. 115-56, 131 Stat. 1129, 1139 (enacted Sept. 8, 2017) (hereinafter "2018 Continuing Appropriations Act").  Subsequent continuing resolutions have simply modified the 2018 Continuing Appropriations Act to extend the deadline for passing a budget.  Although the 2018 Continuing Appropriations Act funded the government during FY 2018 "at a rate for operations as provided in the applicable appropriations Acts for fiscal year 2017," it contained exceptions designed to maintain the funding prerogatives of Congress and the President during budget negotiations.

Two exceptions in the 2018 Continuing Appropriations Act are relevant here. First, section 109 specifically addressed the ability of agencies to award grants for programs that depend on further appropriations:

> Notwithstanding any other provision of this Act, except section 106, for those programs that would otherwise have high initial rates of operation or complete distribution of appropriations at the beginning of fiscal year 2018 because of distributions of funding to States, foreign countries, grantees, or others, such high initial rates of operation or complete distribution shall not be made, *and no grants shall be awarded for such programs funded by this Act that would impinge on final funding prerogatives*.

131 Stat. at 1141 (emphasis added). Second, section 110 provided that the act must be "implemented so that *only the most limited funding action* of that permitted in the Act shall be taken in order to provide for continuation of projects and activities." *Id.* (emphasis added). Consequently, not only did the 2018 Continuing Appropriations Act not renew TPP Program funds for FY 2018, it explicitly prohibited HHS from obligating FY 2018 funds under that program.

## PROCEDURAL HISTORY

Funding for the TPP Program in FY 2018 (which began October 1, 2017) was a subject of significant debate. The President's FY 2018 budget request, announced in May 2017, recommended eliminating the program. *See* 2018 Budget Request for Gen. Departmental Mgmt., U.S. Dep't of Health & Human Servs., *available at* https://www.hhs.gov/sites/default/files/combined-general-department-management.pdf. The HHS House appropriations bill would have declined to fund the program. H.R. 3358, 115th Cong. (2017). In response, a number of members of Congress expressed support for the program. Letter to the Honorable Tom Price, M.D., from 149 House Members, July 25, 2017, Hunt Decl., Ex. D; Letter to the Honorable Tom Price, M.D., from 37 Senators, July 21, 2017, Hunt Decl., Ex. E.

Disagreement over the future of the TPP Program was a contributing factor to the larger budget impasse. *See* Jennifer Haberkorn & Sarah Ferris, *Planned Parenthood Defunding Threatens Government Spending Package*, Politico, Mar. 7, 2018, Hunt Decl., Ex. F (noting disagreement between Republicans and Democrats over riders that would "ax the Teen Pregnancy Prevention Program"). On March 23, 2018, Congress agreed to a full-year appropriations statute for FY 2018 that renewed the program using the same language used in the FY 2017 appropriations bill. Pub. L. No. 115-141, 132 Stat. 348 (2018).

When HHS issued FY 2017 Notices of Award to Plaintiffs in the summer of 2017, it announced it would not issue continuation awards for the remaining "project period" years. *See, e.g.*, Wen Decl., Ex. F, at 1; Paluzzi Decl., Ex. K, at 1. If Congress renewed TPP Program funding, HHS would recompete the funds by issuing a new Funding Announcement to interested parties, which could include Plaintiffs. Kretschmaier Decl., ¶¶ 4-5. The agency made its change in policy priorities and reassessments publicly known. "Teen Pregnancy Prevention Program Facts," Press Release, Office of the Assistant Secretary for Health, U.S. Dep't of Health & Human Servs., Aug. 28, 2017, Hunt Decl., Ex. G. It also informed grantees of this decision in July 2017 in the text of their awards for the 2017-18 "budget period," which shortened the "project period" of their awards to end in 2018.

Plaintiffs have drawn down their FY 2017 funds, thereby accepting the change in the project period and the underlying terms. Kretschmaier Decl., ¶ 3. Then, seven months later, Plaintiffs filed this suit seeking to "reinstate the terms of the Notice of Award, … including …

the five-year funding term." Am. Compl., ECF No. 21, at Prayer for Relief, ¶ 2. Over a month

after filing suit, Plaintiffs sought preliminary injunctive relief.[4] Mot., ECF No. 18.

## ARGUMENT

### I. Plaintiffs Are Not Entitled to a Preliminary Injunction

To succeed on their request for a preliminary injunction, Plaintiffs must establish (1) that

they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the

absence of interim relief, (3) that the balance of equities tips in their favor, and (4) that an

injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20

(2008). "A preliminary injunction shall be granted only if the moving party clearly establishes

entitlement to the relief sought." *Di Biase v. SPX Corp.,* 872 F.3d 224, 230 (4th Cir. 2017). "A

plaintiff need not establish a 'certainty of success,' but must make a clear showing that he is

likely to succeed at trial." *Id.* "Similarly, a plaintiff must demonstrate more than just a

"possibility" of irreparable harm." *Id.* As the Supreme Court held in *Winter*, a preliminary

injunction is "an extraordinary remedy never awarded as of right." 555 U.S. at 24.

Plaintiffs cannot demonstrate a "clear likelihood of success" on the legal merits of their

claims. The undisputed record establishes as a matter of law that they have no entitlement to

further funding. Every time they accepted a TPP Program grant from the government, Plaintiffs

acknowledged that they had no legal right to future awards within the "project period," and that

HHS could deny continuation awards in future years by deciding, "for whatever reason," that

issuing continuation awards was not in the federal government's interest. Hunt Decl., Ex. B, at

II-89. HHS exercised this explicit authority, and Plaintiffs accepted that decision by drawing

---

[4] Although styled as a "motion for preliminary and permanent injunction," Plaintiffs offer little
basis for consolidating any issues for a trial. Indeed, as demonstrated below, Defendants are
entitled to dismissal of all claims or judgment in their favor.

down their funds for the FY 2017 budget period.  Plaintiffs' attempt to recast their relationship with HHS as a "five-year" grant would vitiate the terms and conditions of their grants and violate the Anti-Deficiency Act.  The delay in Plaintiffs' request and the harm that would befall both HHS and the public if injunctive relief were granted further weighs against Plaintiffs' request here.  The Court, therefore, should both reject Plaintiffs' unlawful termination theory—for it is impossible to "terminate" a grant that has not been awarded—and deny their motion.

### A.  Plaintiffs' Administrative Procedure Act Claims (Counts I & II) Are Unlikely to Succeed on the Merits

### 1.  Plaintiffs' Interpretation Would Violate the Anti-Deficiency Act

Plaintiffs' asserted basis for relief would violate the Anti-Deficiency Act, if true.  The Constitution gives Congress primary authority over federal spending, *see* U.S. Const. art. I, § 8, cl. 1, and the Anti-Deficiency Act enforces that authority.  *See* 31 U.S.C. § 1341.[5]  The Anti-Deficiency Act forbids agencies from "from entering into a contract for future payment of money in advance of, or in excess of, an existing appropriation." *Hercules, Inc. v. United States*, 516 U.S. 417, 427 (1996).  This prohibition applies to grants and cooperative agreements.  *See Md. Dep't of Human Res. v. Dep't of HHS*, 854 F.2d 40, 42 (4th Cir. 1988) (applying Anti-Deficiency Act to grant distribution decisions of HHS); *see also* GAO Principles of Federal Appropriations Law, 3rd ed., vol. 2, ch. 10, at 10-43, GAO-06-382SP [hereinafter "*GAO Red Book*"] (2015), *available at* https://www.gao.gov/assets/210/202819.pdf.  Thus, it is axiomatic that HHS's

---

[5] As relevant here, the Anti-Deficiency Act provides:

(a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—
  (A)   make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]
  (B)   involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law . . . .

ability to commit to fund a TPP Program grant for any year is necessarily constrained by whether an appropriation exists for that year.

Following Congress's directive, "the Supreme Court … and other federal courts have explicitly and repeatedly held that *all* contracts for future payments of money, in advance of or in excess of existing appropriations, are void ab initio" unless Congress provides otherwise. *Davis & Assocs., Inc. v. District of Columbia*, 501 F. Supp. 2d 77, 80 (D.D.C. 2007) (quoting *Williams v. District of Columbia*, 902 A.2d 91, 94 (D.C. 2006)). Absent congressional authority to make "multi-year" commitments, any agreement that contemplates payment of money is valid only if (1) the contract is contingent on an "appropriation be[ing] made available" and (2) "the government … affirmatively continue[s] the [commitment] for such subsequent year; thereby, in effect … making a new [commitment] under the authority of such appropriation for the subsequent year." *Leiter v. United States*, 271 U.S. 204, 206-07 (1926) (invalidating a multi-year lease); *see also GAO Red Book*, vol. 2, ch. 6, at 6-52–6-56 (summarizing the *Leiter* rule).

The Supreme Court's decision in *Leiter* is the foundational case. There, the plaintiff had leased office space to government agencies that eventually merged into the Veterans' Bureau "for terms of four and five years." 271 U.S. at 205. The leases "stipulated annual rentals" and were made contingent on Congress appropriating funds. *Id.* But before the full term of the leases had expired, the Veterans' Bureau notified the plaintiff that it would cancel its lease for future years, even though Congress eventually appropriated funds for the Veterans' Bureau to lease office space. *Id.* at 206-07. The Court held that because "at the time [the leases] were made there was no appropriation available for the payment of rent after the first fiscal year," the leases violated the Anti-Deficiency Act and "created no binding obligation against the United States after the first year." *Id.* at 207. The only way the contract would be "binding for any

13

subsequent year" is if the government, in addition to making the contract contingent on appropriations, had "affirmatively continue[d] the lease for such subsequent year … making a new lease under the authority of such appropriation for the subsequent year." *Id.*

After *Leiter*, unless another congressional directive states otherwise (and no such authority is invoked by Plaintiffs or the grant documents), a "subject to availability" clause is not sufficient to permit multiyear funding. *GAO Red Book*, vol. 2, ch. 6, at 6-55. The government instead has a position akin to an option contract. *RCS Enters. v. United States*, 57 Fed. Cl. 590, 595 (2003) (distinguishing a "true option" in a contract governed by *Leiter* as one the government can "decline to exercise" for future years). A "contract 'dies' at the end of the fiscal year" unless it is "revived … by affirmative action by the government" to create a "'new' contract." *GAO Red Book*, vol. 2, ch. 6, at 6-55.[6]

Plaintiffs' view of their TPP Program awards is contrary to the Anti-Deficiency Act. They insist that HHS obligated itself in 2015 to award as-yet unappropriated funds through 2020, but no such multi-year obligating authority exists. The Anti-Deficiency Act prescribes, and the TPP Program grant documents promise, only a "one-year contract followed by a series of government renewal options" that can be "exercised only by the government's affirmative

---

[6] *See also Sam Gray Enters. v. United States*, 250 F.3d 755 (table), 2000 WL 701733 (Fed. Cir. May 31, 2000) (rejecting five-year lease because "'[a]nnual appropriations' can be obligated only in the specified fiscal year" and plaintiff failed to show appropriations to fund a multi-year contract); *Autonomy, Inc. v. TASC, Inc.*, No. 15-cv-505, 2015 WL 7313380, at *5 n.7 (E.D. Va. Nov. 19, 2015) (plaintiffs' claimed understanding that agency was "authorized … to commit the federal government to purchase … in advance of obtaining appropriated funds," suggests "such an understanding … was unreasonable as a matter of law") (citing *Leiter*, 271 U.S. at 207, and the Anti-Deficiency Act, 31 U.S.C. § 1341); *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 333 (1999) (rejecting claim that would have "obligate[d] the CIA to make payments for all five years of the contract, so long as Congress appropriates funds each year," without having the option to renew); *Davis & Associates, Inc.*, 501 F. Supp. 2d at 80 (voiding contingency fee contracts between collection agencies and D.C. government because they "provided for the payment of money that had not been previously authorized and appropriated").

action." *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327, 332 (1999). HHS could not lawfully commit the government to a "future payment of money in advance of, or in excess of, an existing appropriation." *Hercules*, 516 U.S. at 427; *see also Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1449 (Fed. Cir. 1997) ("the Antideficiency Act restricts the ability of the government to enter into multi-year contracts because funds generally cannot be obligated beyond the current fiscal year.").

Plaintiffs cannot rely upon statements in the Funding Announcements, *see, e.g.*, Pls.' Br. at 7, to create a multiyear obligation for funding. *See GAO Red Book*, vol. 2, ch. 6, at 6-55 ("If a 'subject to availability' clause were sufficient to permit multiyear contracting, the effect would be automatic continuation from year to year unless the government terminated," which violates the Anti-Deficiency Act). The Funding Announcements must be read in the context of other grant documents that explain the grantees' lack of legal rights to future continuation awards, and they must be read in light of the Anti-Deficiency Act, which prohibits any obligation attaching to future funds unless the government affirmatively exercises its option to continue the relationship.

Even if Plaintiffs were correct about the grant documents' meaning (and, as demonstrated below, they are not), the government cannot be bound by the acts of agents beyond the scope of their actual legal authority. *See Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *see also Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 426 (1990). HHS is not authorized to agree to the future award scheme Plaintiffs describe. Agreements that do not comport with *Leiter* and the Anti-Deficiency Act are void ab initio. Moreover, the TPP Program appropriation specifically appropriates funds "for making competitive contracts and grants." Pub. L. No. 115-31, 131 Stat. at 536. Plaintiffs cannot use that statute to *prohibit* HHS from competing FY 2018 funds. HHS did what it was legally obliged to do by reserving the option not to make

continuation awards and exercised that option by choosing to recompete the funds appropriated to the TPP Program by Congress.

### 2. Plaintiffs' Award Documents Reserve HHS's Discretion Not to Make Continuation Awards in Future Years

Plaintiffs' theory of their TPP Program awards is not only inconsistent with the Anti-Deficiency Act, it is contrary to the terms of those awards. The TPP Program grant awards explicitly reserved HHS's discretion to not continue future years of funding and to recompete such funding if HHS decides "for whatever reason, continued funding would not be in the best interests of the Federal government." Hunt Decl., Ex. B, at II-89. Plaintiffs accepted these terms and cannot now demand an injunction to receive future awards.

Each Notice of Award received by the Plaintiffs stated that "[a]cceptance of the grant terms and conditions is acknowledged by the grantee when funds are drawn or otherwise obtained from the grant payment system." *See, e.g.*, Wen Decl., Ex. F, at 1. In addition, the FY 2017 Notices further provided that, "[b]y drawing or otherwise obtaining funds for the award from the grant payment system or office, you accept the terms and conditions of the award and agree to perform in accordance with the requirements of the award." *Id.* at 3.

The terms and conditions further notified Plaintiffs that they must comply with "grant policy terms and conditions contained in applicable Department of Health and Human Services (HHS) Grant Policy Statements" and it provided a link to the Grants Policy Statement. *Id.* The Grants Policy Statement provides that "[a]n [operating division] may decide not to make a non-competing continuation award within the current competitive segment" if "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." Hunt Decl., Ex. B, at II-89. It further explains that "projected levels of future support [from project periods] are

*contingent* on satisfactory progress, the availability of funds, and *the continued best interests of the Federal government*." *Id.* at I-34 (emphasis added).

The Grants Policy Statement controls here. By accepting the Notices of Award, Plaintiffs acknowledged that HHS could decline to approve a continuation award for whatever reason, in its sole discretion. Moreover, no statute or regulation impairs HHS's authority to deny a continuation award. *See Navajo Nation v. Azar*, CV 18-0253, 2018 WL 1092155, at *5 (D.D.C. Feb. 28, 2018) (applying Grants Policy Statement terms to grant dispute); *Siebert v. Gene Security Network, Inc.*, 75 F. Supp. 3d 1108, 1124 (N.D. Cal. 2014) (same). Indeed, as explained above, any regulation that would interfere with HHS's ability to decline a continuation award in these circumstances would run afoul of the Anti-Deficiency Act.

Consequently, Plaintiffs are asking this court to negate the express, repeated terms of their own awards—terms that declare Plaintiffs are not entitled to any future years of continuation funds if HHS deems the interests of the government have changed. Indeed, their position is even further removed from the latest award terms, for Plaintiffs' 2017 awards declared that "[t]his award also shortens the project period to end on June 30, 2018 at the end of this budget year." *See, e.g.*, Wen Decl., Ex. F, at 1. After accepting those terms by drawing down funds, Plaintiffs now wish to be free of them and insist that they need urgent injunctive relief from this Court. But Plaintiffs have known each year since 2015 that future years of funding might not be awarded on a continuation basis, and each year they accepted funds subject to this condition. Plaintiffs have not been injured by HHS's decision to exercise that option. Plaintiffs, like the rest of the public, are free to participate in the competition for the newly appropriated funds, but Plaintiffs have no basis to deprive the public of that same opportunity.

### 3. HHS Regulations Governing "Termination" Do Not Negate the Plain Terms of Plaintiffs' Awards

The regulations themselves, when read in their entirety and applied properly to the grant documents, confirm that HHS did not enter an arrangement that would violate the Anti-Deficiency Act. Plaintiffs hinge their whole case on the phrase "period of performance," but their brief never mentions the actual substantive definition of that term. For good reason: "period of performance" is defined as the "time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award." 45 C.F.R. § 75.2. And for purposes of Plaintiffs' awards, "the amount of Federal funds authorized for obligation" is limited to a particular budget period. Hunt Decl., Ex. B, at I-33. Because Plaintiffs could not incur any new obligations under their awards beyond the year for which the funds were appropriated, it is clear that the period of performance for those awards was the budget period.

A single cross-reference exists in the regulations for "project period" to "period of performance," 45 C.F.R. § 75.2, but that cross-reference cannot overcome the substantive definition of "period of performance" in the regulations. The "work authorized under the Federal award" by HHS is the one year of work authorized by the Notice of Award, and "the time during which the non-Federal entity may incur new obligations to carry out [that] work" is the "budget period," the only time period in which funds are made available for obligation to the grantee. A cross reference cannot override that definition, particularly when doing so would impose financial obligations on the government beyond a fiscal year, in violation of the Anti-Deficiency Act.

The cross-reference for "project period" also cannot overcome the plain terms of the awards. The Grants Policy Statement, incorporated in each award, states that the "amount of Federal funds authorized for obligation by the recipient" are for the current budget period only.

Hunt Decl., Ex. B, at I-33.  The Notice of Award under HHS's "project period" system accordingly "only committed [HHS] to fund[] the grant for the current budget period due to dependency upon the annual Congressional appropriations process."  *United States ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 681 (E.D. Pa. 2009).  The "projections of future funding levels" found in the Notice of Awards "[we]re not guarantees that the project will be funded beyond the end date of the current budget period." *Id.*[7]

Agency practice confirms these straightforward points.  Grantees submit, and HHS approves, budgets and work plans for continuing applications on a year-by-year basis.  Hunt Decl., Ex. C, at 3.  Remaining years of the "project period" are nothing more than recommendations or projections of future support.  Such support is secured only after an applicant applies for a continuation award and HHS authorizes that new award.  Until that point, it is only "projected" support.  And the denial of a continuing award is treated very differently from the "termination" of grant funds that are already available for the grantee to obligate, as such terminations are afforded enhanced due process procedures and appeal rights.[8]

In sum, Plaintiffs' view of their grants would displace the regulations, the parties' mutual understanding of the law at the time, and widespread agency practice.  It must be rejected.

---

[7]  Indeed, if "recommended future support" on the Notice of Award were, contrary to law, a guarantee of future funding, then the omission of a funding projection, such as occurred on the City of Baltimore's Notice of Award for FY 2016, *see* City of Baltimore FY 2016 Award, Hunt Decl., Ex. I, would have had substantive consequences.  But that is not, and cannot be, the case.

[8]  Thus, the City of Baltimore's claim that it tried to "appeal" to HHS but received no response, Pls.' Br. at 13, is readily explained by the fact no existing grant was "terminated," and so no appeal process would attach to the programmatic change. *See Vance-Warren*, 2008 WL 2649498, at *1.

### 4. Neither the Impoundment Control Act Nor the Appropriations Laws Provide Support for Plaintiffs' Administrative Procedure Act Claims

#### a. Plaintiffs Do Not Fall Within the "Zone of Interests" Protected By the Impoundment Control Act or Appropriations Laws

Before the Court can consider Plaintiffs' claim of an "impoundment" or some other appropriations law violation, Plaintiffs must establish a cause of action under the APA to bring such a claim and that requires proof that their claim "falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990). Plaintiffs failed to meet this minimum threshold. Plaintiffs argue that even if the Impoundment Control Act itself provides no private right of action, they can rely upon the APA to challenge agency action that allegedly violates the Impoundment Control Act. That argument is unavailing. Congress enacted the Impoundment Control Act to enforce its control over the federal purse, not to give private citizens a platform to second-guess spending decisions. *See Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981) (private groups do not fall within the "zone of interests" of the Impoundment Control Act because it was "clearly enacted to safeguard Congress's interests, not those of private citizens").

#### b. HHS Has Not Taken "Final Agency Action" With Respect to TPP Funds

Plaintiffs' impoundment and appropriations arguments also fail because they challenge non-final agency action. Judicial review under the APA is limited to "final agency action." 5 U.S.C. § 704. Agency action is "final" if (1) it "mark[s] the consummation of the agency's decisionmaking process" and is therefore not tentative or interlocutory, and (2) it determines the "rights or obligations" of the parties. *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (citations omitted).

The APA "does not provide judicial review for everything done by an administrative agency," *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (internal quotation marks and citation omitted). "The term 'action' as used in the APA is a term of art that does not include all conduct such as, for example, constructing a building, operating a program, or performing a contract. Rather, the APA's definition of agency action focuses on an agency's determination of rights and obligations, whether by rule, order, license, sanction, relief, or similar action." *Vill. of Bald Head Island v. U.S. Army Corps of Engineers*, 714 F.3d 186, 193 (4th Cir. 2013) (citation omitted). In the absence of final agency action, "intermediate agency actions" along the path toward a final action are not reviewable. *See Ancient Coin Collectors Guild v. U.S. Customs & Border Prot., Dep't of Homeland Sec.*, 801 F. Supp. 2d 383, 404 (D. Md. 2011), *aff'd*, 698 F.3d 171 (4th Cir. 2012).

To date, neither HHS nor any Executive branch official has taken reviewable action that could be construed as an "impoundment." HHS has merely determined that it will not make continuation awards for existing TPP Program projects and that funds available under the new annual appropriation will be recompeted in a process in which this year's grantees would be free to participate. Kretschmaier Decl., ¶¶ 3-5.

HHS's activity to date is exactly the type of "intermediate agency action[]" not subject to judicial review. *See Ancient Coin Collectors Guild*, 801 F. Supp. 2d at 404. Until just recently, HHS has been operating under continuing resolutions that restricted its ability to make grant awards that could undermine congressional spending prerogatives. But HHS has always expressed an intent to spend appropriated TPP Program funds. *See* Hunt Decl., Ex. G ("Should Congress continue to fund the TPP Program, decisions by the Department will be guided by science and a firm commitment to giving all youth the information and skills they need to

improve their prospects for optimal health outcomes."); Letter from Barbara P. Clark, Acting

Assistant Secretary of Legislation, U.S. Dep't of Health & Human Servs., to Sen. Patty Murray,

Nov. 22, 2017, Hunt Decl., Ex. H (HHS will "continue to distribute funds in accordance with the

parameters set by Congress" if the TPP Program is refunded).  Its decision to do so in a future

recompete is consistent with its obligations under the appropriations laws.

Plaintiffs' cited cases, which all address President Nixon's use of impoundments "as a

means of shaping domestic policy to his liking [by] withholding funds from various programs he

did not favor," *City of New Haven v. United States*, 634 F. Supp. 1449, 1454 (D.D.C. 1986), are

readily distinguished.  In *Train v. City of New York*, 420 U.S. 35 (1975), for example, the EPA

Administrator refused to allocate funds earmarked for three specific years by Congress as part of

an appropriation to remediate water pollution.  *Id.* at 37-40.  The Administrator contended that he

could allocate the funds in smaller amounts over a longer period of time, but the Court held that

he must allocate the entire amounts authorized to be appropriated each year.  *Id.* at 44.  As an

initial matter, the Court noted that the recently-passed Impoundment Act did not apply to the

dispute.  *Id.* at 41 n.8.  More fundamentally here, HHS has not issued any final decision

regarding the TPP funds, let alone a decision—such as the Administrator's decision in *Train*—to

*refuse* to allocate appropriated funds.[9]  Although Plaintiffs would prefer that HHS allocate those

---

[9]  In all the other cases Plaintiffs cite, *see* Pls.' Br. at 27-28, agencies affirmatively directed that funds appropriated for certain purposes not be spent on those mandated purposes, even though no budget had been passed for a subsequent year that would justify a program wind-down.  *See Nat'l Council of Cmty. Mental Health Centers, Inc. v. Weinberger*, 361 F. Supp. 897 (D.D.C. 1973) (citing directive not to issue new staffing grants after Congress appropriated funds for staffing); *see also Montana v. Brinegar*, 380 F. Supp. 861, 862 (D. Mont. 1974) (highway funds impounded at direction of the Office of Management and Budget); *Local 2677, Am. Fed'n of Gov't Emp. v. Phillips*, 358 F. Supp. 60 (D.D.C. 1973) (defendant sent detailed instructions to regional offices to terminate Community Action Agency funding while appropriations still existed and before Congress defunded the program for FY 1974).  By contrast, HHS intends to spend new TPP Program appropriations; it simply intends to do so by recompeting awards.

funds via continuation awards, HHS's decision to recompete those funds is well within its discretionary authority.

### c. HHS Complied With the 2018 Continuing Appropriations Act While in Effect, and Did Not "Impound" Funds By Doing So

Even if Plaintiffs had standing and a final agency action to argue "impoundment," the claim would still fail. Plaintiffs rest on an unsubstantiated theory that HHS is withholding funds that Congress appropriated to the program under section 101 of the 2018 Continuing Appropriations Act. Pl's Br. at 26. But the critical flaw in their theory is that HHS is not withholding funds for the TPP Program. It simply decided not to issue continuation awards and instead to recompete TPP Program funds. No funds have been obligated by HHS to the grantees. Had Congress wanted to direct funds to particular agencies or groups, it could have done so. *See, e.g.*, *Nat'l Ctr. For Mfg. Scis. v. United States*, 114 F.3d 196, 198 (Fed. Cir. 1997).

Plaintiffs' theory also misunderstands HHS's obligations under the continuing resolutions. An agency operating under a continuing resolution "may determine the pattern of its obligations . . . so long as it operates under a plan which will keep it within the rate for operations limit set by the resolution." *GAO Red Book*, vol. 2, ch. 8, at 8-15. Therefore, "[i]f an agency usually obligates most of its annual budget in the first month or first quarter of the fiscal year, it may continue that pattern under the resolution." *Id.* Here, HHS typically obligates TPP Program funds by issuing notices of award in late June, towards the end of the fiscal year. It did not need to obligate funds for the TPP Program while the continuing resolutions were in effect because current year grantees were funded through June 2018, based on FY 2017 appropriations. HHS breached no obligation by observing its customary timetable.

More critically, Plaintiffs' theory of section 101 would run afoul of other provisions. Section 109 states that "no grants shall be awarded for such programs funded by this Act that

23

would impinge on final funding prerogatives." Section 110 also required that the statute be "implemented so that only the most limited funding action of that permitted in the Act shall be taken." Obligating funds to the grantees before March—when grants are do not have to be awarded until the close of the fiscal year—would not be "the most limited funding action" possible. HHS's actions were fully consonant with the relevant appropriations laws.

## 5. HHS's Decision Not to Issue Future Continuing Awards Is "Committed to Agency Discretion" and Unreviewable

Given that neither the agency's regulations nor the grant documents afford Plaintiffs a right to multi-year funding, the choice whether to obligate appropriated TPP Program funds on a non-competitive basis or to recompete those funds is committed to HHS's discretion and therefore unreviewable here. Although the APA presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption . . . . [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Lincoln*, 508 U.S. at 191 (quoting *Heckler*, 470 U.S. at 831).

The discretionary nature of HHS's decision whether to make continuation awards or recompete funds is evident from the absence of a meaningful standard by which a court could judge it. Neither the TPP Program nor regulations provide any guidance about that decision. And grantees understood that continuation awards could change if, "for whatever reason,

continued funding would not be in the interests of the Federal government." Hunt Decl., Ex. B, at II-89. The absence of "law to apply" in this area strongly suggests it is committed to agency discretion. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971).

A choice by agencies as to how to spend appropriated TPP Program funds also falls peculiarly within their area of expertise. Section 701(a)(2) applies to an agency's decision to spend appropriated funds "as long as the agency allocates funds . . . to meet permissible statutory objectives" and Congress has not "put[] restrictions in the operative statutes" to prohibit particular expenditures. *Lincoln*, 508 U.S. at 193 (addressing lump-sum appropriations). Plaintiffs have not alleged a violation of any of the statutory guidelines for appropriated TPP funds, but merely protest the decision not to make continuation awards. Indeed, "the allocation of grant funds among various eligible recipients, none of which has any statutory entitlement to them, is traditionally a matter 'committed to agency discretion by law,'" for it "shares with agency decisions not to prosecute what the Supreme Court has called in the latter context a 'general unsuitability for judicial review.'" *Cal. Human Dev. Corp v. Brock*, 762 F.2d 1044, 1052 (D.C. Cir. 1985) (Scalia, J., concurring) (quoting *Heckler*, 470 U.S. at 823)). Unsurprisingly, courts presented with similar issues have concluded that decisions regarding the conferral of research grants or the renewal of contracts are committed to agency discretion.[10]

---

[10] *See Cmty. Action of Laramie Cnty. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Without manageable substantive standards against which to judge HHS' exercise of discretion, our review would amount to nothing more than an impermissible ad hoc assessment of the fairness of agency action. We are not empowered to ask whether HHS's decision was wise in the absence of controlling guidelines . . . . Funding determinations are 'notoriously unsuitable for judicial review.'"); *Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) ("medical merits of NIH decisions on training grants may be committed to the unreviewable discretion of the agency"); *Kletschka v. Driver*, 411 F.2d 436, 443 (2nd Cir. 1969) (not "feasible" to review V.A. decisions "awarding or refusing to award research grants," which "involves a determination … [on] the relative merits of the many proposed research projects for which funds are sought."); *Grassetti v. Weinberger*, 408 F. Supp. 142, 150 (N.D. Cal. 1976) ("[I]t is probable that the medical merits of

The court's decision in *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530

(S.D.N.Y. 1984), *aff'd*, 805 F.2d 1088 (2nd Cir. 1986), points to the appropriate result here.  In

*Guttmacher*, the plaintiff operated a publication funded by a grant awarded by the Agency for

International Development ("AID") under the Foreign Assistance Act.  *Id.* at 1534.  AID chose

not to renew the grant after concluding that it was "economic[ally] superfluous" and promoted

"abortion as a family-planning tool," and plaintiff sued, alleging that the decision not to renew

the grant violated that act.  *Id.* at 1533.  Like the TPP Program, the Foreign Assistance Act gave

substantive guidelines for administering funds under the program, but the court nonetheless ruled

that AID's decision was committed to agency discretion.  *Id.* at 1535-36 (citing 22 U.S.C.

§ 2151b(d)).  Even though the Foreign Assistance Act "might … permit a court to decide

whether a project was particularly inappropriate for funding," it did not "give courts any

guidance in sorting among the many projects consistent with the goals stated."  *Id.* at 1536.

Because "it would be virtually impossible for a court to make a determination that [plaintiff's

publication] served such an important role … that its rejection by [AID] was an abuse of

discretion," such decision was not subject to review under the APA.  *Id.* at 1537.

The same conclusion should apply to HHS's decision to recompete funds appropriated

under the TPP Program.  There were nearly 500 applications for the 81 grants HHS awarded

from the TPP Program in its last competitive grant cycle.  Kretschmaier Decl., ¶ 2.  The TPP

Program's statutory authorization does not give any guidance by which a court could effectively

---

agency decisions on research grant applications are committed to the unreviewable discretion of
the agency, subject to judicial scrutiny only where it is alleged that the agency has transgressed a
constitutional guarantee or violated an express statutory or procedural directive."); *accord Phila.
Hous. Auth. v. U.S. Dep't of Hous. & Urban Dev.*, , 439 (E.D. Pa. 2008) (finding no case
"suggesting that the APA empowers a district court to review an agency's refusal to renew a
contract or to accede to particular contract terms.").

evaluate whether HHS abused its discretion by declining to issue continuation awards in order to recompete the funds. That decision is accordingly unreviewable under the APA.

### 6. HHS's Decision Was Not Arbitrary or Capricious under the APA

As demonstrated above, numerous doctrines preclude APA review of HHS's exercise of discretion to not issue continuation awards for the TPP Program in FY 2018.[11] Even if that decision were reviewable, Plaintiffs could not establish that it was arbitrary and capricious. That standard is "ultimately narrow and highly deferential," *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012), requiring only a "rational connection between the facts found and the choice made." *Inova Alexandria Hosp. v. Shalala*, 244 F.3d 342, 350 (4th Cir. 2001) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency's decision need not be a "model of analytic precision," and courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (internal quotation marks and citations omitted). Further, judicial "review is particularly deferential when … the agency is tasked with balancing often-competing interests." *Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014). The "party claiming that an agency's action was arbitrary and capricious bears the burden of proof." *Fort Sumter Tours, Inc. v. Babbitt*, 66 F.3d 1324, 1336 (4th Cir. 1995) (citation omitted).

HHS did not act arbitrarily or capriciously by exercising its rights under the terms and conditions of the Plaintiffs' grants. The Grants Policy Statement, which controls the parties' conduct, emphasizes that (1) HHS carries "no legal obligation to provide funding beyond the ending date of the current budget period" and (2) future continuation awards could be denied with no opportunity to appeal if, "[f]or whatever reason, continued funding would not be in the

---

[11] As demonstrated above, this is the only arguably "final" decision that could even be subject to review; everything else is in an intermediate stage.

best interests of the Federal government."  Hunt Decl., Ex. B, at I-34, II-89.  HHS's policy

concerns with the current TPP Program are a matter of public record.  *See* Hunt Decl., Ex. G, Ex.

H.  In accepting the funds under their grants, Plaintiffs agreed that HHS had discretion to decline

to issue continuation awards for "whatever reason," and HHS did not act arbitrarily, capriciously,

or contrary to law by doing so.

Plaintiffs express disappointment over HHS's decision not to renew grants, but that

disappointment does not amount to a legal claim.  It is true that Plaintiffs will receive no further

funding without recompeting.  But, Plaintiffs accepted their grants with these one-year budget

terms.  As a result, Plaintiffs' arguments about the success of their programs, Pls.' Br. at 7-11,

and the role of HHS decision-makers, *id.* at 12-16, are not material to the issues of law before the

Court.  Similarly, internal disagreement within an agency, even if presumed to be true for this

motion, does not render a decision arbitrary and capricious.

Indeed, much of what Plaintiffs assert in their moving brief is simply inapposite to

whether they have a vested right to more federal funds.  The success Plaintiffs believe their

projects have enjoyed is not material.  Likewise immaterial is Plaintiffs' allegations about the

involvement or non-involvement of particular HHS officials in the decision not to make

continuation awards.  *See* Pls.' Br. at 14.  Thus, even if Plaintiffs' factual allegations were

accepted as true, their claims for relief would still lack merit.  Plaintiffs had no legal entitlement

to a five-year grant, and HHS had discretion to determine how the appropriated funds for FY

2018 will be awarded.  Plaintiffs may not arrogate that discretion to themselves.

Finally, Plaintiffs suggest some sort of impropriety in the alleged involvement of political

appointees at HHS in making a policy decision about whether to recompete TPP funds or

proceed with continuation grants, but that view would challenge all agency discretion to change

policy.  If carried to its logical conclusion, Plaintiffs' claimed entitlement to further funding would necessarily mean that any administration could bind future administrations to fund a select set of grantees for defined projects for an untold number of years, so long as Congress appropriated the dollars.  Their theory, if accepted, could hamstring otherwise appropriate policy adjustments. Likewise, Plaintiffs identify no basis (and there is none) why political appointees should be excluded from HHS's discretionary decision-making prerogatives.  Political appointees "must remain receptive to the concerns of the politicians whose constituents are affected by their decisions[,]" *Am. Trucking Ass'n, Inc. v. Delaware River Joint Toll Bridge Comm'n*, 458 F.3d 291, 303 (3d Cir. 2006), and thus political appointees carry out the policies of the administration.  Should Plaintiffs wish for new political appointees and new policies at HHS, their recourse is at the polls—not in the courts.  *See Ass'n of Nat. Advertisers, Inc. v. F.T.C.*, 627 F.2d 1151, 1174–75 (D.C. Cir. 1979) (noting the importance of not "plung[ing] courts into the midst of political battles concerning the proper formulation of administrative policy" and explaining that courts "serve as guarantors of statutory and constitutional rights, but not as arbiters of the political process").

## B.  The Remaining Preliminary Injunction Factors Do Not Support Relief

### 1.  Plaintiffs' Delay in Seeking Relief Undermines Their Assertion of Irreparable Harm

Plaintiffs received notice that their TPP Program grants would not be renewed by early July 2017.  Their claim—i.e., they are entitled to additional years of funding absent a determination that they violated the terms and conditions of the grant or a lapse in appropriations—has been available to them since they received those notices.  Yet Plaintiffs waited nearly seven months to file this suit, long after they accepted the grant terms by drawing down grant funds.  Meanwhile, Plaintiffs' declarations show that much of the alleged impact on

their programs due to HHS's decision not to award continuation grants has already occurred. Wen Decl., ¶¶ 33-35; Paluzzi Decl., ¶¶ 24-26.  The only purported justification for this delay that appears in their brief is contained in an appeal letter the City of Baltimore sent to HHS in August 2017.  Pls. Br. at 12.  But Healthy Teen Network does not allege that it sent an appeal letter. And Plaintiffs tarried six more months before bringing suit, even though the City of Baltimore maintained it was under no obligation to exhaust administrative appeals prior to seeking relief in court.  Wen Decl., Ex. G, Letter from Leana S. Wen to Evelyn M. Kappeler dated August 3, 2017 (Baltimore "does not concede in any way that exhaustion of HHS's administrative remedies is necessary before seeking judicial review of [its] actions.").  Similarly, Healthy Teen Network waited to sue even though it says it was told by HHS officials that there was "no use in appealing" the decision.  Paluzzi Decl., ¶ 18.  Even after filing this suit, Plaintiffs waited nearly six weeks to move for injunctive relief from this Court.

The Fourth Circuit has refused injunctive relief in the face of similar delays by a party when seeking relief months after its cause of action accrued.  In *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 75 (4th Cir. 1989), federal and local officials in Montgomery County, Maryland, sought to build a new four-lane road.  Six months after all necessary federal approvals for the project were provided, local citizens' associations sought declaratory and injunctive relief to halt construction of the road.  *Id.* at 75-76.  In affirming the district court's refusal to grant the plaintiffs a preliminary injunction, the Fourth Circuit highlighted how plaintiffs' delay weakened their allegations of irreparable harm.  *Id.* at 79-80.  "Lack of diligence, standing alone, may … preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm."  *Id.* at 80 (internal quotation marks and citation omitted); *Wilson-Cook Med., Inc. v. Wiltek Med., Inc.*, 927 F.2d 598 (4th Cir. 1991)

(table) ("'Perhaps even more telling of the absence of convincing proof that the Plaintiff would suffer irreparable harm is the Plaintiff's delay in seeking an injunction.'" (quoting *John Lemmon Films, Inc. v. Atlantic Releasing Corp.*, 617 F. Supp. 992, 996 (W.D.N.C. 1985))); *see also Nat'l Credit Reporting Ass'n, Inc. v. Equifax, Inc.*, No. 08-cv-2322-WDQ, 2008 WL 4457781, at *3 (D. Md. Sept. 30, 2008) (plaintiffs "waited more than six months to file for injunctive relief," which "work[ed] against [the] plaintiff's showing of imminent harm").

Plaintiffs' "lack of urgency suggests that [their] fear of irreparable harm is less than dire." *Gen. Parts Distribution LLC v. Perry*, 907 F. Supp. 2d 690, 692 (E.D.N.C. 2012). Plaintiffs' submission makes no attempt to explain either the seven-month gap between learning of HHS's decision and filing their lawsuit, or the additional six weeks of delay in seeking relief after filing a complaint. Indeed, Plaintiffs' declarations show that they were willing to accept funds under the new terms of the TPP Program grant award and to sustain significant modifications to the operation of their programs all the while. Much of the Plaintiffs' actual and "potential harm was a product of [their] own delay in pursuing this action," and the Court should weigh Plaintiffs' delay in assessing whether the equities justify relief in this case. *Quince Orchard*, 872 F.2d at 79. No relief is warranted here.

## 2. The Balance of Equities Favors HHS

Plaintiffs' tardy demand for injunctive relief has created significant administrative problems for HHS. To recompete TPP Program funds and obligate them before the fiscal year ends as required by law, HHS must announce a new funding opportunity to solicit competitive grant applications. At the same time, Plaintiffs are demanding issuance of new continuing awards by late June. The processing of those awards will double the workload of staff responsible for administering the TPP Program because OASH will, in effect, be administering two versions of the TPP Program. Kretschmaier Decl., ¶ 6. HHS is already defending TPP

Program claims in three other jurisdictions, and this has created significant uncertainty regarding how TPP Program funds will be awarded in the future. *Id.* ¶ 7. All of this could have been avoided had Plaintiffs sought relief earlier. Contrary to Plaintiffs' unsupported assertions, HHS's harm is palpable and weighs against relief.

### 3. Plaintiffs' Requested Relief Will Deprive the Public of the Opportunity to Compete for TPP Program Funds

Unlike the asserted damage to Plaintiffs' specific programs discussed in their brief, a preliminary injunction in favor of Plaintiffs will harm the public at large in two significant ways. First, by tying up HHS's grant-making processes with their eleventh-hour request for relief, Plaintiffs would deprive the public of the opportunity to participate in a competitive grant-making process. Congress directed HHS to issue "competitive contracts and grants" using TPP Program funds. Plaintiffs requested relief deprives the public of that opportunity.

Second, injunctive relief could cast significant uncertainty upon HHS and other agencies that use "project periods" to structure grants for projects funded through annual appropriations. If true, Plaintiffs' theory could confer a vested property interest upon all grantees with multi-year projects, subject only to each grantee's compliance with the terms of their grants and successive appropriations by Congress to fund the work. Such a theory would not only be at odds with controlling precedent, it would harm the public fisc by mandating ongoing funding of projects, even when they no longer advance the government's best interests. The Court should not take such a drastic step at this preliminary stage, especially in light of the weakness of the underlying merits.

## II.  The Court Should Dismiss, or Enter Summary Judgment on, All of Plaintiffs' Claims

HHS moves to dismiss the amended complaint under Rule 12(b)(1) or 12(b)(6), or for summary judgment according to Rule 56.  Fed. R. Civ. P. 12(b)(1), (b)(6) & 56.  Judgment under Rule 12(b)(1) or 12(b)(6) is appropriate if, assuming the truth of all well-pleaded factual allegations in the complaint, Plaintiffs have failed either to establish this Court's jurisdiction or to state a claim upon which relief can be granted.  Judgment under Rule 56 is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.

### A.  As Demonstrated Above, Plaintiffs' APA claims (Count I & II) Lack Merit

Neither the TPP Program appropriation nor HHS's regulations guarantee Plaintiffs a full five years of funding.  Indeed, the grant documents provide that grantees have no enforceable legal right to funds in future project years and that HHS has the right not to issue continuing awards if "for whatever reason, continued funding would not be in the best interests of the Federal government."  Hunt Decl., Ex. B, at II-89.  Plaintiffs draw an incorrect analogy between a new "award" and "carryover" funding, Am. Compl. ¶ 132(c).  Carryover is a term of art relating to funds budgeted for use in a particular fiscal year that a grantee desires to use in a subsequent period.  Hunt Decl., Ex. B, at II-51.  Consistent with the concept of one-year funding, no funds may be carried over without HHS approval.  *Id.*  HHS was not required to approve the carryover request, and Plaintiffs cite no authority requiring such approval.  This administrative framework underscores the fundamental one-year-only design of the grants; Plaintiffs could not even spend a prior year's funds in a future year without express approval.[12]  Further, because

---

[12]  The approval requirement for carryover funds only further highlights that the period of performance for those awards was the budget period.  *See, supra,* Section I.A.3

HHS did not "terminate" the Plaintiffs' grants within the meaning of that term, the City of Baltimore was not entitled to an appeal of the decision. *See, supra,* n.8. For these reasons, and the reasons stated above in Section I of the Argument, Plaintiffs claims should be dismissed.

### B. Plaintiffs' Equitable Relief Claim (Count III) Fails to State a Claim and Is Barred By Sovereign Immunity

Finally, this Court lacks jurisdiction over Plaintiffs' claim in Count III for equitable relief to "preserve the remedy," for no waiver of sovereign immunity exists. Insofar as the Court gleans an alleged claim from the complaint (which it should not), Plaintiffs bear the burden of identifying a waiver of sovereign immunity, *Welch v. United States,* 409 F.3d 646, 650 (4th Cir. 2005), and they fail to do so here. The United States, as sovereign, is immune from suit absent consent. *See FDIC v. Meyer,* 510 U.S. 471, 475 (1994). Plaintiffs cite *City of Houston v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1427 (D.C. Cir. 1994), Am. Compl. ¶ 140, but that case supplies no such waiver. No consent exists for the equitable claim asserted in Count III; it should be dismissed with prejudice. *E.g., Department of Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999) (claim for equitable lien is a "form of substitute not specific relief," and "falls outside § 702's waiver of sovereign immunity.").

## CONCLUSION

For these reasons, the Court should deny Plaintiffs' motion for a preliminary and permanent injunction, grant HHS's cross motion to dismiss or for summary judgment, and either dismiss Plaintiffs' complaint with prejudice or enter judgment in favor of HHS.

Dated:  April 4, 2018

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

STEPHEN M. SCHENNING
Acting United States Attorney

RUTH A. HARVEY
Director, Commercial Litigation Branch

JOEL McELVAIN
Assistant Branch Director, Federal Programs
Branch

MICHAEL J. QUINN
Senior Litigation Counsel, Commercial
Litigation Branch

/s/ *Alicia M. Hunt*
Alicia M. Hunt (D.C. Bar No. 484620)
Jonathan E. Jacobson
Trial Attorneys
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L St. NW, 10th floor
Washington, D.C. 20005
Tel: (202) 307-3548
Fax: (202) 514-9163
E-mail: alicia.m.hunt@usdoj.gov


/s/ *Michael J. Gerardi*
Michael J. Gerardi
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 7223
Washington, D.C. 20530
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.gerardi@usdoj.gov


*Attorneys for Defendants*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 4, 2018, a true and correct copy of the foregoing was served on plaintiffs via their counsel of record through the Court's Electronic Case Filing (ECF) system.

/s/ *Alicia M. Hunt*
Alicia M. Hunt