# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

HEALTHY TEEN NETWORK
1501 St. Paul Street, # 124
Baltimore, MD  21202

    and

MAYOR AND CITY COUNCIL OF
BALTIMORE
100 N. Holliday Street, Suite 101
Baltimore, MD  21202

    Plaintiffs,

    v.

ALEX M. AZAR II, in his official capacity as
SECRETARY, U.S. DEPARTMENT OF
HEALTH AND HUMAN SERVICES
200 Independence Avenue SW
Washington, DC  20201,

    and

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES
200 Independence Avenue SW
Washington, DC  20201

    Defendants.

Civil Action No.  1:18-cv-00468-CCB

**COMBINED REPLY IN SUPPORT OF
PLAINTIFFS' MOTION FOR
PRELIMINARY AND PERMANENT
INJUNCTION & MEMORANDUM OF
LAW IN OPPOSITION TO
DEFENDANTS' CROSS-MOTION TO
DISMISS OR FOR SUMMARY
JUDGMENT**

# TABLE OF CONTENTS

Argument ......................................................................................................................3

I.   HHS's Decision to Terminate Plaintiffs' Grants Violated HHS's Governing
     Regulations and the Administrative Procedure Act..........................................3

     A.   HHS awarded Plaintiffs grants with a five-year period of performance. ...............3

          1.   Under HHS's grantmaking regulations and the terms of the
               grant documents, Plaintiffs' grants have a five-year period of
               performance ..........................................................................................3

          2.   Five-year grants under the TPP Program do not violate the Anti-
               Deficiency Act ........................................................................................9

     B.   HHS's decision to end Plaintiffs' five-year grants prematurely was a
          "termination" subject to 45 C.F.R. § 75.372.........................................12

     C.   HHS's terminations were arbitrary, capricious, and contrary to law....................14

          1.   The terminations were contrary to law ......................................14
          2.   The terminations were arbitrary and capricious.........................15

     D.   HHS's termination of Plaintiffs' grants was not "committed to agency
          discretion by law" .................................................................................19

II.  Defendants Cannot Defend Their Termination as a "Withholding" Under the
     2007 Grants Policy Statement ("GPS") ...............................................................21

     A.   The "whatever reason" withholding authority is incompatible with 45
          C.F.R. part 75 and therefore invalid ....................................................22

     B.   The FOA and the Awards do not incorporate the "whatever reason"
          provision ...............................................................................................26

     C.   Even if the purported withholding authority applies, it does not authorize
          HHS's unreasoned, blanket cancellation of all grants ..........................28

III. Plaintiffs Are Already Suffering Harm and Will Continue to Suffer Irreparable
     Harm If Their Grant Terminations Are Allowed to Stand...............................30

IV.  The Court Should Decide Plaintiffs' Motion; Defendants' Cross-Motion
     Should Be Rejected..........................................................................................34

Conclusion ...............................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alan Guttmacher Institute v. McPherson*,
 597 F. Supp. 1530 (S.D.N.Y. 1984)...................................................................20

*Alaska Trojan P'ship v. Gutierrez*,
 425 F.3d 620 (9th Cir. 2005) ............................................................................24

*Albemarle Corp. v. Herman*,
 221 F.3d 782 (5th Cir. 2000) ............................................................................24

*Andreas-Myers v. NASA*,
 2017 WL 1632410 (D. Md. Apr. 28, 2017) ......................................................34

*Apter v. Richardson*,
 510 F.2d 351 (7th Cir. 1975) ............................................................................20

*Arc of Cal. v. Douglas*,
 757 F.3d 975 (9th Cir. 2014) ............................................................................32

*Autonomy, Inc. v. TASC, Inc.*,
 2015 WL 7313380 (E.D. Va. Nov. 19, 2015).....................................................11

*Bennett v. Kentucky Dep't of Educ.*,
 470 U.S. 656 (1985)..........................................................................................12

*Black & Decker Corp. v. C.I.R.*,
 986 F.2d 60 (4th Cir. 1993) ..............................................................................23

*Burgin v. OPM*,
 120 F.3d 494 (4th Cir. 1997) ............................................................................18

*Cal. Human Dev. Corp. v. Brock*,
 762 F.2d 1044 (D.C. Cir. 1985).........................................................................21

*Caldwell v. Astrue*,
 2008 WL 2713714 (E.D. Tenn. July 10, 2008) .................................................24

*Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*,
 23 F. App'x 134 (4th Cir. 2001) ...................................................................31, 32

*Cessna Aircraft Co. v. Dalton*,
 126 F.3d 1442 (Fed. Cir. 1997).........................................................................11

*Chamblee v. Espy*,
100 F.3d 15 (4th Cir. 1996) ...........................................................................19

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
401 U.S. 402 (1971).........................................................................................19

*City of Houston, Tex. v. Dep't of Hous. & Urban Dev.*,
24 F.3d 1421 (D.C. Cir. 1994) ...................................................................34, 35

*City of Kansas City v. HUD*,
923 F.2d 188 (D.C. Cir. 1991) ...................................................................16, 20

*Clean Ocean Action v. York*,
57 F.3d 328 (3d Cir. 1995)..............................................................................24

*Cmty. Action of Laramie Cty., Inc. v. Bowen*,
866 F.2d 347 (10th Cir. 1989) ....................................................................20, 21

*Cray Research, Inc. v. United States*,
44 Fed. Cl. 327 (1999) ....................................................................................11

*Dairy Maid Dairy, Inc. v. United States*,
837 F. Supp. 1370 (E.D. Va. 1993) .................................................................30

*Davis & Assocs., Inc. v. District of Columbia*,
501 F. Supp. 2d 77 (D.D.C. 2007) ..................................................................11

*Duncan v. Walker*,
533 U.S. 167 (2001).........................................................................................23

*FCC v. Fox Tele. Stations, Inc.*,
556 U.S. 502 (2009).........................................................................................18

*Finkelstein v. United States*,
29 Fed. Cl. 611 (1993) ....................................................................................24

*Grassetti v. Weinberger*,
408 F. Supp. 142 (N.D. Cal. 1976) ..................................................................20

*Gutierrez de Martinez v. Lamagno*,
515 U.S. 417 (1995).........................................................................................19

*Hart v. McLucas*,
535 F.2d 516 (9th Cir. 1976) ...........................................................................23

*Hercules Inc. v. United States*,
516 U.S. 417 (1996).........................................................................................11

*Inova Alexandria Hosp. v. Shalala*,
  244 F.3d 342 (4th Cir. 2001) ................................................................15

*Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*,
  31 F.3d 1536 (10th Cir. 1994) .............................................................31

*Kletschka v. Driver*,
  411 F.2d 436 (2d Cir. 1969)................................................................21

*Krygoski Constr. Co. v. United States*,
  94 F.3d 1537 (Fed. Cir. 1996)............................................................29

*Leiter v. United States*,
  271 U.S. 204 (1926)......................................................................10, 11

*Lincoln v. Vigil*,
  508 U.S. 182 (1993)............................................................................20

*Maryland Department of Human Resources v. Department of Health and Human
  Services*,
  854 F.2d 40 (4th Cir. 1988) ...............................................................11

*Md. Gen. Hosp., Inc. v. Thompson*,
  308 F.3d 340 (4th Cir. 2002) .............................................................22

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002).............................................................20

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983)................................................................15, 17, 28

*N.C. Wildlife Fed. v. N.C. Dep't of Transp.*,
  677 F.3d 596 (4th Cir. 2012) ..................................................15, 17, 28

*Nat'l Venture Capital Ass'n v. Duke*,
  --- F. Supp. 3d ----, 2017 WL 5990122 (D.D.C. Dec. 1, 2017) ............18

*Navajo Nation v. Azar*,
  --- F.3d ----, 2018 WL 1512336 (D.D.C. Mar. 27, 2018) ......................20

*Perine v. William Norton & Co.*,
  509 F.2d 114 (2d Cir. 1974)................................................................18

*PGBA, LLC v. United States*,
  57 Fed. Cl. 655 (2003) ........................................................................29

*Phila. Hous. Auth. v. HUD*,
  553 F. Supp. 2d 433 (E.D. Pa. 2008) ..................................................21

iv

*PPG v. United States*,
    52 F.3d 363 (D.C. Cir. 1995) ............................................................................34

*Quince Orchard Valley Citizens Association, Inc. v. Hodel*,
    872 F.2d 75 (4th Cir. 1989) ............................................................................31

*RCS Enters. v. United States*,
    57 Fed. Cl. 590 (2003) ...................................................................................11

*S. Mut. Help Ass'n, Inc. v. Califano*,
    574 F.2d 518 (D.C. Cir. 1977) ................................................................*passim*

*Sam Gray Enters. v. United States*,
    250 F.3d 755 (Fed. Cir. 2000) ........................................................................11

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) .......................................................................................15

*Service v. Dulles*,
    354 U.S. 363 (1957) .......................................................................................19

*Shipbuilders Council of Am. v. U.S. Coast Guard*,
    578 F.3d 234 (4th Cir. 2009) .....................................................................23, 24

*State of Conn. Office of Prot. & Advocacy for Persons with Disab. v. Hartford Bd. of Educ.*,
    355 F. Supp. 2d 649 (D. Conn. 2005) ........................................................12, 25

*United States v. Menasche*,
    348 U.S. 528 (1955) .......................................................................................24

**Statutes, Rules, and Regulations**

5 U.S.C. § 701(a)(2) .............................................................................................19

31 U.S.C. § 1341(a)(1)(B) .......................................................................................9

31 U.S.C. § 6303 ..................................................................................................12

31 U.S.C. § 6304 ..................................................................................................12

31 U.S.C. § 6305 ..................................................................................................12

2 C.F.R. § 200.77 ...................................................................................................7

42 C.F.R. § 65.6(b) ...............................................................................................25

45 C.F.R. § 74.110 (1976) .....................................................................................13

45 C.F.R. § 74.2 (1997) ..............................................................................6

45 C.F.R. § 75.2 ...............................................................5, 6, 12, 14

45 C.F.R. § 75.104 ..............................................................................6, 25

45 C.F.R. § 75.105 ..............................................................................24

45 C.F.R. § 75.207(b)(2) ..................................................................23

45 C.F.R. § 75.342(b)(1) ..................................................................8

45 C.F.R. § 75.371 ..............................................................................22, 23

45 C.F.R. § 75.372 .............................................................3, 11, 12, 14, 15

45 C.F.R. § 75.381 ..............................................................................8

45 C.F.R. § 75.386 ..............................................................................8

45 C.F.R. § 1351.14(b) ......................................................................25

79 Fed. Reg. 75871 (Dec. 19, 2014) ...............................................7, 24

81 Fed. Reg. 89393 (Dec. 12, 2016) ...............................................7, 24, 25

Fed. R. Civ. P. 8(a)(2) .......................................................................34

Fed. R. Civ. P. 12(b)(6) .....................................................................34

Fed. R. Civ. P. 56(a) ..........................................................................34

**Other Authorities**

*Federal Appropriations Law* (vol. II, 3d ed. 2006), *available at*
https://www.gao.gov/assets/210/202819.pdf ...........................10

S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945) ..........................19

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE
465 (2002) ...................................................................................27

As explained in Plaintiffs' opening brief, HHS awarded Plaintiffs five-year grants to replicate or study medically accurate, evidence-based teen pregnancy prevention programs—and then prematurely terminated those grants after only three years, without explanation and without following its own regulations governing terminations within a grant's period of performance. Under bedrock principles of administrative law and decades of grantmaking practice, the terminations must be set aside because they are arbitrary, capricious, and contrary to law.

Defendants, in response, attempt to recast their action as something other than a termination and Plaintiffs' suit as a demand for payment under the two remaining years of the grants. Neither assertion is correct. First, Defendants claim that the five-year grants HHS awarded were actually only one-year grants, a claim they can make only by rewriting and ignoring HHS's regulations, guidance documents, and the grant award documents. They disregard express statements in the grant documents stating that the grants were for a five-year project period, as well as regulations explaining that the "project period" and the "period of performance" are identical. *See infra* § I.A.1. They assert a limitless authority to withhold ongoing grants that would make HHS's carefully drawn withholding regulations entirely superfluous. *See infra* § II.A. And they justify HHS's actions with post hoc rationalizations rather than an administrative record showing a reasoned decision. *See infra* §§ I.C.2, I.D. If credited by the Court, Defendants' position would allow HHS to cancel grants for whatever reason or no reason at all, with no explanation of any sort. This novel approach to grantmaking would cast a shadow over billions of dollars of vital public health grants. It is as dangerous as it is meritless.

Second, Plaintiffs are not asserting an unconditional right to future funding. Rather, they advance a claim well within the heartland of the APA: that having been awarded grants with five-year periods of performance, HHS must adhere to its regulations in funding future budget

years, and its funding decisions must be informed by reasoned decision-making. *See infra* §
I.A.2.

Defendants fare no better with the other preliminary injunction factors. They do not deny
that Plaintiffs are suffering irreparable harm—nor could they, given that Plaintiffs are laying off
staff, downsizing offices, cancelling projects, and otherwise curtailing the activities funded by
the grants. *See* Pls.' Br. at 16-18, 29-32, ECF No. 18-1. They also ignore the modest provisional
relief at issue—namely, that HHS process Plaintiffs' year-four grant applications in order to
preserve the availability of relief while this litigation proceeds. *See* Pls.' Br. at 2, 31-32. Instead,
they only claim that Plaintiffs' "delay" precludes preliminary relief. But it is *Defendants* who
have persistently delayed in the face of Plaintiffs' diligent efforts to challenge and learn the basis
of the terminations. *See infra* § III. Moreover, the Fourth Circuit has made clear that delay alone
is insufficient to deny an injunction, unless the resulting harm to defendants outweighs the harm
to plaintiffs. *See infra* § III. Defendants' conclusory claims of harm to themselves and the
public—claims at odds with HHS's own findings, *see* Pls.' Br. at 9, 11-14, 32—do not come
close to doing so. *See infra* § III. Finally, and tellingly, Defendants make no attempt to explain or
excuse the harm to the public from cutting short high-performing public health grants aimed at
preventing teen pregnancy and squandering many millions of federal dollars in the process. *See*
Pls.' Br. at 32.[1]

---

[1] On April 9, HHS announced that it would issue new Funding Opportunity Announcements for
the TPP Program on April 16. *See* Announcement of the Availability of Funds for Phase I New
and Innovative Strategies (Tier 2) to Prevent Teenage Pregnancy and Promote Healthy
Adolescence, available at https://www.grants.gov/search-grants.html?agencyCode%3DHHS;
Announcement of the Availability of Funds for Phase I Replicating Programs (Tier 1), available
at https://www.grants.gov/search-grants.html?agencyCode%3DHHS (collectively, "2018 Grants
Notices"). In light of this announcement, Plaintiffs at this time are not advancing their claims
based on the Continuing Appropriations Act of 2018, the Consolidated Appropriations Act of

Accordingly, the Court should grant Plaintiffs injunctive relief requiring Defendants to process Plaintiffs' year-four applications in compliance with the governing regulations and should deny Defendants' motion to dismiss or for summary judgment.

## ARGUMENT

I.     **HHS's Decision to Terminate Plaintiffs' Grants Violated HHS's Governing Regulations and the Administrative Procedure Act**

As explained in Plaintiffs' opening brief, Plaintiffs were awarded grants with a five-year period of performance, and HHS's grantmaking regulations limit terminations to specific circumstances that Defendants do not claim apply here. *See* Pls.' Br. at 24-26; *see also* 45 C.F.R. § 75.372. Defendants argue that the period of performance is actually *one* year, and that HHS's termination regulations are therefore inapplicable—and that in any event, the Administrative Procedure Act ("APA") does not apply to grant terminations. These arguments cannot be squared with the text of HHS's governing regulations, its internal guidance, or the grant documents, much less the APA and the body of caselaw that plainly subjects HHS's actions to this Court's review.

### A.     **HHS awarded Plaintiffs grants with a five-year period of performance**

*1.     Under HHS's grantmaking regulations and the terms of the grant documents, Plaintiffs' grants have a five-year period of performance*

HHS has long approved grants for multi-year project periods that are funded in annual budget periods. *See, e.g.*, *S. Mut. Help Ass'n, Inc. v. Califano*, 574 F.2d 518, 519 (D.C. Cir. 1977) (issuance of a multi-year grant under the "Project Period System" by the Department of Health, Education, and Welfare ("HEW"), the predecessor of HHS). Consistent with this longstanding agency practice and the language of HHS's grantmaking regulations, 45 C.F.R. part

---

2017, and the Impoundment Control Act, Pls.' Br. at 26-29, but reserve their rights to renew these claims in the event of a change in factual circumstances.

75, HHS awarded grants to Plaintiffs for five-year "periods of performance," also called "project periods." Tier 1B FOA at 39 (capitalization altered); Tier 2B FOA at 34 (same). Defendants' attempt to recast Plaintiffs' awards as "one-year-only . . . grants," Defs.' Br. at 33, ECF No. 27-1, fails as a reading of HHS regulations, the grant documents, and decades of agency practice.

In fulfilling Congress's directives to award medically accurate, evidence-based TPP Program grants, HHS issued Funding Opportunity Announcements ("FOAs") specifying that the grant awards would each be "in the form of a *five-year* cooperative agreement" with a "*period of performance* . . . not to exceed 5 years.*" Tier 1B FOA at 38-39 (capitalization altered; emphasis added); Tier 2B FOA at 33-34 (same). Consistent with the funding of the TPP Program through an annual appropriation, the FOAs explained that the grants are "generally *approved* for a project period of up to five years" but are "*funded* in annual increments (budget periods)," and that grantees would be required to submit a "noncompeting application" in advance of each year of the "approved project period." Tier 1B FOA at 39, 83 (emphasis added); Tier 2B FOA at 34, 85 (same); *see also, e.g.*, Hunt Decl. Ex. C at 3-4, ECF No. 27-6 (recommending that grantees' noncompeting continuation applications include a "work plan for the upcoming budget year (July 1 – June 30) [that] should include the long-term goal(s) that spans the life of the *five-year grant project*" (emphasis added)).

The FOAs further specified that the "budget period length," in contrast to the "project period," was "12 months." Tier 1B FOA at 39 (capitalization altered); Tier 2B FOA at 35 (same). Thus, funding "beyond the first year of the grant is generally level with the initial award amount," but is contingent upon "the availability of funds, satisfactory progress of the project, and adequate stewardship of Federal funds." Tier 1B FOA at 39; Tier 2B FOA at 34. The FOAs went on to make clear that, so structured, the work under the grant was authorized to extend for five years. For example, they set forth "expectations of grantees throughout the five-year project period," Tier 1B FOA at 13; Tier 2B FOA at 13; require that applicants "include a detailed work

plan for the five-year project," Tier 1B FOA at 67; Tier 2B FOA at 68; and provide that applicants be evaluated on "how and by whom the intervention will be implemented over the five-year grant," Tier 2B FOA at 73.

HHS's use of the terms "project period" and "period of performance" was not accidental; rather, those are defined terms under HHS's regulations. 45 C.F.R. § 75.2. "Project period" and "Period of performance" are synonyms. *Id.* ("Definitions: . . . *Project period* (see *Period of performance*).") A "[t]ermination" under HHS's regulations is defined as the "ending of a Federal award, in whole or in part *at any time prior to the planned end of [the] period of performance*." *Id* (emphasis added). Thus, HHS's regulations explicitly provide that the ending of an award prior to the planned end of the project period is a termination.

These definitions are likewise reflected in the grant documents HHS issued to Plaintiffs. HHS issued Notices of Award that defined a five-year "project period" spanning from "July 1, 2015 to June 30, 2020" and a one year "budget period" from July 1 to June 30. *E.g.*, Paluzzi Decl. ¶ 3, Ex. A, ECF No. 18-3; Wen Decl. ¶ 9, Ex. A, ECF No. 18-2. These Notices included a schedule of quarterly and annual financial reporting for the full five years of the grant. *Id.* Along with their initial Notices of Award, Plaintiffs also received a letter from Evelyn Kappeler, the Director of the Office of Adolescent Health ("OAH"), stating that OAH was looking "forward to working with you *over the next five years* to support your project and ensure your continued success." Paluzzi Decl. ¶ 3, Ex. B (emphasis added); Wen Decl. ¶ 10, Ex. B (same). HHS's internal documents also show that the agency viewed Plaintiffs' grants as five-year endeavors under the project period system. For example, in a May 2017 memo, OAH Director Kappeler "[a]pproved" the annual continuation funding of the existing TPP Program grantees (a decision subsequently overridden by political appointees, *see* Pls.' Br. at 14-16) for "the third year of the five-year project period." *See* Link Decl. ¶ 3, Ex. C at Page 85_17-0284-FOIA & 87_17-0284-FOIA, ECF 18-4; *see also id.* at Page 85_17-0284-FOIA ("In FY15, OAH awarded funding

through the TPP Program . . . for a five-year project period."). Thus, under HHS's regulations, the FOAs, and the terms of their grants, Plaintiffs were awarded grants with five-year periods of performance known in HHS's parlance as project periods.

Defendants agree that the "project period" for Plaintiffs' grants was five years. Defs.' Br. at 3. They also agree that a "termination" is the ending of a federal award before "the planned end of [the] period of performance." Defs.' Br. at 7 (quoting 45 C.F.R. § 75.2); *see infra* §§ I.B, I.C.1. This should resolve the question of whether the premature cancellation of Plaintiffs' grants was a "termination" under HHS's regulations: as noted above, the grant documents repeatedly refer to a five-year "project period" or "period of performance," the regulations equate "project period" and "period of performance," and HHS ended the awards before the planned end of the five-year period of performance.

To avoid this inescapable conclusion, Defendants maintain that the "planned period of performance" for Plaintiffs' grants is not the five-year "project period," despite the plain language of the regulations and the grant documents themselves. Instead, they argue, the "period of performance" in Plaintiffs' grants is the one-year "budget period," such that the regulatory limitations on "termination" apply only when grant funding is canceled within a discrete *budget* period. Defs.' Br. at 18. This is not and cannot be the case.

Defendants' argument is flatly contrary to HHS's grantmaking regulations, which, as noted above, explicitly equate "project period" and "period of performance." *See* 45 C.F.R. § 75.2. Defendants attempt to dismiss the significance of this clear regulatory language as a mere "cross-reference," Defs.' Br. at 18, but the regulatory history shows a far more considered decision. Historically, HHS used the phrase "project period" to mean "the period established in the award document during which HHS awarding agency sponsorship begins and ends." 45 C.F.R. § 74.2 (1997), *superseded by 45 C.F.R. part* 75 *as stated in* 45 C.F.R. § 75.104(b). In 2014, HHS amended its grants management regulations through a joint rulemaking to implement

6

the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards (the "Uniform Guidance") published by the Office of Management and Budget. *See* Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75871, 75872 (Dec. 19, 2014). The Uniform Guidance does not use the term "project period," instead using the term "period of performance." *See* 2 C.F.R. § 200.77. When HHS replaced its prior grant regulations with the Uniform Guidance, it included "certain amendments, based on existing HHS regulations, to supplement the guidance as needed for [HHS]"—one of which was the addition of the term "project period" as a synonym of the Uniform Guidance's term "period of performance." 79 Fed. Reg. at 75875-76, 75896. Thus, to make the amended regulations correlate with HHS's existing regulations and the agency's practice of using the "project period" system, HHS defined "project period" as the "period of performance." When HHS made additional "technical amendments" to its grant regulations in 2016 to reflect "existing law or HHS policy," it did nothing to disturb the definition inserted in 2014, once again underscoring that the "project period" is the "period of performance." Health and Human Services Grants Regulation, 81 Fed. Reg. 89393-01, 89393-96 (Dec. 12, 2016).

Defendants do not identify a single regulation or other authority equating "budget period" with "period of performance." Quite the contrary, HHS policies show that "budget period" has a different and more limited purpose than the official term "period of performance." For example, the guidance HHS issued alongside the FOAs explained that "budget period" merely refers to the "annual increments" in which funding is provided "[f]or budgetary and reporting purposes." HHS, Frequently Asked Questions for OAH 2015 TPP FOAs at 8 ("What is a project period versus a budget period?"), *available at* https://www.hhs.gov/ash/oah/sites/default/files/2015-general-tpp-faqs.pdf. The project period, by contrast, is the "total time for which support of a

project has been programmatically approved." *Id.*[2] Ignoring this, Defendants cite HHS's 2007

Grants Policy Statement ("2007 GPS") to argue that "[b]ecause Plaintiffs could not incur any

new obligations under [the TPP] awards beyond the year for which the funds were appropriated,

it is clear that the period of performance for those awards was the budget period." Defs.' Br. at

18. Defendants' reading of the 2007 GPS is not supported by the actual text Defendants cite.

Defendants claim that the 2007 GPS "states that the 'amount of federal funds authorized for

obligation by the recipient' are for the current budget period only." Defs.' Br. at 18-19 (quoting

Hunt Decl. Ex. B at I-33). This is demonstrably wrong: the cited portion of the 2007 GPS merely

requires the Notice of Award to set forth the "[a]pproved project period and budget period start

and end dates" and the "[a]mount of Federal funds authorized for obligation by the recipient."

Hunt Decl. Ex. B at I-33. It does not suggest, let alone state, that grantees may only obligate

funds in the year in which funds are appropriated.

Defendants' novel attempt to equate the "period of performance" with the "budget

period," such that a multi-year project period consists of several consecutive periods of

performance, is also impossible to square with other portions of HHS's governing regulations

and guidance. For example, 45 C.F.R. §§ 75.381 and 75.386 provide detailed "closeout"

procedures for completion "at the end of the period of performance," such as liquidating

obligations and refunding unobligated balances, that are not required and would make no sense

to require at the end of each budget period. Similarly, 45 C.F.R. § 75.342(b)(1) distinguishes

between "annual reports [due] before the anniversary dates of multiple year Federal awards" and

the "final performance report . . . due 90 calendar days after the period of performance end date."

---

[2] To the extent it applies at all (*see infra* § II), the 2007 Grants Policy Statement likewise explains that under "the project period system of funding . . . projects are programmatically approved for support in their entirety, but are funded in annual increments called budget periods." Hunt Decl. Ex. B at I-34; *see also id.* at B-8 (defining "project period" as "[t]he total time for which support of a project has been programmatically approved").

These provisions would be nonsensical and duplicative if periods of performance were limited to one year, with grantees submitting annual reports *and* a "final" performance report each year. Unsurprisingly, this is not how HHS has historically interpreted these requirements. *See, e.g.*, Hunt Decl. Ex. B at II-90-91 (requiring the "Final Financial Status Report" and "Final Progress Report" at "the end of the project period"); Paluzzi Decl. Ex. K (making grantee aware of "Reporting Requirements for final reports to closeout this grant at the end of the project period").

In sum, the relevant regulatory and grant materials all point to the conclusion that the "project period" accords with the "period of performance" and that Plaintiffs were awarded grants with a five-year "period of performance." HHS's alternative, unsupported contention that these were one-year grants must be rejected.

2. *Five-year grants under the TPP Program do not violate the Antideficiency Act*

Stretching to support their contention that Plaintiffs' awards were simply serial one-year grants, Defendants argue that a contrary interpretation would raise the risk of Antideficiency Act ("ADA") violations. Defs.' Br. at 14. But even if one sets aside the fact that HHS has—for decades—funded public health programs through multi-year grants with nary a reported ADA violation, nothing in the ADA undercuts reading Plaintiffs' TPP Program grants to have a period of performance comprising five years.

The ADA provides, in pertinent part, that an "officer or employee of the United States Government . . . may not . . . involve [the] government in a contract or obligation for the payment of money before an appropriation is made." 31 U.S.C. § 1341(a)(1)(B). Plaintiffs' grants simply do not create "an obligation for the payment of money [by HHS] before an appropriation is made" that would implicate the ADA. To the contrary, as outlined in detail above (*see supra* § I.A.1), Plaintiffs' grants were structured to accord with HHS's project period system, where grants have multi-year performance periods and are funded in annual increments known as "budget periods." As provided by the agency's regulations, the FOAs, and the Notices

9

of Award to Plaintiffs, HHS agreed to obligate funds for each budget period based on the applicable Congressional appropriation. This is why grantees were required to submit a "noncompeting application" each year of the "approved project period," Tier 1B FOA at 83; Tier 2B FOA at 85, and why the funding for subsequent years of Plaintiffs' grants is "contingent upon *the availability of funds*, satisfactory progress of the project, and adequate stewardship of Federal funds." Tier 1B FOA at 39 (emphasis added); Tier 2B FOA at 34 (same); *accord* Paluzzi Decl. Ex. A (Notice of Award stating that "recommended future support" is "contingent upon *availability of funds* and satisfactory progress of the project" (emphasis added)).

Defendants, notably, muster no authority saying that this project period system, used for many decades by HHS and by grantees across many HHS sponsored programs (*see Califano*, 574 F.2d 518 (D.C. Cir. 1977), discussed *infra* § I.B), contravenes the ADA. This is for good reason: Plaintiffs' grants and the project period system fully comport with the rule enunciated in *Leiter v. United States*, 271 U.S. 204 (1926), cited in Defs.' Br. at 13, where the Court invalidated a leasing contract with a government agency that purported to provide for payments after the first year out of as-yet-unappropriated funds. 271 U.S. at 207. Given that the funding for each budget period of Plaintiffs' awards is only ever obligated from—and is conditioned on the availability of—the applicable appropriation, the structure of the awards avoids any *Leiter* issue. *See* GAO, *Principles of Federal Appropriations Law* (vol. II, 3d ed. 2006), *available at* https://www.gao.gov/assets/210/202819.pdf ("GAO Red Book"), Vol. I, 5-43 ("Multiyear arrangements may be permissible, even without specific statutory authority, if they were structured in such a way that the agency, at [the] time of contract award, incurs no *financial obligation*." (emphasis added)).

Defendants attempt to reframe Plaintiffs' suit as a demand for payment under the two remaining budget years of the grant. Defs.' Br. at 12 (arguing that Plaintiffs' "asserted basis of relief" violates the ADA). But Plaintiffs have never argued that they have a contractual right to

this funding and recognize that HHS was not obliged to automatically fund their grants beyond the first budget year. Plaintiffs demand only that having awarded grants with five-year periods of performance, HHS adhere to the dictates of the APA and its own regulations in funding or terminating future budget years. These regulations enumerate the only valid non-appropriations-related bases for cancelling a grant award prior to the end of the project period. *See* 45 C.F.R. § 75.372(a)(1)-(4) (permitting termination for "fail[ure] to comply with the terms and conditions of the award" and "for cause"); *accord*, *e.g.*, Tier 2B FOA at 32; Paluzzi Decl. Ex. A. Given that there is no dispute that Plaintiffs' grants were and remain fully funded by Congress,[3] the only issue is whether HHS, having so cabined its discretion, acted in accord with its regulations and engaged in reasoned decision-making. As explained below, it did not (*see infra* §§ I.B, I.C).

With one exception,[4] Defendants fail to cite to a single ADA case involving a multi-year grant.[5] In so doing, Defendants have failed to grapple with fundamental differences between

---

[3] On March 23, 2018, Congress passed the Consolidated Appropriations Act, once again mandating that "$101,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy . . . ." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348. Notwithstanding this appropriation, HHS has not reinstated Plaintiffs' terminated grants.

[4] That one case is of negligible relevance. *Maryland Department of Human Resources v. Department of Health and Human Services*, 854 F.2d 40, 42 (4th Cir. 1988), concerned whether a grantee could obtain payment of a grant on a schedule other than that outlined by the Director of the Office of Management and Budget as required by Section 1512(a) of the ADA and HHS regulations. *Id.* The case stands only for the narrow proposition that, in making expenditures under a grant, agencies must comply with relevant payment schedules outlined in a section of the ADA and regulations that are not at issue in this case.

[5] Except for *Maryland Department of Human Resources*, discussed above, every one of Defendants' cases deals with government contracting. *See Hercules Inc. v. United States*, 516 U.S. 417 (1996) (contract to manufacture Agent Orange); *Leiter v. United States*, 271 U.S. 204 (1926) (leasing contract); *Sam Gray Enters. v. United States*, 250 F.3d 755 (Fed. Cir. 2000) (leasing contract); *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442 (Fed. Cir. 1997) (contract for training, and related technical and maintenance support); *Autonomy, Inc. v. TASC, Inc.*, No. 15-cv-505, 2015 WL 7313380 (E.D. Va. Nov. 19, 2015) (procurement contract); *Davis & Assocs., Inc. v. District of Columbia*, 501 F. Supp. 2d 77, 79 (D.D.C. 2007) (contingency fee contract); *RCS Enters. v. United States*, 57 Fed. Cl. 590 (2003) (auditing contract); *Cray Research, Inc. v. United States*, 44 Fed. Cl. 327 (1999) (acquisition contract).

contracts and grants awarded through cooperative agreements, such as those issued to Plaintiffs. *Compare* 31 U.S.C. § 6303 ("An executive agency shall use a procurement contract . . . when . . . the principal purpose of the instrument is to acquire . . . property or services . . . ."), *with* 31 U.S.C. §§ 6304, 6305 (grants and cooperative agreements are meant "to carry out a public purpose of support or stimulation authorized by a law of the United States" and not for the "direct benefit" of the government.); *see also* GAO Red Book, Vol. II, 10-9 ("While grant relationships have certain 'contractual' relationships, the contract analogy has its limits."). Although "grant agreements ha[ve] a contractual aspect," they are "[u]nlike normal contractual undertakings, [in that] federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy." *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 669 (1985). The judgment Congress made here— through the continual funding of the TPP Program—is that HHS must award grants for medically accurate, evidence-based teen pregnancy prevention interventions. And now that it has done so, the agency must administer those grants in a way that is neither arbitrary, capricious, nor contrary to its own regulations. Nothing in the ADA vitiates this bedrock proposition.

## B. HHS's decision to end Plaintiffs' five-year grants prematurely was a "termination" subject to 45 C.F.R. § 75.372

In cancelling Plaintiffs' grants two years before the planned end of the project period in June 2020, HHS ended Plaintiffs' grants "prior to the planned end of period of performance" and therefore "terminated" the grants within the meaning of its regulations. *See* 45 C.F.R. § 75.2 (defining "[t]ermination"). In an attempt to escape the plain language of HHS's own regulations and the plain terms of Plaintiffs' grants, Defendants contend that the regulation simply does not apply to a "decision not to issue future continuation awards." Defs.' Br. at 7.

This argument has been soundly rejected under strikingly similar circumstances to those here. In *Southern Mutual Help Association v. Califano*, 574 F.2d 518 (D.C. Cir. 1977), the D.C. Circuit considered a five-year grant awarded by HHS's predecessor, HEW. There, the plaintiff's

grant was awarded under the "Project Period System" still used by HHS today, in which "projects are approved for multi-year support, but are funded in annual increments called budget periods" and grantees "must file annual, noncompeting applications for continued funding." *Id.* at 519. HEW rejected the plaintiff's application for the third budget year and awarded the funds elsewhere. *Id.* at 520. After the plaintiff attempted to appeal this termination, HEW—taking the identical position HHS does here—informed the plaintiff that "our administrative decision not to renew this grant at the end of the budget period does not constitute grant termination. Therefore, those rules and regulations governing grant termination procedures . . . do not apply in this instance." *Id.* at 521.

The plaintiff filed suit under the APA claiming, among other things, that the termination violated HEW's regulations. *Id.* The plaintiff maintained that it was "awarded a five-year grant, divided into five individual budget periods" and that the "action taken by HEW … with two years remaining on the grant, must logically be viewed as a termination." *Id.* at 525-26. Like Defendants here, HEW argued that although the original grant was approved for a "five-year project," it was "composed of five individual one year grants (and corresponding budget periods)." *Id.* at 526. According to HEW, the decision not to continue the grant "did not result in the termination of [the] grant" because the grants for years four and five "had not been made" but rather constituted a "pre-award decision related to an application for the additional grant." *Id.*

The D.C. Circuit rejected the government's argument. It found the agency's position inconsistent both with the grant documents (which specified a "project period" that extended for five years) and the regulatory definition of "termination," *id.* at 527, which covered "the cancellation of Federal assistance, in whole or in part, under a grant at any time prior to the date of completion." 45 C.F.R. § 74.110 (1976). Accordingly, the court of appeals held "that the action taken by HEW was a termination" that was subject to the agency's regulations governing

the circumstances in which a grant may be terminated. 574 F.2d at 528.[6]

Here, as in *Califano*, the grants awarded to Plaintiffs were based on the "project period system," with the Notices of Award to Plaintiffs identifying a "project period" of five years and a "budget" period that corresponded to the yearly appropriation. And as in *Califano*, when HHS informed Plaintiffs that it would not continue their funding after the third year of the project, this was a "termination" of their awards subject to HHS's "termination" regulation.[7]

At bottom, Defendants' argument that the premature cancellation of Plaintiffs' grants was not a "termination" despite the plain language of its governing regulations rests on its contention that—notwithstanding the grant documents' *explicit* equation of the phrases "project period" and "period of performance"—the period of performance was only the one-year "budget period." For all the reasons explained above, this argument is meritless.

### C. HHS's terminations were arbitrary, capricious, and contrary to law

#### 1. *The terminations were contrary to law.*

Defendants do not deny that HHS's actions were contrary to law *if* they constituted "terminations" under section 75.372. Nor could they; section 75.372 allows an agency to terminate an ongoing, Congressionally funded grant unilaterally only if the grantee "fails to comply with the terms and conditions of the award" or "for cause," 45 C.F.R. § 75.372(a)(1)-(2), neither of which Defendants have ever claimed applies to either Plaintiff. Instead, Defendants rest entirely on the argument that they did not "terminate" Plaintiffs' grants at all, which fails for the reasons stated above. Accordingly, it is undisputed that, should the Court agree that HHS's

---

[6] Although HEW's decision not to renew the funding for the *Califano* plaintiff appears to have been performance-based, the basis for the termination was not a factor in the Court's decision.

[7] Defendants' argument that the "termination" regulation is inapplicable to Plaintiffs' grants also fails because it reads the word "planned" out of that regulation. Section 75.2 defines a "termination" as the ending of a grant award "prior to the *planned* end of period of performance" (emphasis added). Here, as indicated in both the FOAs and Notices of Award, there can no doubt that the parties had always "planned" for a five-year period of performance.

decision to end Plaintiffs' five-year grants two years early is a "termination" for purposes of

section 75.372, HHS failed to comply with those regulations and the terminations must be set

aside as contrary to law under the APA.

2. *The terminations were arbitrary and capricious.*

Defendants defend HHS's actions on the ground that an "agency's decision need not be a

'model of analytic precision.'" Defs.' Br. at 27 (quoting *Inova Alexandria Hosp. v. Shalala*, 244

F.3d 342, 350 (4th Cir. 2001)). But even that half-hearted defense presupposes an articulated

analysis. Indeed, the very paragraph from which Defendants quote explains why their actions

cannot survive APA review: an "agency must provide an adequate explanation for its actions,

and the explanation must show a 'rational connection between the facts found and the choice

made.' The required explanation must be articulated by the agency at the time of its action;

neither [a court] nor the agency may supply the explanation on appeal." *Inova Alexandria Hosp.*,

244 F.3d at 350 (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S.

29, 43 (1983)). As the Fourth Circuit has made clear, this explanation must be found in "the

administrative record, not subsequent . . . rationalizations." *N.C. Wildlife Fed. v. N.C. Dep't of

Transp.*, 677 F.3d 596, 604 (4th Cir. 2012). Where an agency does not cite an appropriate

basis—or any basis at all—"the court is powerless to affirm the administrative action by

substituting what it considers to be a more adequate or proper basis." *SEC v. Chenery Corp.*, 332

U.S. 194, 196 (1947).

This foundational requirement of administrative law is fatal to HHS's actions, as

Plaintiffs previously explained. *See* Pls.' Br. at 20-24. The administrative record discloses *no*

reason for the terminations. *See* Hunt Decl. Exs. A, B, C, I; *see also* Hunt Decl. ¶¶ 2-4, 10

(identifying Exs. A, B, C, and I as "part of the administrative record in this case"). Defendants

assert that they had "policy concerns with the current TPP Program [that] are a matter of public

record," Defs.' Br. at 28, but all they cite are two after-the-fact documents that they appear to concede have no place in the administrative record. S*ee* Hunt Decl. Exs. G, H; *see also* Hunt Decl. ¶¶ 8-9 (not identifying Exs. G or H as part of the administrative record). These documents—a press release postdating the terminations by almost two months and a letter to Congress postdating them by more than four months—are the exact type of extra-record, post hoc justifications that courts routinely reject.

The D.C. Circuit's decision in *City of Kansas City v. HUD*, 923 F.2d 188 (D.C. Cir. 1991), is squarely on point. There, HUD canceled a grant that it had previously awarded to Kansas City. *Id.* at 188-89. In the decision letters terminating the grants, HUD blamed "the alleged *untimeliness* of Kansas City's evidentiary submission." *Id.* at 193. This allegation was inaccurate, so HUD pointed in court to "the submission's qualitative inadequacy," based on "other communications between HUD and Kansas City officials." *Id.* at 194. The D.C Circuit rejected that argument, because "not one of the three agency decision letters makes any reference to the deficiencies." *Id.* The "other communications" to which HUD pointed in litigation could not "fill this gap," because courts "must look to the agency decisions themselves." *Id.* Given that "none of HUD's three decision letters incorporate[d] these secondary communications, nor refer[red] to them in any way as the basis for the agency action," they could not provide the reasoned administrative decision-making that the APA requires. *Id.* Here, the impropriety of the asserted "policy concerns" is even more stark. Defendants have only proffered post hoc rationalizations intended to tamp down public and Congressional outrage at HHS's unlawful, unexplained decisions. They can play no role in the defense of the terminations.

Even if the post hoc documents Defendants proffer could be considered in some way, they would not come close to providing a reasoned basis for HHS's actions in terminating the

grants. The press release to which Defendants point claims there is "strong evidence of negative impact or no impact" in the first round of TPP Program grants, which had expired in 2015. Hunt Decl. Ex. G at 1. But at the time HHS issued the press release, OAH Director Kappeler, OAH's top subject matter expert, had already identified "several errors" in the analysis advanced in the press release, warning that it did not reflect "accurate data" about the TPP Program and that the evidence supporting the program's performance was "very strong." Link Decl. Ex. K at Page 174_17-0284-FOIA; *see also* Pls.' Br. at 22 (citing post-termination examples of HHS conceding the effectiveness of the TPP Program in general and Plaintiffs' programs in particular). Defendants' newly proffered basis for the terminations thus "relied on . . . mischaracterizations" and cannot be sustained. *N.C. Wildlife Fed.*, 677 F.3d at 604; *see also, e.g.*, *State Farm*, 463 U.S. at 43 (action is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency").

Nor would the supposed rationales in those documents justify HHS's actual termination decision even if they were accurate. HHS terminated *all* of the existing grants, including Tier 2B grants like Healthy Teen Network's. But Tier 2B grants were not intended to replicate the programs that the press release claimed had failed; instead, they were designed to "rigorously evaluat[e] new or innovative approaches for preventing teen pregnancy and related risk behaviors." Pls.' Br. at 7. Even now, Defendants have given *no* explanation for why they canceled grants studying *potential* interventions, a core part of Congress's intent in creating a rigorous, evidence-based program. *See* Pls.' Br. at 4-5 (citing appropriations dedicating 25 percent of funds to research seeking to develop and test new approaches).

Similarly, internal HHS documents produced through Freedom of Information Act ("FOIA") litigation show that the rationale of the political appointees who made the termination

decisions did not support cancelling all grants. *See* Link. Decl. ¶¶ 1-2 (describing litigation). In

an email sent on July 7, 2017, HHS Associate Director for Policy Steven Valentine suggested to

Chief of Staff for the Office of the Assistant Secretary of Health Valerie Huber[8] that they tell

Congress that the grants were canceled because "updated project periods will allow time to

review and refocus grant programs for FY 2018 without disrupting services." Morse Decl. Ex. A.

That, of course, is not what Defendants did: they disrupted services by terminating the grants, as

they were well aware. *See* Link Decl. Ex. F at Page 168_17-0284-FOIA (acknowledging that

"continuation grantees are now having to lay off staff"); Paluzzi Decl. ¶¶ 24-26; Wen Decl. ¶¶

33-38. Moreover, they did not do so to "refocus" the existing programs or "review" them to

decide which to continue; to the contrary, their decision was (they now argue in their legal

papers) intended to let other programs have a chance to compete for the same grants they failed

to earn in 2015. *See, e.g.,* Defs.' Br. at 21 ("HHS has merely determined that it will not make

continuation awards for existing TPP Program projects . . . and that funds available under the

new annual appropriation will be recompeted . . . ."). Thus even the shifting, post hoc

explanations in Defendants' extra-record exhibits and internal correspondence do not justify

---

[8] Defendants attack a strawman by saying Plaintiffs "suggest some sort of impropriety in the alleged involvement of political appointees" in the termination decisions and that Plaintiffs' "recourse is at the polls—not in the courts." Defs.' Br. at 28-29. The impropriety that Plaintiffs challenge is not the mere *involvement* of political appointees, but rather their failure to conduct a decision-making process that adhered to the APA. *See, e.g.*, *FCC v. Fox Tele. Stations, Inc.*, 556 U.S. 502, 549 (2009) ("[A]n agency must act consistently. The agency must follow its own rules."); *Nat'l Venture Capital Ass'n v. Duke*, --- F. Supp. 3d ----, 2017 WL 5990122, at *1 (D.D.C. Dec. 1, 2017) ("Elections have consequences. But when it comes to federal agencies, the Administrative Procedure Act shapes the contours of those consequences."). Moreover, as shown by the internal documents released in the FOIA litigation, their decision-making was "not based on expertise in the particular field," *Burgin v. OPM*, 120 F.3d 494, 497 (4th Cir. 1997) (internal quotation omitted); to the contrary, it contradicted the actual expert evidence before the agency. Therefore, "great deference is not required." *Id.* (internal quotation omitted); *see also, e.g.*, *Perine v. William Norton & Co.*, 509 F.2d 114, 120 (2d Cir. 1974) ("[D]eference is usually justified on the basis of the agency's superior expertise in the area of its authority.").

what they *actually* chose to do. HHS's failure to engage in reasoned decision-making and document its reasons in the administrative record, and its willful decision to go against the evidence before it, render the terminations arbitrary and capricious.

      **D.**      **HHS's termination of Plaintiffs' grants was not "committed to agency discretion by law"**

Lacking a credible substantive defense of their actions, Defendants fall back on 5 U.S.C. § 701(a)(2), arguing that they are immune from APA review because terminations are "committed to agency discretion by law." Defs.' Br. at 24.[9] Defendants substantially overstate the scope of section 701(a)(2), which the Supreme Court has explained is a "very narrow exception . . . applicable in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410 (1971) (quoting S. Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). When in doubt, courts "adopt[] the reading that accords with traditional understandings and basic principles: that executive determinations generally are subject to judicial review." *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417, 434 (1995). Regulations can limit agency discretion and provide judicially enforceable standards even where underlying statutes themselves do not. *See, e.g.*, *Service v. Dulles*, 354 U.S. 363, 372 (1957) (holding that "regulations validly prescribed by a government administrator are binding upon him as well as the citizen" and that "this principle holds even when the administrative action under review is discretionary in nature").

---

[9] Defendants also argue that they have not taken final agency action. Defs.' Br. at 20-23. This bizarre argument is obviously wrong; HHS finally adjudicated Plaintiffs' non-competing continuation grants and carryover authority, and its resolution determined Plaintiffs' rights to the subject funds. *See, e.g.*, *Chamblee v. Espy*, 100 F.3d 15, 17-18 (4th Cir. 1996) (decision to suspend plaintiff's appeal of an application denial was final agency action). Defendants do not cite any cases that even entertain the possibility that the denial or termination of a grant is not final agency action. In any event, Defendants raised this argument only in regard to Plaintiffs' impoundment claims, which are not currently at issue. *See supra* n.1.

As explained above, HHS's grantmaking regulations limit its discretion to terminate grants during their period of performance. *See supra* § I.B. Numerous courts have found that grantmaking regulations provide standards allowing a court to apply the APA to grant determinations, including termination decisions. *See, e.g.*, *City of Kan. City*, 923 F.2d 188; *Cmty. Action of Laramie Cty., Inc. v. Bowen*, 866 F.2d 347 (10th Cir. 1989); *Califano*, 574 F.2d 518; *Navajo Nation v. Azar*, --- F.3d ----, 2018 WL 1512336 (D.D.C. Mar. 27, 2018).

Defendants dismiss this long line of precedent by citing cases where plaintiffs could point to *no* applicable standards. *See* Defs.' Br. at 24-26 & n.10. *Lincoln v. Vigil*, 508 U.S. 182 (1993), for example, dealt with the allocation of "a lump-sum appropriation, which contained no restrictions on use of the funds, for a program not mentioned in a statute or the agency's regulations." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002) (describing *Lincoln*). In *Alan Guttmacher Institute v. McPherson*, 597 F. Supp. 1530 (S.D.N.Y. 1984), the statutory authorization allowed the President to award assistance "on such terms and conditions as he may determine," an authority that was not subject to any relevant regulations. *Id.* at 1535 & n.1. Such cases have no bearing on the TPP Program, which is a targeted appropriation funding a specific, Congressionally created program and subject to extensive grantmaking regulations.

The rest of Defendants' cases are of the same ilk. *See* Defs.' Br. at 25-26 & n.10. In most of them, the court explicitly noted that there are circumstances in which grant determinations or terminations may be subject to judicial review.[10] In one instance, Defendants cite to a *concurring*

---

[10] *See Apter v. Richardson*, 510 F.2d 351, 355 (7th Cir. 1975) (noting that even if "the medical merits of NIH decisions on training grants may be committed to the unreviewable discretion of the agency . . . that does not mean that NIH actions wholly escape judicial scrutiny"); *Grassetti v. Weinberger*, 408 F. Supp. 142, 150 (N.D. Cal. 1976) ("[I]t is probable that the medical merits of agency decisions on research grant applications are committed to the unreviewable discretion of the agency, subject to judicial scrutiny only where it is alleged that the agency has transgressed a constitutional guarantee or violated an express statutory *or procedural* directive."

opinion, whose conclusion that a particular grant decision was committed to agency discretion by law was expressly rejected by the panel majority, which applied the "traditional requirement that if an agency decides to promulgate rules, then it is bound by its own regulations even if the action of the agency was discretionary." *Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1048 n.28 (D.C. Cir. 1985). And in the only two cases that did not include such a caveat, there was no sign of *any* relevant regulation or statute guiding the administration of the appropriation.[11]

Ultimately, Defendants' claim to discretion in grant termination decisions simply recasts their argument that the termination regulations do not apply. They do not seriously argue that those regulations provide no administrable standard; they simply argue that they should not be held to that or any other standard. Because their argument that the premature cancellation of Plaintiffs' grants was not a termination fails, so too does their argument that they have unlimited discretion to terminate their grants.

## II. Defendants Cannot Defend Their Termination as a "Withholding" Under the 2007 Grants Policy Statement ("GPS")

Because their actions are indefensible terminations, Defendants' argument that HHS can prematurely end all TPP Program grants without explanation, analysis, or individual consideration is based almost entirely on one sentence in an informal policy document, the 2007 GPS. That purports to allow HHS to "withhold" funds if "[f]or whatever reason, continued

---

(emphasis added)); *Cmty. Action of Laramie Cty.*, 866 F.2d at 352 ("[I]f HHS discontinued financial assistance to [the grantee] without sufficient evidence to conclude that federal statutory or regulatory law had been violated, a federal court might determine the agency's action to be 'arbitrary, capricious or an abuse of discretion.'").

[11] *See Kletschka v. Driver*, 411 F.2d 436, 444 (2d Cir. 1969) (finding relief under APA unavailable "given the absence of any guidelines for the control of the V.A.'s discretion"); *Phila. Hous. Auth. v. HUD*, 553 F. Supp. 2d 433, 439 (E.D. Pa. 2008) (identifying no relevant regulations and thus finding that "the enabling statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion" (internal quotation and alteration omitted)).

funding would not be in the best interests of the Federal government." Hunt Decl. Ex. B at II-89. As explained above, the premature cancellation of Plaintiffs' previously awarded grants was a "termination" under the governing regulations, not a "withholding." But even if it could be construed as a withholding, the authority Defendants assert would be "inconsistent with the plain language of the regulation and cannot be allowed to stand." *Md. Gen. Hosp., Inc. v. Thompson*, 308 F.3d 340, 347 (4th Cir. 2002). Defendants cannot bootstrap this impermissible authority into the terms of the grant by generally citing to the 2007 GPS in grant documents. Moreover, even if HHS were somehow allowed to override its duly enacted regulations, neither the 2007 GPS nor the APA allow an unreasoned decision.

### A. The "whatever reason" withholding authority is incompatible with 45 C.F.R. part 75 and therefore invalid

An agency's informal guidance regarding the application of regulations is only valid if it is a permissible interpretation of those regulations. *See, e.g.*, *id.* Indeed, the 2007 GPS itself acknowledged that "[i]n the case of a conflict, statutes and regulations take precedence over requirements . . . in the HHS GPS." Hunt Decl. Ex. B at II-2. The Notices of Award likewise provide an order of precedence in the event of conflict, prioritizing legislation and regulations over the GPS. *See* Wen Decl. Exs. A & F at line 16; Paluzzi Decl. Exs. A, C, & K at line 16. Defendants' interpretation of their grantmaking regulations as providing it with blanket authority to withhold a continuation award "for whatever reason" is inconsistent with the regulations' carefully circumscribed system of terminations and withholding, and would render multiple provisions of that scheme superfluous. Accordingly, it cannot be sustained.

But even if HHS's actions could appropriately be called a "withholding," the regulations explicitly cover withholding, limiting it in ways that cannot be reconciled with the asserted "whatever reason" authority. 45 C.F.R. § 75.371 authorizes HHS to "[w]ithhold further Federal awards for the project or program," but only "[i]f a non-Federal entity fails to comply with

22

Federal statutes, regulations, or the terms and conditions of a Federal award" and the awarding agency "determines that noncompliance cannot be remedied by imposing additional conditions." 45 C.F.R. § 75.371(a), (e). Similarly, 45 C.F.R. § 75.207(b)(2) allows HHS to "[w]ithhold[] authority to proceed to the next phase" of a grant, but only in specific circumstances: "[w]hen an applicant or recipient has a history of failure to comply with" an award's conditions, "[w]hen an applicant or recipient fails to meet expected performance goals," "[w]hen the applicant or recipient is not otherwise responsible," or when the agency determines the applicant or recipient to be a high risk. *Id.* § 75.207(a); *see also id.* § 75.205 (providing for risk determination).

The regulations thus provide HHS with authority to withhold funds only in limited situations, primarily related to noncompliance or poor performance by grantees. The authority Defendants purport to find in the 2007 GPS, to withhold awards "for whatever reason," is impossible to square with this carefully limited authority. If HHS were free to withhold an award whenever it wanted, without explanation or reasoned analysis, the regulations identifying specific circumstances in which HHS may withhold awards would be entirely superfluous.

"In interpreting . . . regulations, [courts] have a duty, where possible, 'to give effect' to all operative portions of the enacted language, including its 'every clause and word.'" *Shipbuilders Council of Am. v. U.S. Coast Guard*, 578 F.3d 234, 244 (4th Cir. 2009) (quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001); *accord, e.g.*, *Black & Decker Corp. v. C.I.R.*, 986 F.2d 60, 65 (4th Cir. 1993) ("Regulations, like statutes, are interpreted according to canons of construction. Chief among these canons is the mandate that 'constructions which render regulatory provisions superfluous are to be avoided.'" (quoting *Hart v. McLucas*, 535 F.2d 516, 519 (9th Cir. 1976))). In *Shipbuilders Council*, for example, the Fourth Circuit deferred to an agency's interpretation of a regulation only after confirming that it "gives effect to each of [the

regulation's] provisions." *Id.* at 245. Where an agency's informal guidance renders portions of a regulation superfluous, the canon against superfluity overcomes any deference otherwise due. *See, e.g.*, *Caldwell v. Astrue*, No. 07-cv-222, 2008 WL 2713714, at *4 (E.D. Tenn. July 10, 2008) ("[T]he Court need not defer to an agency interpretation of a provision or a word which is contrary to its ordinary meaning nor must deference be accorded to an interpretation of a provision which renders portions superfluous."); *Finkelstein v. United States*, 29 Fed. Cl. 611, 623 (1993) ("A construction of statutes or regulations that renders portions superfluous is not entitled to judicial deference." (citing *United States v. Menasche*, 348 U.S. 528, 538-39 (1955))).[12]

The regulations themselves reinforce the impropriety of Defendants' asserted withholding authority. The current version of the governing regulations was issued in 2014, seven years *after* the 2007 GPS was drafted, and it was amended again in 2016. *See* 79 Fed. Reg. 75871-01; 81 Fed. Reg. 89393-01. Yet HHS chose not to establish the "whatever reason" authority through formal rulemaking. To the contrary, the 2014 amendments specifically *superseded* "all administrative requirements, program manuals, handbooks and other non-regulatory materials that are inconsistent with the requirements of [45 C.F.R. part 75]," with exceptions not applicable here. 45 C.F.R. § 75.105; *see also* Hunt Decl. Ex. B at iii ("The information in [the 2007 GPS] is subject to change following its issuance due to changes in . . .

---

[12] *See also, e.g.*, *Alaska Trojan P'ship v. Gutierrez*, 425 F.3d 620, 631 (9th Cir. 2005) (rejecting agency interpretation that is "inconsistent with the structure of the [underlying] regulations"); *Albemarle Corp. v. Herman*, 221 F.3d 782, 785-86 (5th Cir. 2000) (agency's interpretation requiring "written" work practices is unreasonable where the regulations specify that operating procedures must be written, but do not so specify for work practices); *cf. Clean Ocean Action v. York*, 57 F.3d 328, 333 (3d Cir. 1995) ("While the [governing statute] gives the [agency] broad rule-making authority under which it could have reserved to itself the discretion it now claims, it simply failed to do so.").

Title[] 45."). Where an agency amends a regulation in a way that conflicts with earlier guidance, that guidance loses any force it might have had previously. *Cf. Conn. Office of Prot. & Advocacy for Persons with Disab. v. Hartford Bd. of Educ.*, 355 F. Supp. 2d 649, 659 (D. Conn. 2005), *aff'd*, 464 F.3d 229 (2d Cir. 2006) ("The court cannot defer to an agency interpretation that predates relevant amendments to the statute.").

Moreover, in 2016, HHS codified into the regulations "additional changes . . . based on existing law or HHS policy," 81 Fed. Reg. at 89393—but declined to codify the 2007 GPS, much less the purported "whatever reason" power. Given that HHS recognized the need to incorporate previously uncodified grants policies in the regulations but omitted the "whatever reason" authority, the clear implication is that it has abandoned that authority.[13]

By contrast, HHS has included a "best interest" termination option in *other* grant regulations.[14] It was well aware of its ability to codify a "best interest" authority in regulations and the need to do so—but chose not to do so in the general grantmaking regulations of part 75. HHS appears to have made a considered decision that the "best interest" authority should apply

---

[13] Indeed, there is a real question whether the 2007 GPS survived the 2014 and 2016 amendments to HHS's grant-making regulations at all. The 2007 GPS stated that it was based on OMB Circular A-102, OMB Circular A-110, "the OMB cost principles and single audit circular," 45 C.F.R. part 74, and 45 C.F.R. part 92. Hunt Decl. Ex. B at I-4. *Every single one* of these authorities was withdrawn or superseded by the 2014 amendments. *See* 45 C.F.R. § 75.104(a)(4)-(6), (b). Given that the 2007 GPS acknowledged that "[t]he information in this document is subject to change following its issuance due to changes in statutes, regulations, or policies adopted subsequent to its effective date" and that changes to Title 45 in particular could affect its applicability, Hunt Decl. Ex. B at iii, there is substantial reason to doubt the validity of any portions of HHS's the 2007 GPS that go beyond the current regulations.

[14] *See, e.g.*, 42 C.F.R. § 65.6(b) (for covered grants, continuation awards require a determination "that continued funding is in the best interest of the Federal Government"); *id.* § 65a.8(b) (same); *id.* § 51b.106(b) (same); 45 C.F.R. § 1351.14(b) (same); *id.* § 63.23(c)(3)(iii) (for covered grants, continuation awards "will be reviewed on a non-competitive basis to determine . . . [i]f continuation of the project would be in the best interests of the Government"); *id.* § 1336.10 (for covered grants, approval throughout project period is subject to, *inter alia*, "a determination by HHS that continued funding is in the best interest of the Government").

only to specific grants, so that most HHS grantees can proceed securely in the knowledge that their grant will be continued for the entire period of performance if they comply with the terms of the grant and perform adequately, as long as Congress continues funding the grant program. Defendants' arguments here ignore that choice and would create a scheme that has never gone through formal rulemaking and would place a cloud over every single public health grant in America. The regulations and well-settled rules of interpretation preclude that result.

## B. The FOA and the Awards do not incorporate the "whatever reason" provision

Perhaps recognizing that the 2007 GPS cannot and does not have the force of law, Defendants point to a sentence in the FOA requiring grantees to "comply with all terms and conditions outlined in their grant awards, the Department of Health and Human Services (HHS) Grants Policy Statement, requirements imposed by program statutes and regulations and HHS grant administration regulations, as applicable, as well as any requirements or limitations in any applicable appropriations acts." Hunt Decl. Ex. A at 68. Similarly, they make much of the Awards' disclaimer that grantees must "comply with all terms and conditions outlined in the grant award, including grant policy terms and conditions contained in applicable [HHS] Grant Policy Statements." Wen Decl. Ex. A at 4. These provisions, Defendants suggest, import the entirety of the 2007 GPS, legitimizing its inconsistencies.

But Defendants ignore two crucial limiting portions of the two "incorporating" passages. First, the FOA and the Awards required compliance with the 2007 GPS only where "applicable."[15] To the extent that the GPS conflicts with duly enacted regulations, of course, it is

---

[15] *See* Hunt Decl. Ex. A at 68 ("[R]ecipients must comply with all terms and conditions outlined in their grant awards, the Department of Health and Human Services (HHS) *Grants Policy Statement*, requirements imposed by program statutes and regulations and HHS grant administration regulations, *as applicable* . . . ." (emphasis added)); Wen Decl. Ex. A at 4 ("You must comply with all terms and conditions outlined in the grant award, including grant policy

invalid and thus incapplicable. *See supra* § II.A. Indeed, as noted above, the Awards and even the 2007 GPS itself acknowledge the precedence of the regulations over conflicting portions of the 2007 GPS. *See, e.g.*, Paluzzi Decl. Ex. K at 1 ("In the event there are conflicting or otherwise inconsistent policies applicable to the grant, the above order of precedence shall prevail": "a. The grant program legislation[;] b. The grant program regulations[;] c. This award notice including terms and conditions . . . ."); Wen Decl. Ex. F at 1 (same); Hunt Decl. Ex. B at II-2 ("In the case of a conflict, statutes and regulations take precedence over requirements . . . in the HHS GPS."). The limited language to which Defendants point does not suggest otherwise.

Second, Defendants truncate the language of the FOA and the Awards to suggest that it constituted an "acknowledgment" of or "agreement" to the entirety of the 2007 GPS. But the references to the 2007 GPS in the FOA and the Awards require only that recipients "must *comply* with all terms and conditions" of the applicable GPS. Hunt Decl. Ex. A at 68 (emphasis added); Wen Decl. Ex. A at 4 (same). They do not purport to incorporate the terms of the 2007 GPS *in toto*, but instead only require recipients to comply with the various provisions that call for recipients' compliance.[16] The word "comply" means to "complete, accomplish [or] perform what is due"; it is synonymous with "obey." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 465 (2002). The "whatever reason" provision is not something for *recipients* to comply with; rather, it purports to define a situation in which the *agency* "may decide not to make a non-competing continuation award." Hunt Decl. Ex. B at II-89.

Defendants' repeated insistence that Plaintiffs "accepted" HHS's freewheeling authority

---

terms and conditions contained in *applicable* Department of Health and Human Services (HHS) Grant Policy Statements . . . ." (emphasis added)).

[16] The 2007 GPS contains several such terms. *See, e.g.*, Hunt Decl. Ex. B at II-2 to II-6 (detailing "public policy requirements" to which grantees must adhere); *id.* at II-49 to II-50 (listing actions that cannot be taken without prior approval from the awarding agency).

to cancel grants "for whatever reason," *see, e.g.*, Defs.' Br. at 16, is thus unavailing. Plaintiffs agreed to *comply* with the requirements of the Grant Policy Statements *as applicable*. HHS chose not to explicitly incorporate all terms of the 2007 GPS in the FOA or Awards, nor to include the "for whatever reason" language in the FOA or the Awards themselves. Having declined to do so, it cannot graft terms from an inapplicable policy statement onto awards that require only "compliance" with "applicable" policy statements.

### C. Even if the purported withholding authority applies, it does not authorize HHS's unreasoned, blanket cancellation of all grants

Even if the purported withholding authority in the 2007 GPS existed, it would not authorize HHS's peremptory cancellation of all grants without any reason or explanation whatsoever. The 2007 GPS requires a determination that "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." Hunt Decl. Ex. B at II-89. HHS made no such determination here, as shown by the complete absence of any analysis or explanation in the administrative record proffered by Defendants.

As discussed above, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50; *accord, e.g.*, *N.C. Wildlife Fed.*, 677 F.3d at 604; *see supra* § I.C. Whether viewed as a termination or a withholding, the same rule applies, and HHS's "post hoc rationalizations" cannot satisfy its obligation to articulate a reasoned basis in the administrative record. *N.C. Wildlife Fed.*, 677 F.3d at 604.

Indeed, the documents unearthed by the FOIA litigation show that HHS *did not* conclude that cancelling all grants was in the public interest before acting. As mentioned above, HHS official Steven Valentine claimed in August 2017 that they were canceled because "updated project periods will allow time to review and refocus grant programs for FY 2018 without disrupting services." Morse Decl. Ex. A. This post hoc explanation, even if it could be accepted

as the government's rationale, shows how far HHS's actual decision was from any conceivable determination that cancellation of all 81 grants was in the government's best interest. Mr. Valentine did not say that ending the existing grants was in the "best interests of the Federal government." Hunt Decl. Ex. B at II-89. Rather, he said that "updated project periods" would "allow time to review and refocus grant programs for FY 2017 *without disrupting services*." *Id.* (emphasis added). But as shown above, Defendants were well aware that cutting off the grants disrupted services. See Link Decl. Ex. F at Page 168_17-0284-FOIA (acknowledging that "continuation grantees are now having to lay off staff"); Paluzzi Decl. ¶¶ 24-26; Wen Decl. ¶¶ 33-38. HHS never found, nor even suggested, that disrupting services was in the government's best interest, and its internal documents suggest it recognized that the converse was true.

Indeed, even Defendants' current litigation-driven explanation belies the idea that HHS concluded that letting funding lapse for all grantees was in the best interests of the government. To the contrary, Defendants now claim that they have not decided whether to fund the current grantees. *See, e.g.*, Defs.' Br. at 21 ("HHS has merely determined that . . . funds available under the new annual appropriation will be recompeted in a process in which this year's grantees would be free to participate."). This is inconsistent with a determination that no longer funding Plaintiffs and other grantees was in the "best interests of the Federal government."

Defendants again retreat to the proposition that their discretion is absolute. But courts routinely review whether an agency has acted arbitrarily and capriciously in making a "best interest" finding. *See, e.g.*, *Krygoski Constr. Co. v. United States*, 94 F.3d 1537, 1544 (Fed. Cir. 1996) (reviewing contract allowing government to terminate if it "determines that a termination is in the Government's interest"); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 659-60 (2003) (explaining why "the few courts holding that a 'best interest' determination is nonreviewable"

are wrong and adopting the majority rule). Even courts that have expressed doubt whether such a standard is susceptible to review have concluded that they can invalidate actions where the agency "failed to make *any* finding . . . let alone a finding that [the challenged action] would be in the best interests of the United States." *Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1377 n.1 (E.D. Va. 1993).

At its core, Defendants' argument is that the single phrase "[f]or whatever reason, continued funding would not be in the best interests of the Federal government" allows them to act without reason at all, and immunizes them from the basic requirement that agencies must explain their actions. If that were what HHS intended the 2007 GPS to allow, it could have simply ended the language asserting a withholding power at "[f]or whatever reason." But it did not: it required a finding that HHS never made. Accordingly, even if it provided HHS with some exercisable authority beyond what the regulations allow—which, as explained above, it does not—HHS's unexplained fiat would not suffice to invoke it.

## III. Plaintiffs Are Already Suffering Harm and Will Continue to Suffer Irreparable Harm If Their Grant Terminations Are Allowed to Stand

Defendants do not contest that Plaintiffs and the communities they serve are facing and suffering irreparable harm. *See* Pls.' Br. at 16-18, 29-32; Paluzzi Decl. ¶¶ 23-26; Wen Decl. ¶¶ 32-28. Nor can they. As Plaintiffs have explained, Baltimore is radically scaling back its evidence-based programming, and is poised to cut other public health offerings to fund staff positions paid for by the grant. Wen Decl. ¶¶ 33-37. Healthy Teen Network has stopped replacing departing staff, is moving to smaller office space, and will soon need to lay off staff. Paluzzi Decl. ¶ 25. And both Plaintiffs will be irreparably injured if they are left without a remedy due to Defendants' refusal to process their applications for the fourth year of grant funding in time for that funding to be disbursed. Pls.' Br. at 29-30; Jt. Mot. for Order Preserving Remedies & Agreed Proposed Briefing Schedule ("Jt. Mot.") ¶ 5. Rather, Defendants contend

only that Plaintiffs "delay[ed]" in seeking an injunction, "undermin[ing]" their claim of injury. Defs.' Br. at 29. They are wrong both factually and legally.

As a threshold matter, a movant's delay does not necessarily preclude preliminary relief. As the Fourth Circuit has explained, Defendants' primary authority, *Quince Orchard Valley Citizens Association, Inc. v. Hodel*, 872 F.2d 75 (4th Cir. 1989), "simply does not require [a court] to find, as a matter of law, that the plaintiff suffered no irreparable injury because it delayed in initiating its request for a preliminary injunction." *Candle Factory, Inc. v. Trade Assocs. Grp., Ltd.*, 23 F. App'x 134, 138 (4th Cir. 2001). A court, instead, must assess the "prejudicial impact from the delay when the question of irreparable harm to plaintiffs is balanced against harm to defendants." *Id.*

More to the point, Plaintiffs have not delayed in challenging Defendants' unlawful actions. Quite the contrary, it is *Defendants* who have been dilatory at each pass. Baltimore appealed the termination of its grant on August 3, 2017, but Defendants never responded. Am. Compl. ¶ 64; Wen Decl. ¶ 25, Ex. G. Healthy Teen Network inquired and was advised by an agency employee in August 2017 that there was no use in appealing. Am. Compl. ¶ 98; Paluzzi Decl. ¶ 18. With no explanation forthcoming from the agency, Democracy Forward Foundation, counsel for Plaintiffs in this case, filed a FOIA request with HHS on August 14, 2017 "to uncover the reasons and influences underlying HHS's decision" to terminate the TPP Program grants. Link Decl. Ex. A ¶¶ 38-39. The agency failed for three months to release *any* documents, forcing Democracy Forward Foundation to file suit on November 13, 2017. Link Decl. Ex. A. Even then, HHS did not begin releasing records until just a few weeks before Plaintiffs filed this instant motion. Link Decl. ¶ 2. That production contained multiple documents directly relevant to and supportive of Plaintiffs' claims concerning the unlawfulness and arbitrariness of the grant terminations. Link Decl. Exs. C-M. It is thus *Defendants*' diligence, not Plaintiffs', that is subject to question. *See, e.g., Kan. Health Care Ass'n, Inc. v. Kan. Dep't of Soc. & Rehab. Servs.*, 31

F.3d 1536, 1544 (10th Cir. 1994) (court "reluctant to criticize plaintiffs for awaiting specific and concrete documentation [pertaining to their claim]. Without such documentation, they run the risk of having their claimed injury be deemed speculative.").

At the same time, Plaintiffs also dedicated significant time and resources to pursuing alternative sources of funding, a diversion from their organizational missions that thus far has come up short. *See* Paluzzi Decl. ¶¶ 23, 26; Wen Decl. ¶¶ 35, 36. During that time, Plaintiffs' inability to mitigate their injuries without a judicial remedy became apparent and their injuries ripened. Healthy Teen Network is vacating its offices for a smaller space and, by September 2018, will lay off three staff members (after already leaving the positions of three departed employees unfilled). Paluzzi Decl. ¶ 25. Baltimore similarly faces a deadline of July 1, 2018, the start of the City's fiscal year, by which it will have to divert funds from multiple other public health programs in order to pay for the more than 15 staff positions that were funded by the TPP Program grant. Wen Decl. ¶ 34. "[T]ardiness is not particularly probative in the context of ongoing, worsening injuries" because "the magnitude of the potential harm becomes apparent gradually, undermining any inference that the plaintiff was sleeping on its rights." *Arc of Cal. v. Douglas,* 757 F.3d 975, 990-91 (9th Cir. 2014) (quotation marks omitted).

Moreover, the need for the specific relief sought by Plaintiffs in this motion—the processing of their year-four applications—only recently became apparent. Non-competing continuation applications for Plaintiffs' grants are due each April, *see* Paluzzi Decl. ¶ 22; Wen Decl. ¶ 31, and, only just prior to filing the instant motion did Defendants make known that the processing of Plaintiffs' applications was a two-month undertaking that they would not even commence until ordered by this Court to do so, *see* Jt. Mot. ¶ 5.

But even if Defendants could point to some genuine delay, preliminary relief would still be appropriate. There is no likelihood of harm to Defendants, let alone sufficient harm to outweigh Plaintiffs' undisputed injuries. *See* Pls.' Br. at 32; *Candle Factory*, 23 F. App'x at 138

32

(describing balancing test in the case of movant's delay). Defendants assert that Plaintiffs' "delay" "will double the workload of staff because OASH will, in effect, be administering two versions of the TPP Program." Defs.' Br. at 31. But it was Defendants' choice to terminate Plaintiffs' grants and recompete the TPP Program funds, making any purported "administrative problems" entirely of Defendants' own making. It is also unclear how the modest relief requested by Plaintiffs—the mere processing of the applications of a handful of grantees—could "double the workload" of agency. Indeed, the preliminary Grants Notices that HHS issued this week state that applications for the "recompeted" grants will not be due until June 29, 2018— long *after* the time it would take to process Plaintiffs' year-four applications even on Defendants' two-month timetable.[17] Moreover, HHS advised Plaintiffs this week that "OAH Project Officers will be stopping all check-in calls with TPP grantees *immediately*," which underscores the minimal burden that the purported "two versions of the TPP Program" entail. Morse Decl. Ex. B.

Defendants' claims of public injury are equally unconvincing. *See* Pls.' Br. at 32. Failing to address the plain harms to the public from the termination of important public health grants midstream, Defendants insist that the requested relief would "deprive the public of the opportunity to participate in a competitive grantmaking process." Defs.' Br. at 32. Yet they do not explain why the public has an interest in duplicating a competitive grantmaking process that occurred just three years ago without even a suggestion of any impropriety in the first competition. And any such harm, again, is of Defendants' own making; it was their choice to award five-year grants to these 81 grantees in 2015, then to throw out those grants. Nor can Defendants credibly maintain that Plaintiffs' suit would harm the public fisc, when Defendants' action in cutting short the TPP Program grants will waste millions of federal dollars already spent on long-term scientific studies and evidence-based programming. *See, e.g.*, Paluzzi Decl. ¶ 24 (explaining that Healthy Teen Network has abandoned the Spanish language portion of its

---

[17] *See* 2018 Grants Notices, *supra* n.1.

study, although a major aim of the Tier 2B grants was to address the critical gap in evidence-based sexual health education for Latino youth). To the contrary, the public's interest unquestionably is in the lawful and orderly completion of competitively awarded, high-performing grant projects and the safeguarding of federal dollars appropriated to fund them.

## IV. The Court Should Decide Plaintiffs' Motion; Defendants' Cross-Motion Should Be Rejected

The parties' filings make clear that no material facts are in dispute and this APA case is ripe for decision on the law. *PPG v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) (when final agency action is challenged in district court, that court sits "as an appellate tribunal, not as a court authorized to determine in a trial-type proceeding whether the agency's decision was factually flawed") (internal quotation marks omitted); *Andreas-Myers v. NASA*, Case No. GJH-16-3410, 2017 WL 1632410, at * 5 (D. Md. Apr. 28, 2017) (in reviewing APA case, "the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did") (internal quotations and citations omitted). Because Plaintiffs' motion for permanent injunction, if granted, would dispose of the issues in their entirety, the Court need not in the first instance adjudicate the legal issues through Defendants' cross-motion with its attendant presumptions and inferences. But if the Court denies Plaintiffs' motion, Defendants' Cross-Motion should also be denied because Plaintiffs have pled more than plausible claims and demonstrated that Defendants are not entitled to judgment as a matter of law.[18] *See supra* §§ I-III; Fed. R. Civ. P. 8(a)(2), 12(b)(6) & 56(a).

---

[18] The Court should reject Defendants' efforts to have Plaintiffs' claim for "equitable relief to preserve remedy" dismissed. *See* Defs.' Br. at 34 (citing Am. Compl. Count III, ECF No. 16). The parties have stipulated that "[i]n order to preserve Plaintiffs' remedies should they prevail in this matter, Defendants will preserve and refrain from obligating, through August 31, 2018, any monies appropriated for the TPP Program that would fund Plaintiffs' grants. *See City of Houston, Tex. v. Dep't of Hous. & Urban Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994)." Jt. Mot. ¶ 4. *City of Houston* holds that a court "cannot reach" relevant funds to award relief in a grant funding dispute if the relevant "appropriation lapses" or if the funds "have already been awarded to other recipients" and instructs a plaintiff in such a dispute to seek judicial intervention to preserve the

## CONCLUSION

For the foregoing reasons and those stated in Plaintiffs' opening brief, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss or for summary judgment and grant Plaintiffs injunctive relief requiring Defendants to process Plaintiffs' year-four applications in compliance with the governing regulations.

Dated: April 11, 2018

Respectfully submitted,

DEMOCRACY FORWARD FOUNDATION

*/s/ Josephine T. Morse*

Javier M. Guzman, D.C. Bar #462679
*(Pro Hac Vice)*
Josephine T. Morse, N.Y. Bar
#4505673 *(Pro Hac Vice)*
Jeffrey B. Dubner, D.C. Bar #1013399
(*Pro Hac Vice*)
Skye L. Perryman, D.C. Bar #984573
(*Pro Hac Vice*)
1333 H St. NW, 11th Floor
Washington, DC 20005
(202) 448-9090
jguzman@democracyforward.org
jmorse@democracyforward.org
jdubner@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*

PERKINS COIE, LLP
Barry J. Reingold, Bar No. 06490
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

---

funds. 24 F.3d at 1427. Should the facts concerning the funding for Plaintiffs' grants change from those in the stipulation, Plaintiffs reserve the right to act in accordance with *City of Houston*.

*Attorney for Healthy Teen Network*

Andre M. Davis #00362
City Solicitor

Suzanne Sangree #26130
Senior Counsel for Public Safety & Director of
  Affirmative Litigation

Gabriel Auteri*
General Counsel to Baltimore City Department of
  Health

Elizabeth R. Martinez #29394
Assistant Solicitor, Litigation

City of Baltimore Department of Law
City Hall, Room 109
100 N. Holliday Street
Baltimore, MD 21202
443-388-2190
Andre.Davis@baltimorecity.gov
suzanne.sangree2@baltimorecity.gov
Gabriel.Auteri@baltimorecity.gov
liz.martinez@baltimorecity.gov

*Attorneys for Mayor and City Council of Baltimore*

 *Application for Admission to United States District
Court, District Court of Maryland pending*

**CERTIFICATE OF SERVICE**

I certify that on April 11, 2018, I filed the foregoing with the Clerk of the Court using the ECF System which will send notification of such filing to the registered participants as identified on the Notice of Electronic Filing.

/s/ *Josephine T. Morse*

DEMOCRACY FORWARD FOUNDATION

Javier M. Guzman, D.C. Bar #462679
*(Pro Hac Vice)*
Josephine T. Morse, N.Y. Bar #4505673
*(Pro Hac Vice)*
Jeffrey B. Dubner, D.C. Bar #1013399 (*Pro Hac Vice*)
Skye L. Perryman, D.C. Bar #984573 (*Pro Hac Vice*)
1333 H St. NW, 11th Floor
Washington, DC 20005
(202) 448-9090
jguzman@democracyforward.org
jmorse@democracyforward.org
jdubner@democracyforward.org
sperryman@democracyforward.org

*Attorneys for Plaintiffs*