# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| HEALTHY TEEN NETWORK, *ET AL.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ALEX M. AZAR II, IN HIS OFFICIAL CAPACITY AS )<br>SECRETARY, U.S. DEPARTMENT OF HEALTH )<br>AND HUMAN SERVICES, *ET AL.*, )<br><br>Defendants. ) | Civil Action No. 1:18-cv-00468-CCB |

## REPLY BRIEF IN SUPPORT OF DEFENDANTS' CROSS-MOTION TO DISMISS OR FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 2

ARGUMENT ..................................................................................................................... 3

    I.   The Anti-Deficiency Act and *Leiter* Bar Agreements Purporting to Obligate the Government For More Than One Fiscal Year ................................................................ 4

    II.  HHS Did Not Violate the APA Because It Did Not Terminate the Grant Awards ........... 7

        A.  The Regulations Do Not Support a Five-Year "Period of Performance" ............... 7

        B.  The Grant Awards and the Grants Policy Statement Provide HHS With Significant Discretion in Managing TPP Program Funds ..................................... 12

        C.  *Califano* Does Not Support Plaintiffs' Claim ...................................................... 15

CONCLUSION ................................................................................................................. 19

# INTRODUCTION

Plaintiffs' sole remaining contention is that their original grant awards obligate HHS to continue funding their programs for five full years unless Congress ends the TPP Program altogether or Plaintiffs engage in conduct that justifies grant "termination." Absent this purported right to five years of funding, Plaintiffs' termination claim fails. This "right," however, is illusory: plaintiffs' theory misinterprets the governing framework and contradicts the explicit terms they accepted in their awards. The grant award terms provide that HHS can reconsider the program's interests and recompete future years of funds to the public (including Plaintiffs), and the terms specify that such a decision is not a "termination." Indeed, the fact that Plaintiffs had to file annual applications to be considered for further funding awards belies their claim to five-year funding. But Plaintiffs ask the Court to ignore these facts and the plain terms of their awards.

Plaintiffs' construction of their purported entitlement also contradicts appropriations law. Congress passed the Anti-Deficiency Act to prohibit executive agencies from committing the government to obligations before Congress has made an appropriation for that obligation. Plaintiffs' theory would commit the government to multi-year funding of the grants with no control and no option over whether to continue (or, instead, recompete) if further funds are appropriated.

The terms and conditions of Plaintiffs' grant awards, HHS's regulations governing those awards, and the fiscal constraint on HHS imposed by the Anti-Deficiency Act all compel one conclusion: Plaintiffs have no legal right to further funding and HHS's decision not to renew it is not a reviewable "termination." With no statute or case law on point to support their theory, Plaintiffs rely incorrectly on a single cross-reference in HHS's regulations and a forty-year-old

D.C. Circuit case that did not address entitlement to future funding, did not examine the regulatory language at issue here, and that was superseded by HHS's predecessor shortly thereafter. But Plaintiffs have no vested interest in continued funding. The decision to recompete a grant program is committed to agency discretion under § 701(a)(2) of the Administrative Procedure Act (APA). This Court should therefore grant Defendants' cross-motion for summary judgment and dismiss this case with prejudice.

## ARGUMENT

Several of Plaintiffs' initial arguments have already fallen by the wayside. Plaintiffs have voluntarily withdrawn their appropriations- and impoundment-based arguments, conceding that HHS has not impounded Fiscal Year (FY) 2018 appropriations for the TPP Program. *See* Pls.' Opp. at 2 n.1. Plaintiffs have also failed to meet their burden to identify any waiver of sovereign immunity in response to Defendants' motion to dismiss Count III, and also appear to concede that their claim in Count III is not ripe. Pls.' Opp. at 34 n.18; *see Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003) (an "abstract disagreement[] over administrative policies" is not ripe for adjudication).

The sole issue before the Court, therefore, is whether HHS violated the APA by not renewing Plaintiffs' grants. It did not. When Congress "delegate[s] policymaking responsibilities" to an agency, as it did with the TPP Program, it is understood that "the *incumbent* administration's views of wise policy" will govern those decisions. *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 865 (1985) (emphasis added). Because the President is "accountable to the people," agencies operating under him are entitled to "resolv[e] the competing interests which Congress … intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities." *Id.* at 865-66. Incumbent officials are not required to administer the TPP Program according to the priorities of

a *previous* administration based on commitments by the prior administration to fund a specific set of grants on a non-competing basis for multiple years. Moreover, politically accountable administrators may properly exercise discretion when Congress delegates authority to them. This is a feature of administrative law, not a flaw.

I.      **The Anti-Deficiency Act and *Leiter* Bar Agreements Purporting to Obligate the Government For More Than One Fiscal Year**

The TPP Program, as conceived by Plaintiffs, requires funding for five years of Plaintiffs' projects based on annual appropriations. Because Congress has not exempted the TPP Program from the Anti-Deficiency Act or otherwise made a continuing appropriation to authorize multi-year grants by HHS, the Supreme Court's seminal decision in *Leiter v. United States*, 271 U.S. 204, 206 (1926), is controlling. *See also Gov't Sys. Advisors, Inc. v. United States*, 13 Cl. Ct. 470, 473 (1987) (noting that the government in *Leiter* had "determined that it was in government's best interest not to renew" the lease). Including in the agreement a right to terminate (based on the grantee's failure to comply with a grant's terms and conditions) does not resolve a *Leiter* problem, because such a provision does not require the government to "affirmatively continue" the agreement. 271 U.S. at 207; GAO Principles of Federal Appropriations Law, 3rd ed., vol. 2, ch. 6, at 6-54, GAO-06-382SP [hereinafter "GAO Red Book"][1] (3rd ed. 2015), https://www.gao.gov/ assets/210/202819.pdf ("The reservation of a right to terminate does not save the contract from the prohibition against binding the government in advance of appropriations."); *Comptroller General Warren To The Postmaster General*, 28

---

[1] The Congressional Budget and Impoundment Control Act of 1974 gives the Government Accountability Office (GAO) specific oversight duties on budgetary matters. *See generally* 31 U.S.C. § 1112(c). GAO publishes the *GAO Red Book* to advise the public of its views on appropriations law. Although not binding, the "opinion of the Comptroller General is, of course, entitled to weight as he is the auditing agent of Congress." *Pac. Legal Found. v. Goyan*, 664 F.2d 1221, 1227 (4th Cir. 1981).

Comp. Gen. 553, April 1, 1949 (concluding thirty-day notice and one-day "for-cause" termination provisions did not cure an Anti-Deficiency Act violation). *Leiter* also specifically held that the Anti-Deficiency Act is not satisfied merely by rendering a multi-year funding obligation dependent on future appropriations. *See Leiter*, 271 U.S. 204, 206-07; *see also GAO Red Book*, vol. 2, ch. 6, at 6-55. HHS retains authority to decide how to apply newly appropriated funds.

Plaintiffs attempt to sidestep the Anti-Deficiency Act's constraints by arguing that the "project period" system does not impose an "obligation for the payment of money" on the government when the initial award is conferred. Pls.' Opp. at 9-10. But unless Plaintiffs' had a legal right to multi-year funding when Defendants initially awarded the TPP Program grant, they have no basis for their suit here. That is, Plaintiffs' claim arises only if HHS had a legal duty to renew Plaintiffs' funding for five years without competing the funds, subject only to appropriations and the "termination" provisions of 45 C.F.R. § 75.372(a). If, in July 2015, the government incurred no obligation for FY 2018 and FY 2019 TPP Program funds, Plaintiffs have no vested legal interest on which to challenge the government's July 2017 decision not to make further continuation awards. On the other hand, if the government's initial award obligated HHS to fund all future years, that promise was void *ab initio* because it would have obligated funds in advance of any appropriation. (And *Leiter* teaches, as noted above, that the clause in Plaintiffs' awards providing that future funding is dependent on appropriations, *e.g.*, Paluzzi Decl., Ex. A, at 1, does not alone render the grants compliant with the Anti-Deficiency Act.)

Plaintiffs draw a meaningless distinction between grants (or cooperative agreements) and procurement contracts. *See* Pls.' Opp. at 11-12.[2] Of course, grants are not procurements, but they nevertheless create binding obligations between grantor and grantee.[3] The Anti-Deficiency Act applies not just to procurements, but to all financial "obligations" beyond a lawful appropriation, including a commitment to fund a grant. 31 U.S.C. 1341(a)(1)(A) ("[a]n officer or employee of the United States Government ... may not ... make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."); *see also Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 430 (1990) ("It is a federal crime, punishable by fine and imprisonment, for any Government officer or employee to knowingly spend money in excess of that appropriated by Congress."); *cf. Md. Dep't of Human Res. v. HHS*, 854 F.2d 40, 42 (4th Cir. 1988) ("The Secretary of HHS, while under a statutory duty to schedule the transfer of grant money, is also obliged to comply with the applicable provisions of the Antideficiency Act[.]"); *E. Band of Cherokee Indians v. United States*, 16 Cl. Ct. 75, 78-79 (1988) (Anti-Deficiency Act prohibited Interior Department from reallocating funds to satisfy Indian entitlement program). And the *GAO Red Book*, upon which Plaintiffs rely, expressly provides that "grant obligations and expenditures are subject to the [Anti-Deficiency Act]." *GAO Red Book*, vol. 2, 3d ed., ch. 10, at 10-43. Thus, whatever distinctions may exist between grants and contracts is not relevant here.

The *GAO Red Book* confirms this conclusion. The Plaintiffs' agreement with the government is closely analogous to "a contract covering the needs or requirements of more than

---

[2] The government uses a cooperative agreement as the granting instrument when, as here, the funding carries out a public purpose and "substantial involvement is expected between the executive agency and the State, local government, or other recipient." 31 U.S.C. § 6305(2).

[3] Indeed, absent binding terms, Plaintiffs' claimed "entitlement" would be utterly baseless.

one fiscal year." *See GAO Red Book*, vol. 2, 3d ed., ch. 6, at 6-51 through 6-59. No source of law exists that would exempt this agreement from the Anti-Deficiency Act's strictures.

## II.    HHS Did Not Violate the APA Because It Did Not Terminate the Grant Awards

### A.   The Regulations Do Not Support a Five-Year "Period of Performance"

Plaintiffs have no claim unless they can prove they had a multi-year right to funding that was "terminated." But HHS's inability to commit to multi-year funding, as explained above, clarifies that HHS was not required under the regulations to terminate the grant. "Termination" refers to the withholding of grant funding before "the planned end of period of performance." 45 C.F.R. § 75.2.[4] A "period of performance" is "the time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award." *Id.* The only "time" period in the grant documents consistent with this definition is the "budget period." Work is "authorized under the Federal award" on a "budget period" basis, and the "time during which the non-Federal entity may incur new obligations to carry out" that "work" is that same one-year "budget period." *Id.* (defining "federal award," as relevant here, as "the instrument setting forth the terms and conditions" of the grant, such as the "cooperative agreement"). Future "budget periods" within a "project period" are not "authorized under the federal award" that Plaintiff receives annually; they are projections of future funding that will not be authorized until an appropriation is in place and HHS obligates those funds through a Notice of Award entered under the authority of that appropriation. Because Defendants have not ended Plaintiffs'

---

[4] Plaintiffs erroneously emphasize the use of the word "planned" in the definition of termination. Pls.' Opp. at 14 n.7. A termination ends an award prematurely (*i.e.*, before the end of the obligated budget period).

funding in the middle of a "budget period," there has been no "termination" here that would trigger the requirements of 45 C.F.R. § 75.372-73.

Plaintiffs – recognizing that the substantive definition of "period of performance" undercuts their theory (they do not ever cite the full definition) – redirect the Court to the cross-reference in 45 C.F.R. § 75.2 between the terms "project period" and "period of performance." Pls.' Opp. at 6-7. If the five-year "project period" were the "period of performance," however, Plaintiffs could "incur new obligations to carry out the work authorized under the federal award" for the entire five-year "project period" even though work is "authorized under the federal award" only for one-year "budget periods." Indeed, Plaintiffs appear to embrace improper conduct by suggesting a grantee can incur obligations before funds are even appropriated (for example, by incurring FY 2018 obligations in FY 2017). *See* Pls.' Opp. at 8 (arguing that HHS policies "do[] not suggest, let alone state, that grantees may only obligate funds in the year in which funds are appropriated").

The entire structure of the annual TPP Program award process is inconsistent with a five-year obligation. Instead, under the initial Notice of Award, the grantee is awarded a one-year budget period, with the possibility of funding through the five-year project period. Generally, absent a decision to recompete the funds, each year a grantee must apply for continuing funds for the following year. *See* Hunt Decl., Ex. B, at I-34. And, each year, HHS reviews the noncompeting continuing applications and determines whether to issue a continuing grant for the following budget year. The regulations even require that any "carryover funding" – that is, use by a grantee of funds from one prior budget period in a later budget period, *see* 45 C.F.R. § 75.309(a) – must be expressly approved by a grants management officer, after receipt of a timely

request by the grantee.  *See* Hunt Decl., Ex. B, at II-56-57.  This is all consistent with a one-year budget scheme.

Plaintiffs attempt to generate confusion where none exists with their discussion of the "closeout" procedures provided for in 45 C.F.R. §§ 75.381 and 75.386.  Pls.' Opp. at 8.  These regulations provide detailed procedures for closing out grants, including liquidating obligations and refunding unobligated balances "at the end of the period of performance," which Plaintiffs contend would "make no sense to require at the end of each budget period."  *Id.*  Under § 75.381, however, closeout is only required after "all applicable administrative actions and all required work of the Federal award have been completed."  When HHS confers a continuation award, a new budget period begins, the grant funding is awarded, the project continues, and closeout is unnecessary (because "all required work" has not been "completed").  By contrast, when HHS does not renew a continuation award, the grant award – and the time in which Plaintiffs may incur obligations under it – has ended and there is no further work to complete, which triggers closeout obligations.[5]

Plaintiffs' contention that HHS's decision not to make continuation awards is inconsistent with 45 C.F.R. §§ 75.371 & 75.207 fares no better.  These two regulations do not provide the exclusive bases for withholding continuation funding or authorize "withholding" in the best interests of the federal government.  *See* Pls.' Opp. at 22-24.  Plaintiffs attempt to conflate (a) a non-renewal with no funds obligated and (b) a renewal obligating funds but withholding them pending the grantee's compliance with some requirement.  Only the latter is

---

[5] This is why Plaintiffs' FY 2017 awards required closeout at the end of the period of performance.  *See, e.g.*, Wen Decl., Ex. F., at 1.  This outcome is consistent with the Grants Policy Statement's proviso that closeout is due "if the grant will not be extended or after termination."  Hunt Decl., Ex. B, at II-90.

covered by the regulations, because it addresses how HHS will administer an otherwise active award. No such "withholding" in the meaning of the cited regulations occurred here.

Section 75.371, part of a section entitled "Remedies for Noncompliance," is immaterial. The regulations list actions that an agency may take when a grantee does not adhere to "Federal statutes, regulations, or the terms and conditions of a Federal award." *Id.* In addition to suspending or terminating an award, among other options, this regulation identifies "withhold[ing] further Federal awards for the project or program" as a possible remedy for grantee noncompliance. The provision addresses only the correction of grantee non-compliance. It says nothing about HHS's discretion to issue or not issue a continuation award, which is specifically addressed in the Grants Policy Statement.

The other section Plaintiffs cite runs into the same problem. Section 75.207 also addresses only non-compliant (or problematic) grantees. It authorizes HHS to add "specific award conditions" when: (1) an awarding agency's risk assessment deems a grant applicant risky; (2) a grantee "has a history of failure to comply with the . . . terms and conditions of a Federal award"; (3) a grantee "fails to meet expected performance goals"; or (4) a grantee "is not otherwise responsible." § 75.207(a). The subsequent subsection provides a non-exclusive list of conditions that may be imposed under such circumstances, including "[w]ithholding authority to proceed to the next phase until receipt of evidence of acceptable performance within a given period of performance." § 75.207(b)(2). Again, nothing in this section addresses the discretion that HHS may exercise when deciding whether to award non-competitive continuation funding.

Indeed, the Court's acceptance of Plaintiffs' position would disrupt the regulatory scheme. For instance, HHS's internal appeal rules rely on the distinction between decisions to "terminate" a grant (which are always appealable) and the "denial of a noncompeting

continuation award under the project period system" (which is only appealable "where the denial

is for failure to comply with the terms of a previous award").  45 C.F.R. pt. 16, App'x A, at

C(a)(2)-(3) (stating jurisdiction of HHS's departmental appeals board); 42 C.F.R. § 50.404(a)(1),

(4) (same).[6]  Plaintiffs' interpretation of "period of performance" would render the latter

provision redundant because every refusal to extend continuing support would be a

"termination."

     Plaintiffs latch on to a cross-reference that first entered the regulations as part of a

government-wide update that was never intended to be a substantive rule or change existing HHS

policy.  Pls.' Opp. at 6-7.  The 2014 regulations (which added the cross-reference) were

implemented as part of a joint rulemaking to implement uniform guidance published by the

Office of Management and Budget.  But in that update, "[a]gencies [were] not making new

policy with this interim final rule; all regulatory language included here should be consistent

with either the policies in the Uniform Guidance or the agencies' existing policies and practices."

Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's

Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal

Awards, 79 Fed. Reg. 75871, 75873.  Plaintiffs' discovery of five years of guaranteed funding in

a cross-reference is tantamount to finding an "elephant[] in [a] mousehole" and must be rejected.

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001).  Ultimately, Defendants'

interpretation is the only construction consistent with applicable fiscal law and the regulations.

---

[6] *See also* 45 C.F.R. § 75.374(b)(1) (invoking these appeal rules in HHS's general grant
administration principles); 45 C.F.R. § 75.2 (defining "Departmental Appeals Board" with
respect to part 16 of title 45).

**B. The Grant Awards and the Grants Policy Statement Provide HHS With Significant Discretion in Managing TPP Program Funds**

The grant award terms and the Grants Policy Statement reinforce this conclusion, by providing HHS substantial discretion in managing TPP Program awards. Confronted here with the plain language of the Grants Policy Statement, a 217-page guidance document that has governed HHS's and the Plaintiffs' entire grant relationship, Plaintiffs assert that the Grants Policy Statement does not apply. *See* Pls.' Opp. at 22-26. Plaintiffs consented to the Grants Policy Statements in accepting each of their three Notices of Award. *See* Paluzzi Decl., Ex. A, at 5 ¶ 4, Ex. C at 4 ¶ 4 & Ex. K at 4 ¶ 1; Wen Decl., Ex. A at 4-5 ¶ 4 & Ex. F at 3 ¶ 1; Hunt Decl., Ex. I at 4 ¶ 4. They have also drawn down millions of dollars in federal funding after being expressly advised that acceptance of funds is an acceptance of the Grant Policy Statement. Now, when that guidance disproves their claim for future funding, Plaintiffs should not ask the Court to ignore the guidance.

As incorporated into the Notices of Award,[7] the Grants Policy Statement provides that the "projections of future funding levels" during a "project period" "are not guarantees that the project or program will be funded or will be funded at those levels" and "create no legal obligation to provide funding beyond the ending date of the current budget period as shown in the [Notice of Award]." Hunt Decl., Ex. B, at I-34. HHS can choose to compete a grantee's

---

[7] Plaintiffs suggest that certain provisions of the Grants Policy Statement do not apply because the awards stated only that recipients must "comply" with the terms and conditions of HHS's policy. Pls.' Opp. at 27. Plaintiffs slice their obligations under the Grants Policy Statement far too thinly. By regulation, HHS "must include wording [in the Notice of Award] to incorporate, by reference, the applicable set of general terms and conditions. [T]he reference must be to the Web site at which the HHS awarding agency maintains the general terms and conditions." 45 C.F.R. §75.210(b). The Notices of Award do exactly that. *See, e.g.*, Paluzzi Decl., Ex. A, at 5 ¶ 4 ("You must comply with all terms and conditions outlined in the grant award, including grant policy terms and conditions contained in [the] applicable [HHS Grant Policy Statement] ….").

funds instead of renewing continuing support if it concludes, "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." *Id.* at II-89. That choice is different in kind from a "termination," which is treated separately in the Grant Policy Statement (*compare id.*, at II-89, *with id.* at II-90) and the regulations (*compare* 45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3), *with* 42 C.F.R. § 50.404(a)(1), (4)). Plaintiffs accepted these provisions when they drew down funds. They cannot ignore them or cherry-pick from them when categorizing Defendants' representations about the conditions of their grant funding. In short, they must "take the bitter with the sweet." *Arnett v. Kennedy*, 416 U.S. 134, 154 (1974)

Plaintiffs' only response to the Grants Policy Statement is to insist that their grants were "terminated," but their reasoning begs the question. Pls.' Opp. at 22. HHS's decision not to extend continuing support (that is, not to make a non-competing continuation award for future funding) is not a "termination."

The Grants Policy Statement furnishes HHS with discretion to make changes to the TPP Program, if it serves the best interests of the government. *See* Hunt Decl., Ex. B, at II-89. This discretion is fully consonant with federal fiscal law. *See Leiter*, 271 U.S. at 205-06; *Gov't Sys. Advisors*, 13 Cl. Ct. at 473. Under the Grant Policy Statement, Plaintiffs had no vested legal right to further funding beyond any budget period; it remained always subject to the agency's discretion. The Grants Policy Statement made this condition express by providing that an award's "projected levels of future support are contingent on . . . the continued best interests of the Federal government." Hunt Decl., Ex. B., I-34. The Statement also provided that projected support levels "are not guarantees that the project or program will be funded or will be funded at those levels, and they *create no legal obligation* to provide funding beyond the ending date of the current budget period as shown in the [Notice of Award.]" *Id.* (emphasis added).

Plaintiffs incorrectly argue, in the alternative, that, even if HHS had authority to cease making continuation awards under the Grants Policy Statement, HHS must issue a reason for the decision. Pls.' Opp. at 28. But reviewability is a threshold issue, and must be adjudicated before the Court evaluates the sufficiency of any reasons provided. The cases Plaintiffs rely upon, including *Dairy Maid Dairy, Inc. v. United States*, 837 F. Supp. 1370, 1377 n.1 (E.D. Va. 1993), are inapposite. In *Dairy Maid*, for example, a government contractor protested an adverse procurement decision pending resolution of its post-award bid protest. *Dairy Maid*, 837 F. Supp. at 1377. The bid protest triggered a statutory automatic stay of procuring activity, which the agency could override upon "*a written finding* (I) that performance of the contract is in the best interests of the United States; or (II) that urgent and compelling circumstances" would not permit waiting for a GAO decision. *Id.* (citing 31 U.S.C. § 3553(d)(2)) (emphasis added). Because the agency lifted the automatic stay without making *any* findings in compliance with the statutory requirement, the district court held that the override of the automatic stay was arbitrary and capricious. *Id.* 1379-81. Unlike the express statutory requirement in *Dairy Maid*, which mandated a "written finding," neither the Grants Policy Statement nor any other statute, regulation, or guidance applicable here requires a "written finding" of any kind. *See* Hunt Decl., Ex. B, at I-89 ("An [operating division] may decide not to make a non-competing continuation award . . . for one or more of the following reasons: . . . For whatever reason, continued funding would not be in the best interests of the Federal government."). Instead, as explained in Defendant's Opposition and Cross-Motion at pages 24-27, HHS's decision not to issue continuation awards was committed to agency discretion and is unreviewable.[8]

---

[8] Plaintiffs argue that Defendants offer only "post hoc rationalizations" to justify the decision not to renew their grants, but their argument sidesteps § 701(a)(2), which provides HHS with discretion in deciding where to allocate TPP Program funds. For this reason, *City of Kansas City*

As a last resort, Plaintiffs fall back on the funding opportunity announcements ("Funding Announcements") as the source of their five-year funding commitment. *See* Pls.' Opp. at 4-5, 26-28. No statement in those documents guarantees multi-year funding absent a termination for cause or a lapse in appropriations. The Funding Announcements, for example, note that funding is only provided on a "budget period" basis, even though projects are "generally approved" for a longer period of "up to" or "not to exceed" five years. *See* Hunt Decl., Ex. A, at 32. Further, the Funding Announcements, unlike the Notices of Award, created no rights. *Cf. Eplus Tech., Inc. v. AMTRAK*, 407 F. Supp. 2d 758, 761 (E.D. Va.2005) ("A request for bids is not an offer, rather the bid itself is an offer, which creates no right until it is accepted by the offeree."). Finally, even if the Funding Announcements erroneously suggested that the TPP Program offered five-years of funding, it is clear that HHS had no authority to make such a commitment under the Anti-Deficiency Act and its own agency guidance. Absent express authority to so bind the government, the agreement would be unenforceable. *See* Defs.' Opp. at 15.

### C. *Califano* Does Not Support Plaintiffs' Claim

With little to support their claim of "terminated" five-year grants, Plaintiffs resort in their reply to *S. Mut. Help Ass'n v. Califano*, 574 F.2d 518, 526 (D.C. Cir. 1977), a case they never cited in their opening brief. In that case, HHS's predecessor agency (the Department of Health,

---

*v. HUD*, 923 F.2d 188 (D.C. Cir. 1991), on which they rely, is inapposite. In *Kansas City*, HUD terminated a grant to Kansas City based on certain untimely evidentiary submissions. *Id.* at 193-94. When it became clear during litigation that the submissions were timely, HUD attempted to change its reason for the termination. *Id.* at 194. Unlike the reviewable for-cause termination in *Kansas City*, HHS's decision here is committed to agency discretion by law. *See* Defs.' Opp. at 24-26 & n.10; *see also Angelex Ltd. v. United States*, 723 F.3d 500, 508 (4th Cir. 2013) ("The reasonableness of the [administrative] decision cannot be determined pro forma in a vacuum, but only in the context of the standards intended by Congress."); *Speed Mining, Inc. v. Fed. Mine Safety & Health Review Comm'n*, 528 F.3d 310, 317–18 (4th Cir. 2008) (holding that agency guideline document could not "form a workable standard for reviewing the [agency's] action").

Education, and Welfare, or "HEW") denied a former grantee's application for continuing funding based on an allegation that the grantee had engaged in serious misconduct. *Califano*, 574 F.2d at 520-21. The D.C. Circuit agreed that HEW had "terminated" the grant after reviewing the overall regulatory context and accompanying policy statements. *Id.* at 526. As relief, the Court ordered a hearing to afford that plaintiff an opportunity to rebut the allegations against it and have them "stricken from the record, in whole or in part[,]" if appropriate, in order to redress the reputational harm the plaintiff alleged as a result of HEW's allegations. *Id.* at 528. Plaintiffs argue that *Califano* is "strikingly similar" to the situation here, Pls.' Opp. at 12, but *Califano*'s similarity is more superficial than genuine.

The procedural posture and asserted injury in *Califano* shaped the D.C. Circuit's decision in ways that make it inapposite here. The grantee in *Califano* was not claiming entitlement to additional funding in the remaining fiscal years covered by the "project plan," because the "fiscal years [had already] passed[.]" *Id.* at 522 n.22. The D.C. Circuit grounded standing not on the possibility of future grant awards under its "project plan," but on "the assertion … that its good name and reputation have been damaged." *Id.* at 524. HEW took the position that the regulations only provided for an administrative appeal in the event of a "termination." *Id.* at 521. In order to ensure "maximum due process" and "avoid deciding constitutional questions" regarding the plaintiff's right to a hearing, the D.C. Circuit read HEW's regulations at the time "in the light most favorable to the grantee" to reach the conclusion that a "termination" had occurred and guarantee the plaintiff a hearing to contest the misconduct charges. *Id.* at 525, 527.

The posture of this case could not be more different. Unlike the plaintiff in *Califano*, Plaintiffs here seek additional grant funding, not a hearing. Courts have already ruled that grantees lack a due process right to continued funding, which would be necessary to extend

*Califano*'s logic to the facts of this case. *Nat'l Consumer Info. Ctr. v. Gallegos*, 549 F.2d 822,

828 & n.6 (D.C. Cir. 1977) ("four years of funding" of grants on a "year-to-year basis," coupled

with "ambiguous representations" regarding continued funding, did not create a right to

continued funding for due process purposes); *Mil-Ka-Ko Research & Dev. Corp. v. Office Of*

*Econ. Opportunity*, 352 F. Supp. 169, 173 (D.D.C. 1972) ("A denial of an application for

refunding … is merely the disappointment of a 'unilateral expectation' of a benefit and is

unencumbered with the constitutionally required burden of procedural due process."), *aff'd*, 497

F.2d 684 (D.C. Cir. 1974); *cf. Virginia Dep't of Educ. v. Riley*, 23 F.3d 80, 87 (4th Cir. 1994)

(education statute expressly required a pre-termination hearing not present here; otherwise, court

had "no desire to interfere with the complex administration of a federal grant program")

 Another contemporaneous decision from the Court of Claims considered an argument

similar to the one presented in *Califano* as a basis for extracting further funding, rather than mere

procedural protections, but rejected it on the grounds that a grantee had no legal entitlement to

future years of funding within a "project period." *See Missouri Health & Med. Org., Inc. v.*

*United States*, 641 F.2d 870, 873-74 (Ct. Cl. 1981) (holding that "[the] regulations make it clear

that HEW was under no obligation to renew [Plaintiffs'] grant …."). And Plaintiffs

understandably do not suggest a legal basis under which it would be proper in this case to read

the regulations at issue in the light most favorable to them, as no rule of administrative law

mandates such deference.

 Finally, HHS's reaction to *Califano* after it was decided should remove any doubt that the

case is not relevant today. After the decision, HEW "clarified its regulations" in order "to

specifically distinguish a termination of previously awarded funds from a denial of further

funding." *In re Nw. Rural Opportunities, Inc.*, DAB 324 (1982), 1982 WL 189564, at *1 & n.1

(discussing 45 C.F.R. § 74.110 (1979) and *Califano*)). HEW also "explicitly exclude[d] refusal to extend a grant or award new funds" from the scope of the regulatory "termination" clause, "citing, as an example, the refusal to make a non-competing continuation award." *Id.* The changes further buttressed "the policies stated in the PHS Grants Administration Manual and PHS Grants Policy Statement" in effect at the time. *Id.* And the distinction between "terminations" and decisions to not offer continuing support persists in both the regulations and the Grants Policy Statement to this day. 45 C.F.R. pt. 16, App'x A, at C(a)(2)-(3); 42 C.F.R. § 50.404(a)(1), (4); Hunt Decl., Ex. B, at I-33, I-34, II-89, II-90.

## III. Because No Grant Was "Terminated," Plaintiffs' APA Claim Fails

With the foregoing legal questions resolved, the proper adjudication of Plaintiffs' APA claim is straightforward. Plaintiffs' "arbitrary and capricious" argument takes as its premise that HHS "terminated" Plaintiffs' grants. Pls.' Opp. at 15-18. But there was no "termination" in this case; Defendants merely chose not to issue further continuing support to Plaintiffs (and all grantees) in order to recompete TPP Program funds. HHS violated no statute or regulation with its decision to recompete the TPP Program at the end of the 2017-18 "budget period."

Consequently, this decision is committed to agency discretion by law under 5 U.S.C. § 701(a)(2). Defendants' opening brief demonstrates that decisions regarding the allocation and selection of participants in a grant program fit squarely within this exception to APA review. Defs.' Opp. at 24-27. With over 500 applications for 81 grants in the last competitive grant cycle, Kretschmaier Decl., ¶ 2, and an absence of statutory or regulatory guidance for a court to employ in second-guessing HHS's allocation of funds, the agency's decision about where to

direct funds is unreviewable under the APA.  Accordingly, the Court lacks jurisdiction under the

APA to review the dispute over Defendants' decision to recompete the grants.[9]

## CONCLUSION

For the foregoing reasons and those in Defendants' cross-motion, the Court should grant

Defendants' motion to dismiss or for summary judgment.

---

[9] Alternatively, Defendants request entry of summary judgment on the administrative record because it was not "arbitrary and capricious" to choose to recompete TPP Program funds under the terms and conditions of the grant award that Plaintiffs accepted by drawing down their TPP Program funds.  *See* Defs.' Opp. at 27-29.

Dated: April 18, 2018                    Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

ROBERT K. HUR
United States Attorney

RUTH A. HARVEY
Director, Commercial Litigation Branch

JOEL McELVAIN
Assistant Branch Director, Federal Programs
Branch

MICHAEL J. QUINN
Senior Litigation Counsel, Commercial
Litigation Branch

/s/ *Alicia M. Hunt*
ALICIA M. HUNT (D.C. Bar No. 484620)
JONATHAN E. JACOBSON
Trial Attorneys
United States Department of Justice
Civil Division, Commercial Litigation Branch
1100 L St. NW, 10th floor
Washington, D.C. 20005
Tel: (202) 307-3548
Fax: (202) 514-9163
E-mail: alicia.m.hunt@usdoj.gov

/s/ *Michael J. Gerardi*
MICHAEL J. GERARDI
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave. NW, Room 7223
Washington, D.C. 20530
Tel: (202) 616-0680
Fax: (202) 616-8460
E-mail: michael.j.Hunt@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 18, 2018, a true and correct copy of the foregoing was served on Plaintiff via their counsel of record through the Court's Electronic Case Filing (ECF) system.

/s/ *Alicia M. Hunt*_____
Alicia M. Hunt