## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

Healthy Teen Network, *et al.*                    *

v.                                                *          Civil Action No. CCB-18-468

Alex M. Azar II, *et al.*                         *

                                                  *
                                              ***

### Memorandum

The plaintiffs, Healthy Teen Network and the Mayor and City Council of Baltimore ("Baltimore City") have sued the defendants, Alex M. Azar II, Secretary of the U.S. Department of Health and Human Services, and the Department of Health and Human Services itself, (collectively "HHS"), claiming that the defendants' decision to end their grant award under the Teen Pregnancy Prevention, ("TPP"), program early is contrary to the agency's regulations and arbitrary and capricious. Healthy Teen Network and Baltimore City now move for a preliminary or permanent injunction. HHS opposes the motion, and has cross moved for dismissal for failure to state a claim or for summary judgment. Because both parties agree that there are no disputed issues of fact, and that the plaintiffs' case presents pure issues of law, the plaintiffs' motion will be treated as a motion for summary judgment.[1] For the reasons stated below, the plaintiffs will be granted summary judgment and the defendants' motion will be denied.

---

[1] In light of the parties' agreement, there is no need to address in detail the elements for granting a permanent injunction, but it is clear that the plaintiffs have met them. The plaintiffs have shown (1) irreparable harm, (Pls.' Mot., ECF No. 18, Ex. 3 Paluzzi Decl. ¶¶ 23-26; ECF No. 18, Ex. 2, Wen Decl. ¶ 33, 35); (2) that the remedies available at law are inadequate because HHS intends to recompete the funding that might otherwise be awarded to them; (3) "that, considering the balance of hardships between the plaintiff[s] and defendants, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *see also Planned Parenthood of Greater Washington & North Idaho, et al. v. U.S. Dep't of Health & Human Services, et al.*, 2018 WL 1934070 at *12-*15 (E.D. Wash. April 24, 2018). Further, the plaintiffs will not be required to post a bond under Federal Rule of Civil Procedure 65(c).

**Regulatory Background**

Although administered through the Office of Adolescent Health in HHS, (Defs.' Mot., ECF No. 27, Ex. B, p. 3), the TPP program is a creature of Congress. For the first time in the Consolidated Appropriations Act of 2010, Congress directed that of the funding appropriated to HHS:

> $110,000,000 shall be for making competitive contracts and grants to public and private entities to fund medically accurate and age appropriate programs that reduce teen pregnancy and for the Federal costs associated with administering and evaluating such contracts and grants, of which not less than $75,000,000 shall be for replicating programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors, of which not less than $25,000,000 shall be available for research and demonstration grants to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy, and of which any remaining amounts shall be available for training and technical assistance, evaluation, outreach, and additional program support activities.

Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034 (2009). The program has been renewed in every appropriations act since, including the 2018 Act. *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. 348 (2018).

As a result of this funding, HHS announced two funding opportunities—labelled Tier 1 and Tier 2—in April 2010. (Am. Compl. at ¶ 23). Tier 1 grants were to be awarded to tried and true program models that had already shown promise in reducing teen pregnancy and delaying sexual activity. (*Id.*) Tier 2 grants were to break ground, and fund new research and programs for reducing teenage pregnancy. (*Id.*)[2]

---

[2] Whether these grants were funded through the budget and project period system—further explained below—is unclear from the parties' briefing.

Five years later, HHS expanded its funding opportunities, this time adding Tier 1B and 2B grants. Tier 1B grants were awarded to "replicate evidence-based TPP programs to scale in communities with the greatest need." (Defs.' Mot., ECF No. 27, Ex. B, p. 3). And Tier 2B grants were designed to test "new or innovative approaches to prevent teen pregnancy." (*Id.*). These two grants provided funding to Baltimore City and Healthy Teen Network.

To support what HHS anticipated would be "substantial programmatic involvement . . . between OAH and the grantee during performance of the project," (Am. Compl. at ¶ 34), Tier 1B and Tier 2B awards were distributed over two periods. The first is called the budget period, and refers to the funding successful applicants were guaranteed for one fiscal year. (Defs.' Mot., ECF No. 27, Ex. B, I-34). The second is called the project period—the amount of funding successful applicants could expect over the course of a five year project plan. (*Id.*) Successful applicants were not guaranteed funding for the entire project period, but were required to submit a non-competing continuation application—which had to include a "progress report for the current budget year, and work plan, budget and budget justification for the upcoming year"—for each of the four budget periods, after the initial award year, during the project period. (*Id.*)

Each award required grantees to "comply with all terms and conditions outlined in their grant awards," and with HHS's Grants Policy Statement. (Defs.' Mot., ECF No. 27, City of Baltimore 2015-16 Notice of Award, Ex. A at 68).[3] The Grants Policy Statement is important for two reasons. First, the Statement warned that funding over the course of a project period is:

> contingent on satisfactory progress, the availability of funds, and the continued best interests of the Federal government. They are not guarantees that the project or program will be funded or will be funded at those levels, and they create no

---

[3] The defendants assert that drawing down awarded funds constitutes acceptance of the award's terms.

legal obligation to provide funding beyond the ending date of the current budget
period.

(Defs.' Mot. ECF No. 27, Grants Policy Statement, U.S. Dep't of Health & Human Servs., Ex. B

at I-34). The Statement further warns that HHS may decide not to "make a non-competing

continuation award" because (1) "[a]dequate Federal funds are not available to support the

project;" (2) "[a] recipient failed to show satisfactory progress in achieving the objectives of the

project;" (3) "[a] recipient failed to meet the terms and conditions of a previous award;" or (4)

"[f]or whatever reason, continued funding would not be in the best interests of the Federal

government." (*Id.* at II-89).

Grant termination is the last piece of this case's regulatory puzzle. HHS regulations

define "termination" as "the ending of a Federal award, in whole or in part at any time prior to

the planned end of period of performance." 45 C.F.R. § 75.2. And "period of performance" is its

own term of art, referring to the "time during which the non-Federal entity may incur new

obligations to carry out the work authorized under the Federal award." 45 C.F.R. § 75.2.

HHS may only terminate a grant award if: (1) the grantee failed "to comply with the

terms and conditions of the award;" (2) "for cause;" (3) "with the consent" of the grantee; or (4)

if the grantee requests termination and provides written notification of the reasons for such

termination. 45 C.F.R. § 75.372(a)(1)-(4).

## Factual Background

Healthy Teen Network and Baltimore City both were awarded funding under the TPP

program in 2015 for five-year project periods ending in 2020.

*Baltimore City*

On June 29, 2015, Baltimore City was awarded an $8.745 million grant over a five year project period, with $1.749 million anticipated for each budget period. (Pls.' Mot., ECF No. 18, Ex. 2, ¶ 9). The award noted that Baltimore City was guaranteed funding for the first year (the budget period) of the project period, and that projected future funding (over the project period) was "subject to the availability of funds and satisfactory progress of the project." (*Id.*) After submitting non-competing applications, Baltimore City was granted funding through year two of the project period. On July 3, 2017, however, Baltimore City received a notice of award for the third budget period, which explained the award and warned that "this award also shortens the project period to end on June 30, 2018," two years earlier than was projected when Baltimore City won funding in 2015. (*Id.* at ¶ 24). The notice did not explain HHS's decision to cut the project period short, although Baltimore City is sure that it "complied with all program requirements throughout the grant," (*id.*), and HHS has not stated otherwise.

Baltimore City appealed the termination of the grant in August of 2017 without response. (*Id.* at ¶ 25). Indeed, HHS still has not provided Baltimore City with any specific reason for its decision to end the City's project period by two years. (*Id.* at ¶ 24).

*Healthy Teen Network*

On July 1, 2015, Healthy Teen Network was awarded $3.6 million in funding over a five year project period, with $723,000 anticipated for each one year budget period.[4] (Pls.' Mot., ECF No. 18, Ex. 3, ¶ 3). As was true for Baltimore City's award, notice of Healthy Teen

---

[4] Healthy Teen Network also received a sub-award from Baltimore City—to increase capacity and provide training for the City's project—and a sub-award from the South Carolina Campaign to Prevent Teen Pregnancy—to help several organizations provide pregnancy prevention programming to teens in juvenile justice or foster care. (Pls.' Mot., ECF No. 18, Ex. 3, ¶ 16).

Network's award warned that the project period merely represents "recommended future support

. . . subject to the availability of funds and satisfactory progress of the project." (*Id.* at p. 10).

Also like Baltimore City, Healthy Teen Network successfully submitted non-competing

continuation applications for the next two years of the project period. On July 6, 2017, along

with its award for year three of the project period, however, Healthy Teen Network was notified

that its project period would be cut short by two years. (*Id.* at ¶ 13). HHS's decision was

unexplained, (*id.* at ¶ 15), and Healthy Teen Network alleges that in August 2017 it was advised

by an HHS employee that there was no use in appealing the agency's decision, (*Id.* at ¶ 18).

***

After ending Baltimore City's and Healthy Teen Network's project periods early, HHS

later provided two public explanations for its decision. It claimed: (1) "that there was strong

evidence of negative impact or no impact by the funded projects;" and (2) that because the

President's proposed budget for Fiscal Year 2018 eliminated funding for the TPP program, HHS

anticipated it would lack funding for the projects and terminated them early. (Am. Compl. at ¶¶

107-08). Healthy Teen Network and Baltimore City contend that these explanations are merely

pretense undercut by HHS's longstanding praise for their work, which persisted even after their

funding was terminated, (Pls.' Mot., ECF No. 18, Ex. 2, ¶¶ 22, 26); by the Tier 1B grants

themselves, which were only awarded to programs that had demonstrated positive results in

reducing teen pregnancy; and by the fact that, despite what the President's budget might have

suggested, only Congress possesses the power to eliminate funding for the TPP program, (Am.

Compl. at ¶¶ 107-10).

The plaintiffs sued HHS on February 15, 2018, and subsequently moved for a

preliminary or permanent injunction. HHS cross-moved for dismissal under Federal Rule of

6

Civil Procedure 12(b)(6) or for summary judgment under Rule 56. The court heard oral argument

on the motions on April 19, 2018.

## Standard of Review

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted

"if the movant shows that there is no *genuine* dispute as to any *material* fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a) (emphases added).  "A dispute is

genuine if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Libertarian Party*

*of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Dulaney v. Packaging Corp. of Am.*,

673 F.3d 323, 330 (4th Cir. 2012)).  "A fact is material if it 'might affect the outcome of the suit

under the governing law.'"  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)).  Accordingly, "the mere existence of *some* alleged factual dispute between the parties

will not defeat an otherwise properly supported motion for summary judgment[.]"  *Anderson*,

477 U.S. at 247-48.  The court must view the evidence in the light most favorable to the

nonmoving party, *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and draw all

reasonable inferences in that party's favor, *Scott v. Harris*, 550 U.S. 372, 378 (2007) (citations

omitted); *see also Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir.

2015).  At the same time, the court must "prevent factually unsupported claims and defenses

from proceeding to trial."  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 526 (4th

Cir. 2003) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)).

## Analysis

The plaintiffs have moved for a permanent injunction, here treated as a motion for

summary judgment, on the grounds that HHS's decision to end their project periods early was

unlawful under the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.*, because (1) it

constituted an improper termination under the agency's regulations and (2) was arbitrary and capricious. For the reasons stated below, the court agrees that HHS's decision was an unlawful termination or, in the alternative, an unlawful arbitrary and capricious decision. The plaintiffs will be granted summary judgment.[5]

I.   Termination

Baltimore City and Healthy Teen Network argue that HHS's decision to end their project periods two years early constituted a termination, an action that may only be taken if one of four conditions is met. And because HHS did not comply with those conditions when it terminated the plaintiffs' project periods early, the action was unlawful. HHS concedes that it did not comply with the regulations governing "termination" but argues that those regulations are not applicable here and that Baltimore City's and Healthy Teen Network's interpretation of "termination" runs counter to the established practice of grant funding.

As further explained below, however, the clear text of the regulations defines the challenged action as a termination. "The [regulatory framework] says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver County Employees Retirement Fund*, 138 S.Ct. 1061, 1069 (2018). The plaintiffs' motion will, thus, be granted.

HHS regulations define "termination" as "the ending of a Federal award, in whole or in part at any time prior to the planned end of period of performance." 45 C.F.R. § 75.2. And HHS may only terminate a grant: (1) if the grantee failed "to comply with the terms and conditions of the award;" (2) "for cause;" (3) "with the consent" of the grantee; or (4) if the grantee requests

---

[5] In a ruling from the bench on April 19, 2018, Judge Jackson of the District Court for the District of Columbia reached a similar judgment, holding that "HHS terminated plaintiffs' federal grants within the meaning of the regulations." *Policy & Research, LLC, et al. v. Department of Health and Human Services*, Civil Action No. 18-346, Transcript of Oral Ruling at pp. 13, 23. Judge Jackson granted summary judgment, as the court does here, after the parties agreed that a judgment on the merits was appropriate. *Id.*, Transcript of Argument at pp. 3-4.

termination and provides written notification of the reasons for such termination. 45 C.F.R. § 75.372(a)(1)-(4). Recall that "period of performance" is its own term of art under HHS regulations, and it refers to the "time during which the non-Federal entity may incur new obligations to carry out the work authorized under the Federal award." 45 C.F.R. § 75.2. And by cross-reference the regulations make clear that the "period of performance" includes, at minimum, the "project period." *Id.* (stating, in full, "Project period (see Period of Performance)."[6] This definition is further bolstered by the regulation's definition of "obligations," which contemplates that grantees may commit funding beyond their current budget period: "when used in connection with a non-Federal entity's utilization of funds under a Federal award, obligations means orders placed for property and services, contracts and subawards made, and similar transactions during a given period that require payment by the non-Federal entity during the same or a *future period*," 45 C.F.R. § 75.2 (emphasis added). Put another way, the clear text of the regulations defines "termination" as "the ending of a Federal award, in whole or in part at any time prior to the planned end of the [project period]." *Id.* And when faced with clear text, the court may not accept alternative agency interpretations. *See Christensen v. Harris County*, 529 U.S. 576, 588 (2000).[7]

Unconvinced by the clarity of its own regulations, HHS asserts several arguments, extraneous to the express text of those regulations, to prove that the "period of performance" is not the "project period" but the "budget period." When facing clear text, however, the court is

---

[6] This cross-reference is a recent, and considered, addition to HHS regulations. In 2014 HHS amended its regulations to adopt the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards promulgated by the Office of Management and Budget. *See* Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75871, 75872 (Dec. 26, 2014). Among the amendments HHS made was an alteration to its definition of "project period" so that it cross-referenced "period of performance." *See id.* at 75875-76, 75896.

[7] To be sure, in cases where the plain meaning of a statute or regulation would lead to absurd results the court may appropriately "treat the text as if it were ambiguous." *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004).

not free to alter its interpretation based on "legislative history, purpose, and post-enactment practice." *See N.L.R.B. v. SW General, Inc.*, 137 S.Ct. 929, 941-42 (2017). But even if the court were to consider HHS's arguments, at best, their extra-textual materials are ambiguous.

Ignoring the fact that nowhere do the regulations suggest that the budget period is the period of performance, HHS argues that the "budget period" makes more sense as the "period of performance" because it represents guaranteed funding, whereas the "project period" provides merely an expectation of future funding. HHS insists that there can be no obligation of funds that have not yet been awarded. But there can be obligations *contingent* on future funding.[8] Indeed, one of the purposes of a five-year period of performance is to give the grantee organization some assurance that, so long as Congress continues to provide funding and they comply with the terms of their grant, they can plan for the necessary staff and facilities to carry out the grant's purpose.

Nevertheless, HHS argues that its Grants Policy Statement supports its view that the budget period makes more sense as the period of performance by stating that: "the amount of Federal funds authorized for obligation and any future-year commitments, is issued for each budget period in the approved project period." (Defs.' Opp., Ex. B, HHS Grant Policy Statement, I-33). Thus, in the agency's view, a grantee can only incur obligations during the budget period and as a result that is the period of performance.

But the Grants Policy Statement is merely a guidance document, and, even if it says what HHS believes it says, does not control over the agency's regulations. Putting that aside, the very next sentence after the part of the Statement quoted by the agency seems to contemplate grantees obligating funds even before their budget period: "until an awarding office has issued a [Notice

---

[8] Plaintiffs do not suggest a contractual obligation to the funds. They concede that if Congress failed to fund the TPP program, they would have no claim on federal money.

of Award] for the initial budget period, any costs incurred by the applicant for the project are

incurred at its own risk." And the document defines "obligations" much the same way HHS's

regulations do: "[t]he amounts of orders placed, contract and subawards, goods and services

received, and similar transactions by a recipient during a budget period that will require payment

during the same or a *future budget period*." (*Id.* at B-7) (emphasis added).[9] Thus, at best, the

Grants Policy Statement provides equivocal support for the government's position. And indeed it

may be evidence that a "project period" is the "period of performance" because its definition of

"obligations" contemplates payment beyond the one-year budget period.

Next, the agency argues that the court's interpretation would violate the Anti-Deficiency

Act. The Act prohibits "[a]n officer or employee of the United States Government" from

"mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an

appropriation or fund for the expenditure or obligation" or from "involv[ing] [the] government in

a contract or obligation for the payment of money before an appropriation is made unless

authorized by law." 31 U.S.C. § 1341(a)(1)(A)-(B). Thus, the Act bars federal employees from

obligating funds "for future payment of money in advance of, or in excess of, an existing

appropriation." *Hercules Inc. v. U.S.*, 516 U.S. 417, 427 (1996) (using the Anti-Deficiency Act

as a backdrop for interpreting agency action).[10]  Because of this, the Act only has relevance if

---

[9] If the court considers extraneous documents related to the TPP program, it also should consider the Funding Opportunity Announcement, which contemplates that the period of performance may be longer than one year. (Defs.' Opp., Ex. A, Funding Opportunity Announcement, p. 33) (stating in full, "Period of Performance: Not to exceed 5 years").

[10] HHS also asserts that *Leiter v. U.S.*, 271 U.S. 204 (1926) counsels in favor of rejecting the plaintiffs' interpretation because there the Court held that an agency may not make multi-year funding commitments for a lease without a specific appropriation authorizing such action. 271 U.S. at 206-07.  Such a commitment is binding in a future year, however, if the Government affirmatively continues the commitment, and if a specific "appropriation [is] made available." *Id.* at 207. For the reasons stated above, the plaintiffs' interpretation would not force HHS to treat the multi-year funding represented by project periods as binding without a congressional appropriation.

the court's interpretation would require a federal officer or employee to authorize funding beyond an existing appropriation. There is no reason to think it would.

Reading "period of performance" as including at least the "project period," as the text clearly commands, means only that the grantee could obligate funding projected in its project period, and not that HHS would be required to provide that funding. Indeed, as the Grants Policy Statement puts it, such obligations would be done at the grantee's own risk—it may or may not receive funding to cover the obligation, but the obligation itself does not affect the discretionary nature of HHS's funding decisions under the TPP program.

Ending on a practical note, HHS insists that "termination" is not one of a number of ordinary functions carried out during a grant funding program but rather best considered as a sanction, used only in limited circumstances such as where the agency fails to comply with the conditions of its award. (*See, e.g.*, Transcript of Oral Argument, pp. 35-36). Treating project periods as the "period of performance" runs counter to long running agency practice, according to HHS, and would threaten the use of project periods—which no one doubts provides a helpful framework for awarding funds—across all grant awarding agencies.

At base, the agency would have the court ask, "Notwithstanding the clear text of its regulations, does the plaintiffs' interpretation make sense as a practical matter?" But the court may not ignore clear text based on past agency practice or prudential considerations, *N.L.R.B.*, 137 S.Ct. at 941-42, and in any event the record as to past practice has not been definitively explored. It may be the case that considering the "project period" as the "period of performance" is impractical. It may also be the case that the agency has never treated a project period as the period of performance. Or it may be the case that the agency has never terminated a grant prior

to the end of its project period where there were no grounds to do so. In any event, unlawful action does not necessarily become lawful by virtue of a long period of unchallenged practice.

On the merits of HHS's counter argument, nothing about the court's ruling would permanently affect the project period system of awarding grants. HHS remains free to amend its regulations to make the period of performance the budget period rather than the project period, and thus line up its governing regulations with what it claims to be ordinary practice. What it cannot do, however, is act as if its regulations say something other than what they say. The period of performance includes the project period.

*** 

Thus, the agency's decision to end Baltimore City's and Healthy Teen Network's project periods constituted a termination. HHS was therefore required to comply with at least one of the four conditions for termination: (1) the grantee failed "to comply with the terms and conditions of the award;" (2) "for cause;" (3) "with the consent" of the grantee; or (4) if the grantee requests termination and provides written notification of the reasons for such termination. 45 C.F.R. § 75.372(a)(1)-(4). Because it is undisputed that none of these four conditions was met, HHS's action was unlawful. [11] Accordingly, the plaintiffs' motion for a permanent injunction will be granted. The agency's decision will be vacated, and the agency will be ordered to process the plaintiffs' non-compete continuation awards consistent with this opinion.

---

[11] HHS does not agree that its decision constituted a termination, but also does not challenge the court's ability to review whether the agency complied with its own regulations if the court determines that its decision was a termination. (*See* Defs.' Mot., ECF No. 27). An agency has no discretion to decide whether and when to abide by its own regulations. *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411-13 (1971) (finding "law to apply" when determining whether an agency complied with statutory directives.)

II.     Arbitrary and Capricious Review

Even if HHS's decision to end Baltimore City's and Healthy Teen Network's grants was not a termination, the plaintiffs claim the decision was still arbitrary and capricious and thus unlawful. Because (1) HHS's decision to end the plaintiffs' project periods early is reviewable; (2) *post hoc* rationalizations cannot cure a decision unreasoned at the time it was made; and (3) the agency failed to consider relevant factors when making its decision, the plaintiffs are granted summary judgment as to this claim as well.

A

As a threshold matter, HHS argues that its decision to recompete Baltimore City's and Healthy Teen Network's funding is a decision committed to agency discretion by law because the appropriations acts that have funded the TPP program delegate broad discretion to HHS to determine how best to spend the money. But the relevant congressional act does impose restrictions on how HHS may distribute TPP funding, and the court has manageable standards to ensure that it acts accordingly.

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. But no such review is available if the "agency action is committed to agency discretion by law." 5 U.S.C § 701(a)(2). Together, these provisions create a "basic presumption of judicial review" of agency action that may be rebutted where "the relevant statute is drawn so that a court would have no manageable standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (internal quotation marks omitted).  An "agency bears a heavy burden in attempting to show that Congress prohibited all judicial review of the agency's compliance with a legislative

mandate." *Mach Mining, LLC v. E.E.O.C.*, 135 S.Ct. 1645, 1651 (2015) (internal quotation marks omitted); *see also Quinteros-Mendoza v. Holder*, 556 F.3d 159, 162 (4th Cir. 2009) ("The Supreme Court has drawn the 'committed to agency discretion' exception extremely narrowly.").

In the context of congressional appropriations, the Supreme Court has determined that courts have "no leave to intrude" on the agency's chosen method of achieving the congressionally determined objects of the appropriation, so "long as the agency" acts within "permissible statutory" bounds. *Lincoln*, 508 U.S. at 193.[12] And although asking whether an agency chose the best method to advance that object is unreviewable, whether the agency acted with the appropriate object in mind is. *See Mach Mining*, 135 S.Ct. at 1652.

Eliding this distinction, HHS insists that Baltimore City and Healthy Teen Network, in demanding that the agency provide reasons for its decision, are really challenging the agency's ability to determine how best to spend TPP program funding.[13] And that is a problem, HHS argues, because it has broad discretion to determine how best to prevent teen pregnancies with the money Congress appropriated for that task, and, as a result, the court lacks a manageable standard by which to judge its decision. HHS is correct, to an extent. Congress's appropriation for the TPP program comes with few restrictions, pregnancy prevention is an issue squarely within HHS's expertise, and how to accomplish that object eludes judicially manageable standards. Yet, the government's argument sweeps too broadly, and misses the subtlety of the plaintiffs' challenge. Baltimore City and Healthy Teen Network challenge HHS's decision to end their project periods as arbitrary and capricious because the agency failed to provide reasons for

---

[12] The Supreme Court also has withheld judicial review of agency decisions "not to institute enforcement proceedings;" "an agency's refusal to grant reconsideration of an action because of material error;" and agency decisions "to terminate an employee in the interests of national security." *Lincoln*, 508 U.S. at 191-92 (explaining precedent).

[13] Indeed, the cases cited in HHS's briefing focus on this issue. *See, e.g.*, *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1536 (S.D.N.Y. 1984) (noting that an appropriation did not "give courts any guidance in sorting among the many projects consistent with the goals stated."). But even *Guttmacher* noted that the relevant act "might . . . permit a court to decide whether a project was particularly inappropriate for funding." *Id.*

its decision, and in doing so asks not for the court to weigh in on the worthiness of the

organizations HHS selected and rejected for funding, but whether HHS acted within permissible

congressional bounds when doing so.[14]

The appropriations act for the TPP program required that HHS use the appropriation to

(1) "fund medically accurate and age appropriate programs that reduce teen pregnancy;" (2) to

"replicat[e] programs that have been proven effective through rigorous evaluation to reduce

teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk

factors;" and (3) "to develop, replicate, refine, and test additional models and innovative

strategies for preventing teenage pregnancy." Consolidated Appropriations Act, 2010, Pub. L.

No. 111-117, 123 Stat. 3034 (2009).[15] At minimum, Congress required that HHS consider

teenage pregnancy prevention when making decisions on how to spend teen pregnancy

prevention funding. Thus, the essential question of the plaintiffs' arbitrary and capricious

challenge may be posed as such: "Notwithstanding HHS's broad discretion to determine which

organizations will receive funding, when it decided to end the plaintiffs' funding did it, among

other things, consider teenage pregnancy prevention at all?" And "in insisting that the [agency]"

follow that restriction, "as the statutory language directs, a court applies a manageable standard."

*Mach Mining*, 135 S.Ct. at 1652.

Demanding that a "recipient agency . . . distribute [its] funds among some or all of the

permissible objects" identified by the relevant appropriations act does not break new ground.

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of America v. Donovan*, 746

---

[14] Thus this case is unlike *Speed Mining, Inc. v. Federal Mind Safety & Health Review Com'n*, 528 F.3d 310 (4th Cir. 2008), where the Fourth Circuit held that because Congress did not impose limitations on the particular agency action challenged by the plaintiffs, the court had no "guidelines against which to measure [the agency's]" action and therefore "no manageable standards to apply." 528 F.3d at 317.
[15] As previously noted, all consolidated appropriations acts since the one passed in 2010 use the same language to fund the TPP program. *See, e.g.*, Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 135 (2017).

F.2d 855, 861 (D.C. Cir. 1984) (J. Scalia).  The Supreme Court has shown similar concern over

policing the outer bounds of Congressional appropriations, in *Lincoln* ("a lump-sum

appropriation . . . give[s] an agency the capacity  to . . . meet its *statutory responsibilities* in what

it sees as the most effective or desirable way"), 508 U.S. at 192 (emphasis added), and also in

*Salazar v. Ramah Navajo Chapter*, 567 U.S. 182 (2012) ("[w]ithin" the constraints imposed by

an appropriations act, an agency's "ability to direct those funds was committed to agency

discretion by law"), 567 U.S. at 192 (internal quotation marks omitted).

In sum, the TPP program appropriation gave HHS discretion to act within

congressionally imposed restrictions, such as that HHS consider teenage pregnancy prevention

when making funding decisions. The court has no business second-guessing the agency's

decision to fund one program over another, but the court does have the authority to ensure that

when making that decision HHS considers statutory restrictions. And in doing so the court

applies manageable standards.

## B

Turning now to the merits of the plaintiffs' claim, Baltimore City and Healthy Teen

Network argue that because HHS did not provide reasons for ending their grants, the action was

arbitrary and capricious within the meaning of the APA.

Section 701 of the Administrative Procedure Act instructs courts to set aside an agency

action if it is arbitrary and capricious. Arbitrary and capricious review "is narrow and a court is

not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.

State Farm Mut. Auto. Ins. Co. et al.*, 463 U.S. 29, 43 (1983). And the court should "uphold a

decision of less than ideal clarity if the agency's path may reasonably be discerned." *Id.* (internal

citation omitted). Still, "an agency [action] would be arbitrary and capricious if the agency"

failed to consider "relevant factors" or "relied on factors which Congress has not intended it to consider." *Id.*

As explained below, HHS's decision was arbitrary and capricious. The agency has not shown that it considered relevant congressional factors when making its decision to end the plaintiffs' project periods early, and *post hoc* rationalizations cannot rehabilitate a decision unreasoned at the time it was made.

Congress declared that funding for the TPP program shall be used to (1) "fund medically accurate and age appropriate programs that reduce teen pregnancy;" (2) to "replicat[e] programs that have been proven effective through rigorous evaluation to reduce teenage pregnancy, behavioral risk factors underlying teenage pregnancy, or other associated risk factors;" and (3) "to develop, replicate, refine, and test additional models and innovative strategies for preventing teenage pregnancy." Consolidated Appropriations Act, 2010, Pub. L. No. 111-117, 123 Stat. 3034 (2009). This text suggests that relevant factors to consider when awarding grants are: (1) whether the program is aimed at preventing teenage pregnancy; (2) whether the program is medically accurate and age appropriate; (3) whether the program has achieved proven results; and (4) whether the program represents an innovative strategy for preventing teenage pregnancy. Thus, the appropriation was not an unrestricted sum of money to use for any purpose that might fall within HHS's broad mandate, but rather directs the agency to use the funds to support proven or innovative medically accurate methods of preventing teenage pregnancy.[16]

---

[16] To be sure, HHS may well receive deference on its own interpretation of the relevant factors in the appropriations act, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984), but that argument misses the point. HHS may interpret the TPP program appropriation to determine the relevant factors for administering grants. It may promulgate regulations and policies related to that interpretation, and still more, it may receive deference on its interpretation of those regulations and policies. *See Auer v. Robbins*, 519 U.S. 452, 461-63 (1997). But HHS does not lay claim to any of those things. It instead relies on its own guidance documents, without reference to congressional authority, to explain an unexplained decision. If agency decisionmaking without concern for relevant factors is arbitrary and capricious, this is the standard's paradigm case.

HHS has not shown that it considered any of these congressionally prescribed factors when making its decision to end the plaintiffs' program periods early, as it did not provide any contemporaneous reasons for its decision.[17] And the court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *N.C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 767 (4th Cir. 2012) (quoting *State Farm*, 463 U.S. at 43). "An agency's view . . . may change . . . . But an agency changing its course must supply a reasoned analysis." *State Farm*, 463 U.S. at 57. Here no such reasoned analysis was provided.

Sidestepping its obligation to provide reasoned decisionmaking, HHS argues that its discretion over the project periods is so broad that it did not have to provide any reason at all for ending the plaintiffs' project periods early. (*See, e.g.*, Transcript of Oral Argument, p. 37-40). But even if that were not true, HHS insists, it did in fact give reasons for its decision, specifically that the programs funded were not performing as HHS expected.[18]

To begin, both parties concede that HHS eventually offered public reasons for ending TPP grants early, and HHS asserts that those reasons are good reasons. They may be, but that is beside the point, because an agency may not justify an action through *post hoc* rationalization. *See Burlington Truck Lines, Inc. v. U.S.*, 371 U.S. 156, 168-69 (1962) ("The courts may not accept [an agency's] *post hoc* rationalizations for agency action.") Rather, an agency must show that its decision was reasoned at the time it was made. Here, neither party asserts that HHS met this requirement. Therefore, HHS's *post hoc* public justifications for its decision cannot carry the agency's burden to provide reasons for its decisions.

---

[17] To be clear, the court does not claim authority to judge how the agency applies these factors. Such decisions are squarely within the agency's expertise. But the court can ensure that HHS considers them when making TPP program funding decisions.

[18] The plaintiffs offer contrary evidence that indicates HHS praised the performance of their programs even after the programs were terminated. (Pls.' Mot., ECF No. 18, Ex. 2, ¶¶ 22, 26).

Falling back, HHS asserts that those *post hoc* rationalizations were unnecessary in any case because the Grants Policy Statement warned grantees that their project periods may be cut short if "[f]or whatever reason, continued funding would not be in the best interests of the Federal government." (Defs.' Mot., ECF No. 27, Grants Policy Statement, Ex. B at II-89). Thus, HHS asserts any reason for its decision would suffice. There are two problems with this view.

The first is that HHS ignores the second, narrowing, clause of the condition it is quoting. HHS cannot provide just any reason for its decision, that reason must be a change in the federal interest. HHS provides no evidence a change in the federal interest motivated its decision here.

The second, and more fundamental, problem with HHS's view is that the "federal interest" does not necessarily mean "the federal interest as determined by HHS." The ultimate touchstone for all agency action is not its own guidance documents, or even regulations, but the power delegated to it by Congress. HHS misses this point by not once considering the appropriation act funding the TPP program, and provides no evidence that Congress authorized HHS to determine the federal interest in the area of teen pregnancy or that Congress nevertheless indicated itself that the federal interest in this area has changed. But still more, by failing to consider Congress's grant of authority, HHS has not shown that an unanchored federal interest is even a relevant factor in distributing grant funding under the TPP program. In fact, congressional appropriations for funding the TPP program, as stated above, suggest that the federal interest must be anchored in, among other things, the prevention of teenage pregnancy. Thus, even under the framework HHS proposes, not only was the agency required to provide reasons for its decision, those reasons had to be related to the relevant factors in the congressional appropriation.

In sum, the text of Congress's appropriations act suggests that HHS was to provide and end grants with some reference to their success in preventing teen pregnancy. HHS may have had a sufficient, lawful reason, for terminating the plaintiffs' project period early, but because it failed to provide a reason in this case, or to meaningfully explain the factors it considered relevant to its decision, it is impossible to determine what was motivating the agency and whether that motivation was relevant at all. HHS's decision was, therefore, arbitrary and capricious.

## Conclusion

For the reasons stated above, the plaintiffs will be granted summary judgment. HHS's decision to terminate the Baltimore City's and Healthy Teen Network's project periods will be vacated, and the agency will be ordered to process the plaintiffs' non-compete applications consistent with this opinion. A separate order follows.

___April 25, 2018_____          _____/s/_____
Date                                                    Catherine C. Blake
                                                    United States District Judge